**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CLERK'S CERTIFICATE AND APPEALS COVER SHEET**

**ABBREVIATED ELECTRONIC RECORD**

Case Caption:  Somerville Public Schools et al v. Trump et al

District Court Number:  25cv10677-MJJ

Fee:  Paid?  Yes _____  No _____  Government filer _X_  *In Forma Pauperis* Yes _____  No _____

Motions Pending  Yes _____ No _X_    Sealed documents  Yes _____ No _X_
*If yes, document #* _____   *If yes, document #* _____

*Ex parte* documents  Yes _____ No _X_    Transcripts  Yes _____ No _X_
*If yes, document #* _____   *If yes, document #* _____

Notice of Appeal filed by: Plaintiff/Petitioner _____   Defendant/Respondent _X_   Other: _____

Appeal from:

# #45 Memorandum and Order

Other information:

     I, Robert M. Farrell, Clerk of the United States District Court for the District of Massachusetts, do hereby certify that the annexed electronic documents:

# #45 and #47

with the electronic docket sheet, constitute the abbreviated record on appeal in the above entitled case for the Notice of Appeal # _47_ filed on _May 22, 2025_.

    In testimony whereof, I hereunto set my hand and affix the seal of this Court on _May 23, 2025_.

**ROBERT M. FARRELL**
Clerk of Court

/s/Mathew A. Paine
Deputy Clerk

COURT OF APPEALS DOCKET NUMBER ASSIGNED: _____

**PLEASE RETURN TO THE USDC CLERK'S OFFICE**

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–10677–MJJ</u>

Somerville Public Schools et al v. Trump et al **DO NOT DOCKET IN THIS CASE: ALL FILINGS TO BE MADE IN 25–CV–10601–MJJ.**
Assigned to: Judge Myong J. Joun
related Cases:  1:25–cv–10601–MJJ
                         1:25–cv–11042–MJJ
Cause: 05:702 Administrative Procedure Act

Date Filed: 03/24/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: Federal Question

**Plaintiff**

**Somerville Public Schools**

represented by **Elena Goldstein**
Democracy Forward Foundation
PO Box 34553
Washington, DC 20043
202–448–9090
Email: <u>egoldstein@democracyforward.org</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel F. Homer**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: <u>rhomer@democracyforward.org</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S. Nugent**
Democracy Forward
P.O. Box 34553
Washington, DC 20043
202–862–1393
Email: <u>vnugent@democracyforward.org</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adnan Perwez**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: <u>aperwez@democracyforward.org</u>
*ATTORNEY TO BE NOTICED*

1

**Kali J. Schellenberg**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: kschellenberg@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
Democracy Forward Foundation
PO Box 34553
Washington, DC 20043
202–448–9090
Email: msamburg@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202–773–0490
Email: wbardwell@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Easthampton Public Schools**          represented by  **Elena Goldstein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel F. Homer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S. Nugent**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adnan Perwez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kali J. Schellenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

American Federation of Teachers          represented by   **Elena Goldstein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel F. Homer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S. Nugent**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adnan Perwez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kali J. Schellenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

American Federation of Teachers          represented by   **Elena Goldstein**
Massachusetts                                             (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel F. Homer**
(See above for address)
*LEAD ATTORNEY*

3

*ATTORNEY TO BE NOTICED*

**Victoria S. Nugent**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adnan Perwez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kali J. Schellenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Federation of State, County, and Municipal Employees, Council 93**

represented by **Elena Goldstein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel F. Homer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S. Nugent**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adnan Perwez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kali J. Schellenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)

4

*ATTORNEY TO BE NOTICED*

**Will Bardwell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **American Association of University Professors** | represented by | **Elena Goldstein**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Rachel F. Homer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S. Nugent**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adnan Perwez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kali J. Schellenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Service Employees International Union** | represented by | **Elena Goldstein**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Rachel F. Homer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S. Nugent**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adnan Perwez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kali J. Schellenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Donald J. Trump**                represented by   **Brad P. Rosenberg**
1100 L Street, NW
Washington, DC 20005
202−514−3374
Email: brad.rosenberg@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Benjamin Bruns**
DOJ−Civ
6705 13th Pl NW
Washington, DC 20012
202−758−8520
Email: michael.bruns@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617−748−3100
Fax: 617−748−3971
Email: rayford.farquhar@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Linda McMahon**                                   represented by  **Brad P. Rosenberg**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Michael Benjamin Bruns**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Rayford A. Farquhar**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of Education**                    represented by  **Brad P. Rosenberg**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Michael Benjamin Bruns**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Rayford A. Farquhar**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

   **DO NOT DOCKET IN THIS CASE: ALL FILINGS TO BE MADE IN 25–CV–10601–MJJ.** '">Email All Attorneys

   **DO NOT DOCKET IN THIS CASE: ALL FILINGS TO BE MADE IN 25–CV–10601–MJJ.** '">Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 03/24/2025 | 1 | COMPLAINT against Linda McMahon, Donald J. Trump, U.S. Department of Education Filing fee: $ 405, receipt number AMADC–10908277 (Fee Status: Filing Fee paid), filed by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Category Form Category Form, # 2 Civil Cover Sheet Civil Cover Sheet)(Samburg, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Myong J. Joun assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (CEH) (Entered: 03/24/2025) |
| 03/24/2025 | 3 | Summons Issued as to Linda McMahon, Donald J. Trump, U.S. Department of Education. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (NMC) (Entered: 03/24/2025) |

| 03/24/2025 | 4 | NOTICE of Appearance by Mark Samburg on behalf of Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union (Samburg, Mark) (Entered: 03/24/2025) |
|---|---|---|
| 03/24/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of Will Bardwell Filing fee: $ 125, receipt number AMADC−10908619 by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Affidavit Declaration of Will Bardwell)(Samburg, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice for admission of Elena Goldstein Filing fee: $ 125, receipt number AMADC−10908628 by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Affidavit Declaration of Elena Goldstein)(Samburg, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of Rachel F. Homer Filing fee: $ 125, receipt number AMADC−10908634 by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Affidavit Declaration of Rachel F. Homer)(Samburg, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice for admission of Victoria S. Nugent Filing fee: $ 125, receipt number AMADC−10908640 by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Affidavit Declaration of Victoria S. Nugent)(Samburg, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice for admission of Adnan Perwez Filing fee: $ 125, receipt number AMADC−10908658 by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Affidavit Declaration of Adnan Perwez)(Samburg, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Kali Schellenberg Filing fee: $ 125, receipt number AMADC−10908675 by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Affidavit Declaration of Kali Schellenberg)(Samburg, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 11 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING 5** Motion for Leave to Appear Pro Hac Vice Added Will Bardwell.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register** |

| | | |
|---|---|---|
| | | for a PACER account, go the Pacer website at **https://pacer.uscourts.gov/register–account**. **You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SP) (Entered: 03/24/2025) |
| 03/24/2025 | 12 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 6 Motion for Leave to Appear Pro Hac Vice Added Elena Goldstein.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen–current–pacer–accounts.htm#link–account.<br><br>(SP) (Entered: 03/24/2025) |
| 03/24/2025 | 13 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 7 Motion for Leave to Appear Pro Hac Vice Added Rachel F. Homer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen–current–pacer–accounts.htm#link–account.<br><br>(SP) (Entered: 03/24/2025) |
| 03/24/2025 | 14 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 9 Motion for Leave to Appear Pro Hac Vice Added Adnan Perwez.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account**. **You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SP) (Entered: 03/24/2025) |

| 03/24/2025 | 15 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 10 Motion for Leave to Appear Pro Hac Vice Added Kali Schellenberg.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SP) (Entered: 03/24/2025) |
| 03/25/2025 | 16 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 8 Motion for Leave to Appear Pro Hac Vice Added Victoria S. Nugent.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen–current–pacer–accounts.htm#link–account.<br><br>(SP) (Entered: 03/25/2025) |
| 03/26/2025 | 17 | NOTICE of Appearance by Rachel F. Homer on behalf of Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union (Homer, Rachel) (Entered: 03/26/2025) |
| 03/27/2025 | 18 | NOTICE of Appearance by Will Bardwell on behalf of Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union (Bardwell, Will) (Entered: 03/27/2025) |
| 03/27/2025 | 19 | NOTICE of Appearance by Elena Goldstein on behalf of Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union (Goldstein, Elena) (Entered: 03/27/2025) |
| 03/27/2025 | 20 | NOTICE of Appearance by Adnan Perwez on behalf of Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union (Perwez, Adnan) (Entered: 03/27/2025) |
| 03/27/2025 | 21 | |

| | | |
|---|---|---|
| | | NOTICE of Appearance by Kali J. Schellenberg on behalf of Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union (Schellenberg, Kali) (Entered: 03/27/2025) |
| 03/27/2025 | 22 | NOTICE of Appearance by Victoria S. Nugent on behalf of Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union (Nugent, Victoria) (Entered: 03/27/2025) |
| 03/28/2025 | 23 | MOTION for Leave to File Excess Pages by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union.(Bardwell, Will) (Entered: 03/28/2025) |
| 03/28/2025 | 24 | Judge Myong J. Joun: ELECTRONIC ORDER entered granting 23 Motion for Leave to File Excess Pages by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (JL) (Entered: 03/28/2025) |
| 04/01/2025 | 25 | MOTION for Preliminary Injunction by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Text of Proposed Order)(Homer, Rachel) (Entered: 04/01/2025) |
| 04/01/2025 | 26 | MEMORANDUM in Support re 25 MOTION for Preliminary Injunction filed by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Homer, Rachel) (Entered: 04/01/2025) |
| 04/01/2025 | 27 | DECLARATION re 26 Memorandum in Support of Motion, by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Homer, Rachel) (Entered: 04/01/2025) |
| 04/02/2025 | 28 | NOTICE of Appearance by Brad P. Rosenberg on behalf of U.S. Department of Education, Donald J. Trump, Linda McMahon (Rosenberg, Brad) (Entered: 04/02/2025) |
| 04/02/2025 | 29 | SUMMONS Returned Executed U.S. Department of Education served on 3/31/2025, answer due 4/21/2025. (Homer, Rachel) (Entered: 04/02/2025) |
| 04/02/2025 | 30 | SUMMONS Returned Executed Linda McMahon served on 3/31/2025, answer due 4/21/2025. (Homer, Rachel) (Entered: 04/02/2025) |
| 04/02/2025 | 31 | |

| | | SUMMONS Returned Executed Donald J. Trump served on 3/31/2025, answer due 4/21/2025. (Homer, Rachel) (Entered: 04/02/2025) |
|---|---|---|
| 04/02/2025 | 32 | SUMMONS Returned Executed as to US Attorney by American Association of University Professors, American Federation of Teachers, Service Employees International Union, Easthampton Public Schools, Somerville Public Schools, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93. (Homer, Rachel) (Entered: 04/02/2025) |
| 04/02/2025 | 33 | SUMMONS Returned Executed by American Association of University Professors, American Federation of Teachers, Service Employees International Union, Easthampton Public Schools, Somerville Public Schools, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93. (Homer, Rachel) (Entered: 04/02/2025) |
| 04/04/2025 | 34 | Assented−to MOTION for Revised Briefing Schedule and Request for Leave to File Additional Pages by U.S. Department of Education, Donald J. Trump, Linda McMahon. (Attachments: # 1 Text of Proposed Order)(Rosenberg, Brad) (Entered: 04/04/2025) |
| 04/04/2025 | 35 | Judge Myong J. Joun: ELECTRONIC ORDER entered granting 34 Assented−to MOTION for Revised Briefing Schedule and Request for Leave to File Additional Pages: Consolidated opposition to 25 Motion for Preliminary Injunction due 4/11/2025 and reply due by 4/18/2025. (JL) (Entered: 04/04/2025) |
| 04/07/2025 | 36 | NOTICE of Appearance by Rayford A. Farquhar on behalf of U.S. Department of Education, Donald J. Trump, Linda McMahon (Farquhar, Rayford) (Entered: 04/07/2025) |
| 04/11/2025 | 37 | NOTICE of Appearance by Michael Benjamin Bruns on behalf of U.S. Department of Education, Donald J. Trump, Linda McMahon (Bruns, Michael) (Entered: 04/11/2025) |
| 04/11/2025 | 38 | Opposition re 25 MOTION for Preliminary Injunction filed by U.S. Department of Education, Donald J. Trump, Linda McMahon. (Bruns, Michael) (Entered: 04/11/2025) |
| 04/15/2025 | 39 | Assented to MOTION for Leave to File Excess Pages *for Reply Brief* by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union.(Bardwell, Will) (Entered: 04/15/2025) |
| 04/15/2025 | 40 | Judge Myong J. Joun: ELECTRONIC ORDER entered granting 39 Plaintiff's Assented−to Motion for Leave to File Excess Pages. (JL) (Entered: 04/15/2025) |
| 04/18/2025 | 41 | REPLY to Response to 25 MOTION for Preliminary Injunction filed by Somerville Public Schools, Easthampton Public Schools, American Federation of Teachers, American Federation of Teachers Massachusetts, American Federation of State, County, and Municipal Employees, Council 93, American Association of University Professors, Service Employees International Union. (Homer, Rachel) (Entered: 04/18/2025) |
| 04/24/2025 | 42 | NOTICE of Appearance by Michael Benjamin Bruns on behalf of U.S. Department of Education, Donald J. Trump, Linda McMahon (Bruns, Michael) (Entered: 04/24/2025) |
| 04/25/2025 | 43 | Electronic Clerk's Notes for proceedings held before Judge Myong J. Joun: Motion Hearing Held on 4/25/2025 re (#69) Motion for Preliminary Injunction in case 1:25−cv−10601−MJJ and (#25) Motion for Preliminary Injunction in case 1:25−cv−10677−MJJ. Both motions argued; motions taken under advisement. (Court Reporter: Jamie Halpin at jkhhalpin@gmail.com)(Attorneys present: Shavit, Hamilton, Bruns, Homer, Goldstein, |

| | | |
|---|---|---|
| | | Nugent, Hyman, and Muqaddam) Associated Cases: 1:25−cv−10601−MJJ, 1:25−cv−10677−MJJ(JL) (Entered: 04/25/2025) |
| 05/15/2025 | 44 | Notice of Supplemental Authorities re 25 MOTION for Preliminary Injunction (Homer, Rachel) (Main Document 44 replaced on 5/16/2025) (SP). (Additional attachment(s) added on 5/16/2025: # 1 Exhibit A) (SP). (Entered: 05/15/2025) |
| 05/22/2025 | 45 | Judge Myong J. Joun: ORDER entered **GRANTING** 25 Motion for Preliminary Injunction. See attached Order. (SP) (Entered: 05/22/2025) |
| 05/22/2025 | 46 | Judge Myong J. Joun: ELECTRONIC ORDER entered. ORDER consolidating cases. 25−cv−10601 is now the Lead Case. All entries to be made in Lead Case. (SP) (Entered: 05/22/2025) |
| 05/22/2025 | 47 | NOTICE OF APPEAL as to 45 Order on Motion for Preliminary Injunction by Linda McMahon, Donald J. Trump, U.S. Department of Education. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 6/11/2025. (Rosenberg, Brad) (Entered: 05/22/2025)** |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| STATE OF NEW YORK, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 25-10601-MJJ |
| ) | |
| LINDA MCMAHON, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| | |
| _____ ) | |
| SOMERVILLE PUBLIC SCHOOLS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 25-10677-MJJ |
| ) | |
| DONALD J. TRUMP, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

### MEMORANDUM AND ORDER ON CONSOLIDATED PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

May 22, 2025

JOUN, D.J.

For over 150 years, the federal government has played a crucial role in education. Congress created the Department of Education (the "Department") in 1979 to streamline federal support of education into a single, Cabinet-level department. The Department's role in education across the nation cannot be understated: it administers the federal student loan portfolio, provides research and technological assistance to states and their educational institutions, disburses federal

14

education funds, and monitors and enforces compliance with numerous federal laws. Congress enacted these laws to promote equality and anti-discrimination in schools, assist students with special needs and disabilities, ensure student privacy, and much more.

This case arises out of an attempt by Defendants to shut down the Department without Congressional approval. President Trump has publicly and repeatedly promised to shut down the Department "immediately."[1] On March 11, 2025, Defendants announced a massive reduction in force ("RIF"), cutting the Department's staff by half. On March 20, 2025, President Trump issued an executive order directing the Secretary to "take all necessary steps to facilitate the closure of the Department of Education." On March 21, 2025, President Trump further announced that the federal student loan portfolio as well as the special needs programs would be transferred out of the Department. Defendants argue that the RIF was implemented to improve "efficiency" and "accountability" in the Department. The record abundantly reveals that Defendants' true intention is to effectively dismantle the Department without an authorizing statute.

Since the implementation of the RIF, Plaintiffs—a group of states, school districts, non-profit organizations, and labor unions—have provided an in-depth look into how the massive reduction in staff has made it effectively impossible for the Department to carry out its statutorily mandated functions. As one example, Defendants have shut down seven out of twelve offices of the Office for Civil Rights, a statutorily created program that protects students from discrimination on the basis of race, sex, and disability. The supporting declarations of former Department employees, educational institutions, unions, and educators paint a stark picture of the irreparable harm that will result from financial uncertainty and delay, impeded access to vital

---

[1] Defendants admit that "President Trump ran on the promise to close the Department of Education."

2

knowledge on which students and educators rely, and loss of essential services for America's most vulnerable student populations. Indeed, prior to the RIF, the Department was already struggling to meet its goals, so it is only reasonable to expect that an RIF of this magnitude will likely cripple the Department. The idea that Defendants' actions are merely a "reorganization" is plainly not true.

Defendants do acknowledge, as they must, that the Department cannot be shut down without Congress's approval,[2] yet they simultaneously claim that their legislative goals (obtaining Congressional approval to shut down the Department) are distinct from their administrative goals (improving efficiency). There is nothing in the record to support these contradictory positions. Not only is there no evidence that Defendants are pursuing a "legislative goal" or otherwise working with Congress to reach a resolution, but there is also no evidence that the RIF has actually made the Department more efficient. Rather, the record is replete with evidence of the opposite. Consolidated Plaintiffs have demonstrated that the Department will not be able to carry out its statutory functions—and in some cases, is already unable to do so—and Defendants have proffered no evidence to the contrary. Defendants fail to understand Plaintiffs' claims which is evident by their attempt to frame this case as an unlawful terminations employment action. As fully explained below, a preliminary injunction is warranted to return the Department to the status quo such that it can comply with its statutory obligations.

***

---

[2] The Court acknowledges the amici brief in support of Plaintiffs by 192 members of Congress. [Doc. No. 110].

On March 13, 2025, 21 states[3] ("Plaintiff States") filed suit against Defendants Secretary of Education Linda McMahon (the "Secretary"), in her official capacity, the U.S. Department of Education (the "Department"), (together with the Secretary, the "Agency Defendants"), and President Donald J. Trump ("President Trump"), in his official capacity, (collectively, "Defendants"). Two days prior, on March 11, 2025, Defendants announced a large-scale reduction in force ("RIF") of the Department of Education (the "March 11 Directive").[4] [Doc. No. 1]. The March 11 Directive announced that the Department would cut approximately 2,183, or slightly more than 50% of its 4,133 employees. [*Id.* at ¶ 3]. The Plaintiff States allege that the RIF is not only unlawful, but also so severe and sweeping that it is an impermissible step toward dismantling the Department of Education in its entirety. [*Id.* at ¶ 5]. The Plaintiff States allege that the March 11 Directive violates the Constitution's Separation of Powers doctrine (Count I), violates the Take Care Clause of the Constitution (Count II), is *ultra vires* (Count III), and violates the Administrative Procedure Act ("APA") because it is contrary to law (Count IV), and arbitrary & capricious (Count V). [*Id.* at ¶¶ 149–195].

On March 20, 2025, President Trump issued an executive order (the "Executive Order") directing the Secretary to "take all necessary steps to facilitate the closure of the Department of Education." [Doc. No. 71-1]. On March 24, 2025, Plaintiffs Somerville Public Schools, Easthampton Public Schools, the American Federation of Teachers, American Federation of Teachers Massachusetts, AFSCME Council 93, American Association of University Professors,

---

[3] The Plaintiff States consist of: New York, Massachusetts, Hawai'i, California, Arizona, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Washington, Wisconsin, and Vermont.

[4] As explained below, 25-cv-10601 and 25-cv-10677 are being consolidated. Citations to the docket herein are citations to filings entered in 25-cv-10601, unless noted otherwise. *E.g.*, [Doc. No. __; 25-cv-10677 Doc. No. __].

and the Service Employees International Union (collectively, "Somerville Plaintiffs," together with the Plaintiff States, "Consolidated Plaintiffs") sued Defendants for injuries stemming from the March 11 Directive and the Executive Order. [25-cv-10677 Doc. No. 1]. The Somerville Plaintiffs assert the same causes of action against Defendants as the Plaintiff States, [*see id.* at Counts I-III, V-VII], as well as additional APA claims alleging that the Agency Defendants' actions are contrary to a constitutional right, [*id.* at Count IV], and exceed the Secretary's statutory authority, [*id.* at Count V].

On March 24, 2025, the Plaintiff States filed a Motion for Preliminary Injunction seeking to enjoin the Agency Defendants from implementing the RIF, and from carrying out a directive announced by President Trump orally at a press conference, which directed the immediate transfer of the federal student loan portfolio and special education programs out of the Department ("March 21 Directive"). [Doc. No. 69; Doc. No. 70 at 22; 25-cv-10677 Doc. No. 1 at ¶¶ 75–76]. Plaintiff States also ask this court to direct the Agency Defendants to reinstate federal employees whose employment was terminated as part of the RIF. [Doc. No. 69 at 2]. On April 1, 2025, the Somerville Plaintiffs filed a Motion for Preliminary Injunction seeking the same relief, on largely the same grounds, as the Plaintiff States. [25-cv-10677 Doc. No. 25]. On April 11, 2025, Defendants filed a Consolidated Opposition to both Motions. [Doc. No. 95; 25-cv-10677 Doc. No. 38]. On April 18, 2025, the Consolidated Plaintiffs filed their Reply briefs. [Doc. No. 101; 25-cv-10677 Doc. No. 41]. A hearing on the Motions was held on April 25, 2025. [Doc. No. 118].

## I.    CONSOLIDATION

Rule 42(a) of the Federal Rules of Civil Procedure governs consolidation, providing that "[i]f actions before the court involve a common question of law or fact, the court may: (1) join

for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). The power to consolidate related actions falls within the broad inherent authority of every court "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 192 (4th Cir. 1982) ("The decision whether to sever or to consolidate whole actions or sub-units for trial is necessarily committed to trial court discretion."). Here, the parties have not moved to consolidate the two actions. "Normally the district court would be acting quite within its discretion in taking steps to consolidate or otherwise avoid the duplication of such closely similar cases, whatever the substantive rights of the parties." *Sutcliffe Storage & Warehouse Co. v. United States*, 162 F.2d 849, 851 (1st Cir. 1947). "A district court can consolidate related cases under Federal Rule of Civil Procedure 42(a) *sua sponte*" when the actions involve a "common question of law or fact." *Devlin v. Transportation Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (quoting Fed. R. Civ. P. 42(a)).

Here, the Consolidated Plaintiffs' claims largely overlap and arise from the same event: the March 11 Directive. On April 4, 2025, Defendants filed a motion seeking leave to file a Consolidated Opposition because Consolidated Plaintiffs "seek similar relief under similar sets of arguments," and granting the motion "would promote judicial efficiency for the related arguments to be addressed simultaneously, on the same schedule, in the same set of briefings." [Doc. No. 88 at 2]. Consolidated Plaintiffs agreed. [*Id.*]. In line with these principles, I find it appropriate to exercise my discretion and consolidate the two cases.

## II.    BACKGROUND

### A.    <u>The Creation Of The Department Of Education</u>

The federal government has supported education for over 150 years, addressing gaps in state and local education resources by providing substantial funds, support, and technical assistance to local school districts and educators. [25-cv-10677 <u>Doc. No. 1 at</u> ¶¶ 10–11]. In 1979, Congress established the Department of Education—along with many of its offices—by statute through the enactment of the Department of Education Organization Act ("DEOA"). [<u>Doc. No. 1 at</u> ¶ 46]; *see* <u>20 U.S.C. §§ 3401–3510</u>. Creating the Department allowed Congress to streamline federal support for education, consolidating programs that were dispersed across several departments "into a single Cabinet-level department." [25-cv-10677 <u>Doc. No. 1 at</u> ¶ 11]. While the primary responsibility for funding and creating policy for elementary and secondary education lies with the States, the Department is responsible "for administering federal elementary, secondary, and postsecondary education programs." [25-cv-10601 <u>Doc. No. 1 at</u> ¶ 47 (quoting Rebecca R. Skinner et al., *A Summary of Federal Education Laws Administered by the U.S. Department of Education* (2024))].

At the direction of Congress, the Department distributes funds to schools in all 50 states. [25-cv-10677 <u>Doc. No. 1 at</u> ¶ 13]. During the 2020-21 school year for instance, the Department distributed $101 billion in federal funds, representing, on average, 11% of all funding for elementary and secondary schools in the country. [*Id.*]. In some states, that number was as high as 20%. [*Id.*]. In particular, this funding notably advances two central aspects of the Department's mission: increasing support for low-income students and students with disabilities. [*Id.* at ¶ 15]. Accordingly, almost 95% of all school districts, and 60% of all public schools, are eligible to receive some level of federal funding to support low-income students, and more than

seven million students with disabilities are supported through the Individuals with Disabilities Education Act. [*Id.*].

Since its creation, Congress has enacted statutes authorizing additional functions for the Department and appropriating additional funds for it to administer. [Doc. No. 1 at ¶ 48]. The major statutes administered by the Department include:

a.  The Elementary and Secondary Education Act (ESEA): enacted in 1965 and last reauthorized in 2015 by the Every Student Succeeds Act (ESSA), Pub. L. No. 114-95, 129 Stat. 1802 (codified as amended at 20 U.S.C. § 6301 *et seq.*). Title I-A, the largest ESEA program, provides compensatory grants to local education agencies. Congress appropriates funds for ESEA on an annual basis. [Doc. No. 1 at ¶ 48].

b.  The Individuals with Disabilities Education Act (IDEA): enacted in 1975 and last reauthorized in 2004. Pub. L. No. 108-446, 118 Stat. 2647 (codified as amended at 20 U.S.C. §§ 1400–82). IDEA authorizes grant programs that support early intervention and special education services for children (up to age 21) with disabilities. Over 90% of IDEA funds are appropriated for Part B to fund special education services for school-aged children. The appropriations for Part B are permanently authorized. "Funds for Part C—which authorizes state grants for infants and toddlers with disabilities—and Part D—which authorizes national activities—have been appropriated on an annual basis." [Doc. No. 1 at ¶ 48].

c.  Higher Education Act of 1965 (HEA): enacted in 1965 and last comprehensively reauthorized by the Higher Education Opportunity Act of 2008 (HEOA), Pub. L. No. 110-315, 122 Stat. 3078 (codified as amended at 20 U.S.C. § 1001 *et seq.*). Title IV of HEA authorizes various student aid programs that assist students with postsecondary education expenses, including the Federal Pell Grant program, the William D. Ford Federal Direct Loan

program, and the Federal Work-Study program. The HEA also provides federal support
directly to institutions of higher education through Title III and Title V. Appropriations for
certain HEA programs are mandatory, while others are discretionary. Mandatory funding for
the Direct Loan and Federal Pell Grant programs is permanently appropriated, but funding
for other HEA programs is appropriated on an annual basis. [Doc. No. 1 at ¶ 48].

d.  Rehabilitation Act of 1973: funds vocational rehabilitation services to assist individuals with
disabilities. 29 U.S.C. §§ 701–18. The primary program under the statute is the State
Vocational Rehabilitation Services Program, to which Congress appropriates funding on an
annual basis. [Doc. No. 1 at ¶ 48].

e.  Civil Rights Laws: the Department is responsible for enforcing various civil rights laws that
prohibit discrimination in all programs or activities (unless otherwise specified) receiving
federal funds. [*Id.*]. These laws include: Title VI of the Civil Rights Act of 1964, 42 U.S.C.
§§ 2000d *et seq.*; Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–89;
Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Age Discrimination Act
of 1975, 42 U.S.C. §§ 16101–07; and Title II of the Americans with Disabilities Act of 1990,
42 U.S.C. §§ 12101–03.

f.  Privacy Laws: the Department enforces laws protecting student privacy rights, such as the
Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and the Protection
of Pupil Rights Amendment (PPRA), 20 U.S.C. § 1232h. [Doc. No. 1 at ¶ 48].

Congress granted the Secretary of Education limited discretion to reallocate functions
within the Department. [*Id.* at ¶ 49]. Specifically, the Secretary is allowed to "allocate or
reallocate functions among the officers of the Department, and to establish, consolidate, alter, or
discontinue such organizational entities within the Department as may be necessary or

appropriate." 20 U.S.C. § 3473(a). However, the Secretary's authority under these provisions "does not extend to: (1) any office, bureau, unit, or other entity transferred to the Department and established by statute or any function vested by statute in such an entity or officer of such an entity, except as provided in subsection (b); (2) the abolition of organizational entities established by this chapter; or (3) the alteration of the delegation of functions to any specific organizational entity required by this chapter." *Id.* Moreover, under the statute, there are fourteen offices that the Secretary may consolidate, alter, or discontinue, or whose functions the Secretary may reallocate. 20 U.S.C. § 3473(b)(1). However, even with respect to these offices, the Secretary must first give the Committee on Labor and Human Resources of the Senate and the Committee on Education and Labor of the House of Representatives "a full and complete statement of the action proposed to be taken pursuant to this subsection and the facts and circumstances relied upon in support of such proposed action," and then wait ninety days after the committees receive the statement before acting. 20 U.S.C. § 3473(b)(2).

## B. The Functions Of The Department Of Education

The Department's programs touch on many aspects and levels of education. [Doc. No. 1 at ¶ 54]. Every year, the Department's elementary and secondary programs serve nearly 18,200 school districts and over 50 million students attending roughly 98,000 public schools and 32,000 private schools. [*Id.*]. In addition, the Department's higher education programs provide services and support to more than 12 million postsecondary students. [*Id.*]. What follows is a description of some of these critical programs and functions.

### 1. Birth To Grade 12 Educational Programs

The federal government provides 13.6% of the funding for public K–12 education throughout the country. [*Id.* at ¶ 56]. In fiscal year 2024, the Department spent 25.4% of its funds

on state and local governments. [*Id.*]. The two largest sources of federal funding for schools are Title I funding and IDEA funding. [*Id.* at ¶ 57]. The Department distributes over $18 billion under the Title I program to assist schools with high-poverty populations and disburses over $15 billion in IDEA funding to help cover the costs of special education. [*Id.*]. While the amount of funding that K–12 public schools receive in each state varies significantly, every state receives considerable federal funding and services from the Department. [*Id.* at ¶ 58]. The Department's K–12 funding supports a wide variety of educational programs and needs, including but not limited to: "special education, including paying for assistive technology for students with disabilities; the payment of teacher salaries, and benefits, school counselors, and homeless liaisons; the professional development and salaries for special education teachers, paraprofessionals, and reading specialists; transportation to help children receive the services and programming they need; and physical therapy, speech therapy, and social workers." [*Id.* at ¶ 59]. Additionally, through initiatives like the Preschool Development Grant Birth through Five program—a $250 million competitive federal grant—the Department "supports early childhood education for children from birth through kindergarten." [*Id.* at ¶ 62].

Under IDEA, "a core obligation of the Department of Education is supporting students with disabilities and the schools, parents, and teachers who educate students with disabilities." [25-cv-10677 Doc. No. 1 at ¶ 91]. Congress passed IDEA to ensure that all children receive a "free [and] appropriate public education." [*Id.* at ¶ 90 (citing 20 U.S.C. § 1412(1))]. Specifically, the office within the Department that was designated by Congress to administer IDEA is the Office of Special Education and Rehabilitative Services ("OSERS"), which designs policies intended to help children with disabilities reach their full potential. [*Id.* at ¶¶ 92–94]. Namely, IDEA authorizes grants to states, institutions of higher education, and non-profit organizations

11

with the aim of helping children with disabilities by "support[ing] research, pilot programs, technology and personnel development, and centers to provide parents with training and information." [*Id.* at ¶ 95]. Also, the Office of Special Education Programs ("OSEP") within OSERS provides over $13 billion in IDEA grants every year "to support early intervention (birth to age 2), preschool, K-12 education, and other services through age 21 (for students with disabilities who have not earned a regular diploma)." [*Id.*]. In addition, OSEP assists states and localities in complying with obligations under IDEA, and OSEP staff is critical in helping states and other grantees promptly receive and effectively use IDEA funds. [*Id.* at ¶¶ 95, 106]. In fiscal year 2024, at least 10% of the student population in every state was supported by IDEA funds, and in some states that number was as high as 20%. [*Id.* at ¶ 101]. During the 2022-23 school year, one in every five Massachusetts students received some form of IDEA-funded support. [*Id.* at ¶ 102].

As part of its mission, the Department also works to implement "improvements in the quality and usefulness of education through federally supported research, evaluation and sharing of information." [Doc. No. 1 at ¶ 63 (citing 20 U.S.C. § 3402(4))]. The Department does so by collecting and analyzing data, identifying optimal pedagogical practices, and disseminating such research to educators. [*Id.* at ¶ 64].[5] This research guides educators and school districts in meeting academic standards, educating children who are English language learners, improving school safety, bullying, and chronic absenteeism, supporting children with significant behavioral

---

[5] The Department operates several National Centers housed within the Institute of Education Sciences, all of which conduct research, collect and analyze data, and provide technical assistance to educators, parents, students, policymakers, and the public on a range of topics aimed at improving academic achievement for children and ensuring the effectiveness of educational programs. *See* 20 U.S.C. §§ 3419, 9511(a) (establishing Institute of Education Sciences); 20 U.S.C. § 9531(a) (establishing National Center for Educational Research); 20 U.S.C. § 9541(a) (establishing National Center for Education Statistics); 20 U.S.C. § 9561(a) (establishing National Center for Education Evaluation and Regional Assistance); 20 U.S.C. § 9567(a) (establishing National Center for Special Education Research). [Doc. No. 1 at ¶ 64].

issues, and in other important areas. [*Id.*]. The Department also has offices to support the needs of specific students and aspects of public education. For instance, the Department's Office of English Language Acquisition, Language Enhancement and Academic Achievement for Limited English Proficient Students addresses the educational needs of linguistically and culturally diverse students. [*Id.* at ¶ 65]. Moreover, the Department's Office of Safe and Healthy Schools works on policy for drug and violence prevention programs, character and civic education, and programs supporting students' physical and mental health. [*Id.* at ¶ 67].

## 2. Equal Access To Public Education

The Department is also instrumental in safeguarding equal access to public education through transparency and accountability. [*Id.* at ¶ 71]. Congress created the Department's Office for Civil Rights ("OCR"), which has historically focused on ensuring that diverse student bodies receive equal access to education. [*Id.* (citing 20 U.S.C. § 3413)]. OCR was created primarily to enforce landmark federal civil rights laws that ban discrimination based on race, sex, and disability, in schools that receive federal funds under the following: Title VI of the Civil Rights Act of 1964, which bans race discrimination and race-based harassment; Title IX of the Education Amendments of 1972, which bans sex discrimination and sexual harassment; Section 504 of the Rehabilitation Act of 1973, which bans disability discrimination; and Title II of the Americans with Disabilities Act, which bans disability discrimination by public entities. [25-cv-11042 Doc. No. 1 at ¶¶ 2, 17].[6] Title VI and Title IX expressly direct the Department to enforce

---

[6] On April 21, 2025, the Victim Rights Law Center ("VRLC"), a nonprofit legal organization representing student victims of discrimination in schools, along with students and parents that VRLC represents ("VRLC Plaintiffs"), filed a related lawsuit in this action against Defendants, as well as Craig Trainor, in his official capacity as Acting Assistant Secretary for Civil Rights, arising out of the mass terminations that have resulted in the termination of half of the OCR's staff and closure of seven of its twelve regional offices. To describe the statutory functions of the OCR and the impacts of the RIF on the OCR, I cite to the VRLC's Complaint as [25-cv-11042 Doc. No. 1 at ¶ ___]. Plaintiffs' Motion for Preliminary Injunction, seeking similar relief as Consolidated Plaintiffs, is currently pending. [25-cv-11042 Doc. No. 18].

their anti-discrimination mandates. [*Id.* at ¶ 18 (citing 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682)].

Federal regulations also require OCR to investigate and resolve potential violations of Title VI,

Section 504, Title IX, and Title II. [*Id.* at ¶ 19]. These requirements include ensuring that there is

a Department official that can "make a prompt investigation wherever a compliance review,

report, complaint, or any other information indicates a possible failure to comply" with

regulations implementing Title VI, and initiate "periodic compliance reviews" to assess whether

recipients are compliant with Title VI regulations. [*Id.* (citing 34 C.F.R. § 100.7(a), (c))]. These

requirements are incorporated by reference in the regulations implementing Title IX and Section

504. [*Id.* (citing 34 C.F.R. § 104.61; 34 C.F.R. § 106.81)]. The regulations implementing Title II

also require OCR to investigate Title II complaints. [*Id.* (citing 28 C.F.R. § 35.171)].

 OCR's Case Processing Manual requires OCR to ensure that "the actions it[] takes in

investigations are legally sufficient, supported by evidence, and dispositive of the allegations."

[*Id.* at ¶ 20 (citing Case Processing Manual at 15)]. Once OCR concludes its investigation, it

must issue a letter of finding as to whether there has been a violation. [*Id.* at ¶ 22]. If there has

been a violation, OCR must attempt to negotiate a resolution agreement to remedy the

discrimination and prevent similar instances in the future. [*Id.*]. The manual sets strict deadlines

for the completion of these negotiations. [*Id.*]. When OCR resolves a case through a voluntary

resolution agreement, it must monitor it to ensure that the recipient complies with the agreement.

[*Id.* at ¶ 21]. In the case where there is a violation but OCR is unable to negotiate a resolution

within the specified timeframe, OCR must take enforcement action by choosing to either initiate

administrative proceedings to suspend, terminate, or refuse to grant or continue and defer

financial assistance from the Department to the recipient, or refer the case to the Department of

Justice for judicial proceedings. [*Id.* at ¶ 23]. OCR also must provide technical assistance to help

14

institutions comply with civil rights laws. [*Id.* at ¶ 24 (citing 35 C.F.R. §§ 100.6(a); § 100.12(b))]. This includes providing documents, FAQs, pre-recorded webinars and webcasts, resources for drafting policies that comply with civil rights statutes, and others. [*Id.*].

OCR plays a vital role in enforcing civil rights laws in schools. OCR has designed a process that allows students to file complaints without having to pay for an attorney, and OCR itself assists with the investigation and helps to negotiate a resolution with the schools without the need for costly discovery, motion briefing, or trial. [*Id.* at ¶¶ 27–28]. OCR can also investigate complaints based on claims that students would not otherwise be able to raise in a private lawsuit, including by minimizing the elements that students are required to prove, thereby reducing the burden of fact finding. [*Id.* at ¶¶ 28–31]. OCR has helped make changes to school policies, procedures, and practices to prevent future violations of federal civil rights laws, relief that private litigants often cannot obtain through a private lawsuit. [*Id.* at ¶ 32].

Before the RIF, OCR struggled with a "persistent backlog" of cases. [*Id.* at ¶ 45]. For three consecutive years, from 2022 through 2024, OCR received the highest number of complaints in its history, with a record high of 20,687 complaints in 2024. [*Id.* at ¶ 45]. However, OCR lacked the resources to keep up with demand; from 2021 through 2024, OCR received approximately 14,547 more complaints than it resolved. [*Id.*]. To meet these demands, Congress allocated OCR a budget of $140 million to support 557 employees. [*Id.* at ¶ 46].

However, as a result of the RIF, OCR's staff has been cut in half and seven of its twelve regional offices have been closed. [*Id.* at ¶ 4]. The VRLC Plaintiffs, along with Consolidated Plaintiffs, contend that OCR cannot fulfill its statutory and regulatory mandates with only half of its staff. [*Id.* at ¶ 47]. Indeed, the VRLC Plaintiffs allege it is impossible to do so. [*Id.*]. The closed offices in Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco

cover some of the largest population centers of the country, had an aggregate of 208 full-time and part-time investigators, and the closure of these regional offices make OCR incapable of completing investigations and resolving cases promptly and fairly. [*Id.* at ¶¶ 48–49].

For example, the VRLC's complaint details how the RIF has prevented two students from returning to school. Plaintiff T.R., a twelve-year-old child attending school in Falls City, Nebraska, experienced persistent race-based harassment from 2022 to 2023, in which students called T.R. racial slurs, and physically assaulted him at recess. [*Id.* at ¶¶ 10, 59]. One of these incidents resulted in teachers finding T.R. crying in fetal position after a student pushed T.R. to the ground and stomped on his head. [*Id.* at ¶ 59]. The harassment was so severe that T.R.'s mother, Plaintiff Tara Blunt, was forced to pull T.R. out of school. [*Id.*]. In December 2023, OCR opened an investigation into the school's response to the harassment, but due to the RIF, OCR has stopped processing T.R. and Plaintiff Blunt's complaint entirely, making it impossible for OCR to resolve the investigation so that T.R. can return to public school. [*Id.* ¶¶ 61–63]. Similarly, Plaintiff A.J., a ten-year-old child with life threatening allergies, was severely harassed for his allergies throughout school. [*Id.* at ¶ 11]. These incidents included students pulling off A.J.'s glasses, shoving, pushing, and tripping him, and even taunting and surrounding A.J. with food containing life-threatening allergens. [*Id.* at ¶¶ 11, 65]. A.J.'s mother, Plaintiff Karen Josefosky, withdrew A.J. from public school. [*Id.* at ¶ 11]. OCR opened an investigation and was beginning the process of a mediation, but following the RIF, OCR stopped processing the complaint and the mediation did not go forward. [*Id.*].

### 3.  <u>Higher Education: The Federal Student Loan System</u>

The Department additionally plays a vital role in making higher education more affordable for students across the country, including in Plaintiff States, by administering federal

student loan programs under Title IV of the Higher Education Act of 1965 ("HEA"). [Doc. No. 1 at ¶ 76]. Specifically, the Department's Office of Federal Student Aid ("FSA") manages the federal student loan system by handling loan disbursement, servicing, and borrower assistance. [*Id.* at ¶ 77]. Through Pell Grants, work-study programs, and subsidized loans, the Department collectively awards over $120 billion to roughly 13 million students. [*Id.* at ¶ 78]. A significant portion of these funds is sent directly to colleges and universities, including public colleges and universities in the Plaintiff States. [*Id.*].

FSA also manages the Free Application for Federal Student Aid ("FAFSA") form and, alongside vendors, processes over 17.6 million FAFSA forms each year. [*Id.* at ¶ 79]. The deadline for FAFSA applications is June 30, 2025, but many students apply earlier given that their decisions about which colleges they will attend hinges on the amount of financial aid they are able to receive. [*Id.*]. The Department is also tasked with ensuring that institutions receiving such funds are financially responsible and avoid wasteful spending. [*Id.* at ¶ 80]. As required under the HEA, the Secretary of Education determines and enforces the standard of financial responsibility. [*Id.*].

In addition to distributing federal aid to higher-education institutions, the Department collects and monitors large amounts of data from colleges and universities and enforces their reporting and compliance obligations under Congressional Acts that pertain to campus safety, drug and alcohol use, and sexual violence or harassment. [*Id.* at ¶¶ 82–85]. The Department also works with educational institutions, states, and third-party accreditation authorities to ensure that accredited institutions meet certain quality standards and furnish degrees with value in the workplace. [*Id.* at ¶ 88]. Department-informed accreditation standards help discourage institutional practices that put profits above long-term student welfare and success. [*Id.*].

### 4. <u>Vocational Education And Rehabilitation</u>

The Department also helps individuals prepare for and maintain employment through its vocational education and vocational rehabilitation programs. [*Id.* at ¶ 89]. For instance, the Department's Office of Vocational and Adult Education assists adults with obtaining a high school diploma (or equivalent) and pursuing postsecondary, career, or technical education. [*Id.* at ¶ 90]. Moreover, the Department's Office of Career, Technical, and Adult Education ("OCTAE") administers and coordinates programs related to career and technical education, adult education and literacy, and community colleges for advancing workforce development. [*Id.* at ¶ 91]. Through grant programs under the Carl D. Perkins Career and Technical Education Act, OCTAE's Division of Academic and Technical Education ("DATE") prepares adult students for high-skill, high-wage, or high-demand occupations by providing career and technical education. [*Id.* at ¶¶ 92-93]. OCTAE's Division of Adult Education and Literacy ("DAEL") also operates programs that help adults acquire basic skills like reading, writing, math, English language proficiency, and problem-solving. [*Id.* at ¶ 95]. In addition, OCTAE improves access to postsecondary education by bolstering community colleges and enhancing their ability to provide high-quality and affordable education. [*Id.* at ¶¶ 97–98].

Regarding vocational rehabilitation services, the Department supports individuals with disabilities through its Rehabilitation Services Administration ("RSA")—a component of OSERS—helping such individuals become more independent and competitive in the labor market. [*Id.* at ¶ 99]. The RSA runs and funds programs such as disability employment programs, an independent living program, technical assistance centers, training programs, and disability innovation fund programs. [*Id.* at ¶ 100]. For example, one such program funds the use of evidence-based practices in state agencies aimed at transitioning individuals with disabilities into high-quality employment opportunities. [*Id.* at ¶ 109].

### 5.  <u>Impact Aid</u>

The Department is also the primary agency charged with distributing payments to local school districts under the Impact Aid program. [*Id.* at ¶ 111]. The Impact Aid program was created to ensure the financial viability of school districts who cannot rely on local property taxes for funding due to their location near non-taxable federal land. [*Id.* at ¶ 110]. School districts seeking Impact Aid can submit applications to the Department, which reviews the applications and processes payments based on congressional appropriations each fiscal year. [*Id.* at ¶ 111]. Many school districts within Plaintiff States rely heavily on Impact Aid funding and receive hundreds of millions of dollars each year used for construction, special education, maintenance, and operations. [*Id.* at ¶ 112]. Therefore, any delay in Impact Aid funding threatens to immediately disrupt these school districts' day-to-day operations, including utility payments and payroll. [*Id.* at ¶ 113].

### C.  <u>The President's Directive And The RIF</u>

President Trump has made his intention to dismantle the Department of Education publicly well-known, referring to the Department as a "a big con job" and saying he would "like to close it immediately." [*Id.* at ¶ 114]. In a campaign video from September 2023, President Trump claimed that "very early in the administration" he would be "closing up the Department of Education in Washington, D.C." [25-cv-10677 <u>Doc. No. 1 at</u> ¶ 45]. On March 12, 2025, after President Trump was inaugurated, he said, "[w]e're going to move the Department of Education, we're going to move education into the states . . . so that the states can run education." [*Id.* at ¶ 46 (omission in original)]. Moreover, he told the new Secretary of Education, Defendant Linda McMahon, to put herself "out of a job." [<u>Doc. No. 1 at</u> ¶ 114]. For her part, Secretary McMahon has been steadfast in her support of President Trump's mission, affirming during her

confirmation process that she "wholeheartedly support[s] and agree[s]" that "the bureaucracy in Washington should be abolished," [25-cv-10677 Doc. No. 1 at ¶ 48 (alterations in original)], and asking Department employees to join her in "perform[ing] one final, unforgettable public service to future generations of students" by dismantling the Department. [Doc. No. 1 at ¶ 115]. On March 6, 2025, news outlets reported that the White House had drafted an executive order calling on the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education (DOE) and return authority over education to the States and local communities, [to] the maximum extent allowed by law." [*Id.* at ¶ 116].

Five days later, on March 11, 2025, pursuant to what Secretary McMahon characterized as its "final mission," [25-cv-10677 Doc. No. 1 at ¶ 52], the Department announced that its workforce was being cut in half via a vast reduction in force initiative affecting "[a]ll divisions within the Department." [Doc. No. 1 at ¶ 117]. According to Department figures, the RIF was set to place approximately 1,378 employees on administrative leave, relieving them of all duties, beginning on March 21, 2025. [*Id.* at ¶ 118; 25-cv-10677 Doc. No. 1 at ¶ 69]. Pursuant to the RIF, those affected staff would be terminated by June 2025. [25-cv-10677 Doc. No. 1 at ¶ 69]. When combined with the 259 employees who accepted resignation as part of the "Fork in the Road" initiative,[7] as well as the 313 employees who accepted a "Voluntary Separation Incentive Payment,"[8] the Department's total numbers after the RIF is estimated at 1,950 employees—

---

[7] On January 28, 2025, the U.S. Office of Personal Management ("OPM") sent an email to federal employees presenting a deferred resignation offer, also known as the "Fork in the Road" offer. The offer presented federal workers with a choice of remaining in their position without "assurance regarding the certainty of [their] position or agency" or to resign and "retain all pay and benefits . . . until September 30, 2025." U.S. OFFICE OF PERSONNEL MANAGEMENT, https://www.opm.gov/fork/original-email-to-employees (last visited May 21, 2025).

[8] The Voluntary Separation Incentive Payment Authority allows agencies that are restructuring or downsizing to offer employees payments up to $25,000, also known as voluntary separation incentive

roughly a 50% reduction from the Department's 4,133 employees at the beginning of President Trump's second term. [Doc. No. 1 at ¶ 118]. For context, the mass terminations on March 11, 2025, occurred after the Department fired 65 probationary employees the previous month, though those employees have since been reinstated pursuant to a court order. [25-cv-10677 Doc. No. 1 at ¶ 60].

Secretary McMahon claimed that the mass firings were meant to improve "efficiency, accountability, and ensuring that resources are directed where they matter most." [*Id.* at ¶ 54]. Similarly, President Trump maintained that his administration only "want[ed] to cut the people that aren't working or . . . doing a good job" and "keep[] the best people." [*Id.* at ¶ 55]. Yet Secretary McMahon also admitted that the terminations were intended to dismantle the Department, explaining that "[President Trump's] directive to [her], clearly, is to shut down the Department of Education." [*Id.* at ¶ 58]. Moreover, on the same day that the RIF was initiated, Secretary McMahon told Laura Ingraham of Fox News that the workforce reductions were the first steps in shutting down the Department. [Doc. No. 1 at ¶ 119].

On March 20, 2025, President Trump went further to sign an Executive Order entitled "Improving Education Outcomes by Empowering Parents, States, and Communities," which directs the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education." [25-cv-10677 Doc. No. 1 at ¶ 63]. However, the Executive Order also maintains that the Department should only be closed "to the maximum extent . . . permitted by law," and instructs the Secretary to ensure the "effective and uninterrupted delivery of services,

---

payments ("VSIP") "as an incentive to voluntarily separate." With authorization from the Office of Personnel Management, agencies may offer VSIP to certain employees who volunteer to separate from the agency, allowing agencies to minimize or avoid involuntary separations. U.S. OFFICE OF PERSONNEL MANAGEMENT, https://www.opm.gov/policy-data-oversight/workforce-restructuring/voluntary-separation-incentive-payments (last visited May 21, 2025); *see* 5 U.S.C. § 3521.

programs, and benefits on which Americans rely." [*Id.* at ¶ 64]. The next day, President Trump

gave an interview in which he publicized plans to move key programs out of the Department.

[*Id.* at ¶ 75]. He explained that "the student loan portfolio" would be "coming out of the

Department of Education immediately" and "moved to the Small Business Administration." [*Id.*

at ¶ 76]. He also claimed that the Department of Health and Human Services would replace the

Department of Education's role in "handling special needs." [*Id.* at ¶ 77].

### D.  Impacts Of The RIF On Department Functions

Before the RIF, the Department of Education had the smallest staff compared to the 15

other cabinet-level executive Departments [*Id.* at ¶ 65 ("[C]ompare just over 4,000 employees at

the Department of Education with the approximately 80,000 employees at the Department of

State, for example")]. As a result of the layoffs after the RIF, Consolidated Plaintiffs allege that

key components of the Department have been effectively gutted, thus leaving the agency

incapable of performing many of its core, statutorily mandated functions. [Doc. No. 1 at ¶¶ 120,

134 ("In sum, on information and belief, the RIF has so severely impaired the Department of

Education that it can no longer function and cannot comply with its statutory requirements.")].

For instance, Consolidated Plaintiffs allege that the Office of General Counsel ("OGC")

has been devastated, as "every single division [within the OGC] except for the division of post-

secondary education was abolished" and nearly three-quarters of its staff removed. [25-cv-10677

Doc. No. 1 at ¶ 66; Doc. No. 1 at ¶ 124]. All OGC attorneys specializing in K–12 grants, IDEA

grants, and equity grants have been fired, along with the majority of OGC attorneys handling

privacy issues. [Doc. No. 1 at ¶ 125]. Moreover, all attorneys who advise on regulations or

informal guidance, elementary and secondary education, civil rights, legislation, ethics

obligations, contract issues, labor and employment issues, and the Freedom of Information Act,

were fired. [25-cv-10677 Doc. No. 1 at ¶ 66]. Consolidated Plaintiffs claim that the OGC's gutting will interfere with the Department's statutory duties of advising many units and offices across the Department on this wide array of topics. [Doc. No. 1 at ¶ 124].

Consolidated Plaintiffs also contend that the RIF has significantly harmed the Department's Financial Student Aid ("FSA") programs and functions, which provide financial assistance to almost 12.9 million students across approximately 6,100 postsecondary educational institutions. [*Id.* at ¶ 128]. Consolidated Plaintiffs argue that before the RIF, the agency was already unable "to provide any communication to schools, servicers, or borrowers about how to navigate the changes that [were] coming" under the Trump administration. [*Id.* at ¶ 129 (quoting *Dismantling of Education Department Puts Future of Trillions of Dollars in Student Loans in Question*, CNN (Mar. 7, 2025, 2:51 PM), https://edition.cnn.com/2025/03/07/politics/student-loans-education-trump)]. Additionally, many employees with institutionalized knowledge about FSA programs had quit or been fired. [*Id.*].

After the RIF, many Department employees in various units under the FSA umbrella were terminated, which has further hamstrung the Department's ability to carry out its student-aid-related duties. [*Id.* at ¶¶ 131-33]. For instance, many employees in the FSA's School Eligibility and Oversight Services Group—"responsible for administering a program of eligibility, certification, financial analysis, and oversight of schools participating in [FSA] programs"—were fired, thus diminishing the Department's ability to ensure that schools remain compliant with Title IV requirements for federal funding. [*Id.* at ¶ 131]. Furthermore, the FSA's Vendor Oversight Division has been effectively eliminated. [*Id.* at ¶ 132]. The Vendor Oversight Division ensures that loan servicers meet contractual and Departmental obligations and is key in verifying compliance with the requirements of the Public Service Loan Forgiveness (PSLF)

program and the Income-Based Repayment plan before student debt under these programs is discharged. [*Id.*]. The RIF has also removed employees in FSA's Product Management Group who managed various tools and applications that assisted borrowers in tasks such as certifying their qualifying employment for the PSLF Program. [*Id.* at ¶ 133]. Additionally, the entire team that supervises FAFSA was eliminated. [25-cv-10677 Doc. No. 1 at ¶ 66].

Other parts of the Department which Consolidated Plaintiffs allege the RIF has effectively abolished or materially impacted include: OSERS, including the entire staff that provides IDEA-implementation guidance to states and other grantees, and the entire communications staff that sends key information to students, parents, schools, and states, [Doc. No. 1 at ¶ 126; *see also* 25-cv-10677 Doc. No. 1 at ¶ 66]; the Office of Elementary and Secondary Education's State and Grantee Relations Team, "which partners with stakeholders and connects them to the resources and relationships they need to support and educate students nationally," [Doc. No. 1 at ¶ 127]; the Institute of Education Sciences, where "almost the entire staff . . . has been eliminated," [*Id.* at ¶ 121]; the entire staff of the Office of English Language Acquisition, [25-cv-10677 Doc. No. 1 at ¶ 66]; the entire staff responsible for managing grant operations, grant-related fiscal risk, and contract procurement across the Department, [*Id.*]; and the entire Office of International and Foreign Language Education, [*Id.*].

### E. **Harm To Plaintiff States**

Plaintiff States allege that the Department's effective dismantling will cause serious harm to them and their residents. [Doc. No. 1 at ¶ 135]. To begin with, Plaintiff States claim that the RIF will lead to the loss of or delay in funds intended to support many aspects of K–12 education within their borders, such as salary funding, support for students with disabilities, and afterschool programs. [*Id.* at ¶ 136]. Schools in Plaintiff States use federal funding to pay the salaries of

teachers, special education teachers, paraprofessionals, reading specialists, physical therapists, speech therapists, and social workers. [*Id.*]. Therefore, any RIF-induced loss of funding threatens to reduce school staff, increase class sizes, exacerbate teacher shortages, diminish educational opportunities for students, terminate afterschool programs, and erode support services for students with disabilities. [*Id.*]. Despite whatever alternative sources of support are substituted for the Department, Plaintiff States contend that by itself its "dismantling will create and has created chaos, disruption, uncertainty, delays and confusion for [them] and their residents." [*Id.* at ¶ 137]. For instance, states expecting federal funds do not know who to contact about those disbursements, and students at state universities are left in the dark about the status of their federal student aid packages, including whether the packages will be processed and available before the Fall 2025 semester begins. [*Id.*].

Plaintiff States point to updates on one of the Department's websites following the RIF as an example of the type of chaos likely to ensue. [*Id.* at ¶ 138]. Immediately after the RIF, the Department's website for administering federal funds (referred to as the "G6" system) was shut down. [*Id.*]. G6 "allowed schools to request payments, adjust drawdowns, and return cash to the Department for many Title IV programs." [*Id.*]. On March 12, 2025, the day after the RIF was announced, the G6 website stated: "G6.ed.gov will no longer exist, G5.gov will be the correct URL. To access G5, external users should enter their G5 email ID and their G5 email password." [*Id.*]. Users who subsequently navigated to the G5.gov system to get funds disbursed then encountered an alert on the G5 website warning them to "expect delays in connecting to a live help desk agent for assistance with G5." [*Id.* at ¶ 139]. Here in Massachusetts, a G5-user working for the state's Department of Elementary and Secondary Education tried to access the G5 system

to request disbursements of anticipated federal funds but was unable to access the system for hours due to a "system glitch." [*Id.* at ¶ 140].

Plaintiff States also allege that the impacts to and eliminations of the various Department units and offices discussed above will each produce their own forms of harm [*Id*. at ¶ 141]. With an incapacitated OCR for instance, Plaintiff States fear that equal access to quality education may be restricted within their states. *See supra*, Section II.B.2; [*Id.* at ¶ 142]. Moreover, student complaints of discrimination, sexual harassment, and sexual assault may be ignored, and students with pending complaints are likely to be deprived of meaningful and timely resolutions of their cases due to the reduction in OCR staff. [*Id.*]. The hollowing out of OGC is also likely to have adverse effects, depriving employees of ethical guidance and interfering with the Department's ability to award K–12 grants, IDEA grants, and equity grants to Plaintiff States. [*Id.* at ¶ 144]. Furthermore, the effective elimination of the Office of Elementary and Secondary Education's State and Grantee Relations Team will result in Plaintiff States losing a critical partner in their mission to support and educate their students. [*Id.* at ¶ 145]. Higher education is also likely to become more expensive for students in Plaintiff States as the RIF will put federal funding for Pell grants, work-study programs and subsidized loans at risk, reducing the pool of students able to attend college and posing an existential threat to many state university systems such as those intended to serve first generation college students. [*Id.* at ¶ 143]. Even if these programs and grants were to remain fully funded, Plaintiff States claim that the RIF will prevent the Department from effectively operating these programs. [*Id.*].

The RIF's impacts on FSA will also harm student aid programs in multiple respects. [*Id.* at ¶ 146]. For instance, with the loss of employees in the School Eligibility and Oversight Services Group, "the Department has lost the tool responsible for administering a program of

eligibility, certification, financial analysis, and oversight of schools participating in Federal Student Aid programs." [*Id.*]. With the elimination of the FSA's Vendor Oversight Division, Plaintiff States are also hindered in their ability to ensure that loan servicers are complying with their contractual requirements, and the process by which loan servicers discharge student debt will be crippled as this division gives instructions to the loan servicers about discharging student debt under FSA programs. [*Id.* at ¶¶ 146, 148]. Additionally, the administration of FAFSA applications will be disrupted, resulting in "mass uncertainty regarding whether and how FAFSA applications will be processed" and therefore leaving students in limbo regarding their plans for attending college. [*Id.* at ¶¶ 79, 147]. As the college admissions process is presently in full swing—with the FAFSA application deadline less than six weeks away—the harm which will result from delays in application processing is imminent. [*Id.*].

**F.  Harm To Somerville Plaintiffs**

A description of the Somerville Plaintiffs is in order before discussing their alleged harm.

a.  *Plaintiff Somerville Public Schools ("Somerville")*, a public school district located in Massachusetts, operates eleven schools serving about 5,000 students and employing roughly 440 full-time teachers. [25-cv-10677 Doc. No. 1 at ¶ 20]. Federal funds (including from the Department) provide approximately 6% of Somerville's total budget. [*Id.*]. Nearly $3.5 million of this funding comes from federal grants administered by the Department. [*Id.*].

b.  *Plaintiff Easthampton Public Schools ("Easthampton")*, another public school district in Massachusetts, operates two schools serving approximately 1,400 students and employing about 118 full-time teachers. [*Id.* at ¶ 21]. During the 2024-25 school year, the Department provided Easthampton with more than $800,000 in federal funding. [*Id.*].

c.  *Plaintiff the American Federation of Teachers ("AFT")* is an AFL-CIO-affiliated organization headquartered in Washington, D.C., representing 1.8 million members residing

in every U.S. state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands. [*Id.* at ¶ 22]. AFT members include "pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals." [*Id.*]. By securing fair pay and benefits for its workers and fighting for safe working conditions, AFT furthers its mission of "promot[ing] fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities." [*Id.*].

d. *Plaintiff American Federation of Teachers Massachusetts ("AFT Massachusetts")*, a labor union in Massachusetts, is an independent nonprofit organization created under Section 501(c)(5) of the Internal Revenue Code. [*Id.* at ¶ 23]. Representing over 25,000 public school employees, higher education faculty and staff, and public librarians, AFT Massachusetts works to further "collaborative education reform" for the benefit of students and educators. [*Id.*]. Its members include "teachers, paraprofessionals, guidance counselors, school nurses, social workers, and other school employees," roughly 22,500 of whom work in public school districts across Massachusetts for pre-K through 12th-grade students. [*Id.*].

e. *Plaintiff AFSCME Council 93* is a council of labor unions in Maine, Massachusetts, New Hampshire, and Vermont. [*Id.* at ¶ 24]. The organization is headquartered in Boston, Massachusetts and is affiliated with the American Federation of State, County and Municipal Employees, AFL-CIO. [*Id.*]. AFSCME Council 93 represents thousands of public-school employees in Massachusetts, including paraprofessionals, instructional aides, counselors, cafeteria workers, bus drivers, safety officers, and maintenance and administrative staff. [*Id.*]. Its members work in at least 12 school districts and 27 institutions of higher education in Massachusetts. [*Id.*].

f.   *Plaintiff the American Association of University Professors ("AAUP")* is a nonprofit membership association incorporated in Washington, D.C., representing over 43,000 faculty, librarians, graduate students, and academic professionals working at institutions of higher education in every state. [*Id.* at ¶ 25]. Its purpose is to "advanc[e] academic freedom and shared governance, defin[e] fundamental professional values and standards for higher education, promot[e] the economic security of academic workers, and ensur[e] higher education's contribution to the common good." [*Id.*].

g.   *Plaintiff the Service Employees International Union ("SEIU")* is a labor union representing about two million workers in the public-service, property-service, and healthcare spaces throughout the United States, Canada, and Puerto Rico. [*Id.* at ¶ 26]. Among its members are public school employees in K-12 districts, such as "professionals, paraprofessionals, administrative employees, janitors, bus drivers, food service employees, and other educational support staff;" as well as "higher education employees, including faculty, librarians, counselors, student workers, administrative employees, and janitors." [*Id.*]. In Massachusetts alone, SEIU represents around 7,000 education workers. [*Id.*]. SEIU aims to provide quality public services and secure equitable access to education for all students. [*Id.*].

Regarding the harm alleged by Somerville Plaintiffs, the RIF has led to uncertainty with respect to the availability of federal funds, which risks disrupting services for students and programs within Somerville and Easthampton. [*Id.* at ¶¶ 81–85]. In addition to reducing staff and programs, the ability of these school districts to engage in long-term planning is in jeopardy as the result of budget uncertainty. [*Id.* at ¶ 84]. Federal funds amount to almost 6% of Somerville's school budget, helping to pay for at least 28 staff members, keep class sizes smaller, run summer schools to maintain learning gains for students over the summer, provide services to children with disabilities, offer free preschool, pay for low-income students to take advanced placement

classes, and more. [*Id.* at ¶ 79]. Federal funds similarly play an important role within Easthampton's budget, helping the district pay for staff and student transportation, keeping class sizes smaller, and funding extracurricular activities such as art, music, and athletics, among other things. [*Id.* at ¶¶ 80, 85]. School districts tend to make important planning decisions months in advance, and without assurance that federal funds will be available to support their plans, they are left in a precarious position. [*Id.* at ¶ 81].

Take Somerville's summer programs for instance: decisions involving food-nutrition services and city-run parks and recreation programs are finalized as early as March. [*Id.* at ¶ 82]. Moreover, by early May, Somerville schools must establish summer staffing and programming, typically relying on previously approved federal funds in the process. [*Id.*]. Unsure whether federal funds will be readily available, Somerville may be unable to plan for and provide certain essential summer services. [*Id.*]. Somerville's plans for the full academic year are also disrupted as the result of federal-funds uncertainty. [*Id.* at ¶ 83]. Decisions for the full academic year, including staffing commitments, must be made by May 15. [*Id.*]. If federal funding is uncertain, cuts may have to be made to educators and staff who provide vital student services. [*Id.*].

Furthermore, Somerville Plaintiffs will be impacted by the loss of IDEA funding stemming from the RIF. [*Id.* at ¶¶ 115–16]. For instance, many members of AFT and AFT Massachusetts are special education teachers who rely on IDEA funding to pay their salaries. [*Id.* at ¶ 116]. IDEA also funds the provision of assistive technologies—including text-to-speech and word-prediction devices, Braille displays, and talking calculators—that support students with visual impairments. [*Id.*]. Without such technologies, AFT members will experience difficulty effectively communicating with and teaching students with disabilities. [*Id.*]. Moreover, AFT members risk losing other support provided by the Department, such as professional development assistance and guidance on technology and instructional methods, further

interfering with their ability to educate students with disabilities. [*Id.*]. Members of AFSCME Council 93 and SEIU likewise rely on IDEA funding. [*Id.* at ¶ 117]. School districts employing the paraprofessionals and instructional aides represented by these organizations use IDEA funding to pay for these educators' salaries, professional development and continuing education, as well as critical classroom resources and technology. [*Id.*].

School districts themselves will also be impacted by the loss of IDEA funding. [*Id.* at ¶ 118]. Somerville uses the nearly $1.8 million it receives in IDEA funds to support special education teachers, paraprofessionals, and other specialists, as well as to support students with disabilities directly via summer school, smaller class sizes, special-education-oriented supplies and materials, translation services, and individualized student education plans, among other things. [*Id.* at ¶ 119]. Given the wide array of IDEA-supported special education services in Somerville, any reduction or delay in IDEA funds risks impairing the district's ability to adequately support students with disabilities. [*Id.*]. Similarly, Easthampton uses the approximately $550,000 it receives in IDEA funds for many purposes, including staff salaries, direct services to students, summer programming, staff trainings, and extended-year special education—a disruption in such funds will therefore harm the district's ability to support students with disabilities. [*Id.* at ¶ 120].

The lack of adequate staff to administer Title I funds—relied on by school districts around the country to benefit students via increased resources and instructional support—will also have an adverse effect on Somerville Plaintiffs, resulting in funding delays, an absence of advice to states on how to spend the funds effectively, and barriers to obtaining the waivers which allow for greater flexibility in how the funds are spent. [*Id.* at ¶¶ 172–77]. Department staff work with states to help them submit the state plans required by statute to receive Title I funds, and they also provide technical assistance, advice, and support to the states on effectively

spending those funds to ensure that the state's educational goals are satisfied. [*Id.* at ¶¶ 174–75]. Interference with these functions will hamstring the use of Title I funds, thereby diminishing the ability of AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members to optimally serve their students as educators. [*Id.* at ¶ 178]. Members of these organizations leverage the Title I program to access training and development to support the needs of their students. [*Id.*]. Moreover, states and schools utilize Title I funds to help pay teacher salaries. [*Id.* at ¶ 179]. As funds are denied or delayed, larger class sizes, less instructional support, increased workloads, and job losses will harm educators and make their jobs more difficult. [*Id.*].

School districts like Easthampton and Somerville also depend on the availability of Title I funds to plan their budgets and pay their bills, so disruptions in the availability and timing of these funds will affect their ability to plan for future programing and avenues of student support. [*Id.* at ¶¶ 179, 181]. Somerville, for instance, receives $1.1 million dollars in Title I funding, which it uses to support reading teachers, math interventionists, pre-kindergarten educators, tutors, and professional-development services for staff. [*Id.* at ¶ 181]. Meanwhile, Easthampton receives more than $250,000 in Title I funding, using it to support reading specialists, intervention services, and K-8 school-wide programming. [*Id.*].

Somerville Plaintiffs allege they will further be harmed by the RIF's impact on the Department's federal student aid services. [*Id.* at ¶ 141]. A core mission of school districts like Somerville and Easthampton is to support their students in attending higher education, and they rely on the support of FSA services to accomplish that goal. [*Id.*]. Without services like FAFSA and the student loan and grant programs, college will become unaffordable for many of these districts' students. [*Id.*]. FSA services also benefit AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members. [*Id.* at ¶ 142]. For instance, thousands of AFT, AFT Massachusetts, and SEIU members have received federal student loans or grants through the student aid program,

and they use repayment programs to manage loan repayment while working as teachers and in other essential professions. [*Id.* at ¶ 143]. Similarly, many AFSCME Council 93 members rely on federal student loans and grants to fund their education and training, using FSA programs and resources to identify repayment options that make sense for them. [*Id.* at ¶ 148]. FSA and its loan servicers support the operation of these programs by providing technical assistance to guide students on optimal repayment options. [*Id.* at ¶ 143]. Delays in the provision of such assistance, or "in any aspect of loan administration, including processing repayments and applications for deferral or forbearance," risks harming the members of these organizations who count on the smooth operation of FSA programs to effectively manage their loans. [*Id.*].

AFT and SEIU also support their members in receiving loan forgiveness through the PSLF program, which allows government or nonprofit employees to have their student loans forgiven after ten years of repayment. [*Id.* at ¶¶ 144–46]. AFT and SEIU host clinics to educate their members about repayment options like PSLF, and rely heavily on Department resources like guidance documents, loan repayment calculators, and instructions to advise borrowers on which student loan forgiveness program is best for them. [*Id.* at ¶¶ 145–47]. Thus, a reduction in Department assistance and resources threatens to harm these organizations by interfering with their ability to support their members effectively through the loan repayment process. [*Id.* at ¶ 147]. Moreover, the fact that the entire office tasked with supervising the contractors processing PSLF payments was eliminated will disable AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members from leveraging the PSLF program to reduce their debt burdens. [*Id.* at ¶ 150].

The mass OCR office closures and terminations of OCR employees further risk harming Somerville Plaintiffs, hindering the Department's ability to effectively enforce civil rights laws and provide guidance to schools regarding compliance with these laws. [*Id.* at ¶ 159]. The significant reduction in OCR resources will render the timely review of complaints filed by

students, parents, and teachers much more difficult, thus diminishing the protections of student rights and potentially propelling students, parents, teachers, and schools into costly litigation. [*Id.* at ¶ 160]. Students, educators and staff—including AFT, AFT Massachusetts, AFSCME Council 93, AAUP, and SEIU members—benefit from effective OCR enforcement of civil rights. [*Id.* at ¶ 161]. For example, an educator facing retaliation for acting as a whistleblower can file a complaint with OCR to prevent the school from further retaliating. [*Id.*]. Moreover, graduate students—including AAUP and SEIU members—experiencing issues like sexual harassment at universities are also protected by OCR. [*Id.* at ¶ 162]. School districts like Somerville and Easthampton will also be harmed by the dismantling of OCR given that they rely on OCR guidance to remain compliant with civil-rights obligations, distributing OCR resources to help their students and families navigate civil-rights protections. [*Id.* at ¶ 167].

The incapacitation of various other Department functions risks creating additional harm for the students, schools, and teachers represented by Somerville Plaintiffs [*Id.* at ¶ 182]. These other functions include: programs designed to support rural school districts, which are sparsely populated and typically less resourced than urban and suburban districts; career and technical education ("CTE") services, which provide practical instruction for youth and adult students to prepare them for jobs in critical, well-paying industries like advanced manufacturing, health sciences, and information technology; the Office of English Language Acquisition, Language Enhancement, which supports English learners via grants and educational research; and the Institute of Education Sciences ("IES"), which evaluates the efficacy of federal education programs, collects education statistics, and funds education sciences. [*Id.* at ¶¶ 182–208].

### III.    RIPENESS

This case is ripe for review. Defendants disagree and argue that Consolidated Plaintiffs' claims are not ripe because the Department has not actually closed, and "cannot be closed absent

action by Congress." [Doc. No. 95 at 24]. They argue that any harms flowing from Defendants'

actions are hypothetical and that Consolidated Plaintiffs have only speculated that the

Department will cease providing services in the middle of its "reorganization." [*Id.* at 24–25].

But Defendants' attempts to characterize Consolidated Plaintiffs' claims as based entirely on the

actual closure of the Department is a red herring. The record "makes plain that Defendants intend

to dismantle the Department—and effectively close it—*without* Congressional authorization,"

[Doc. No. 101 at 11–12], and are using a large-scale RIF to do so. Additionally, Defendants have

not provided evidence to meaningfully counter that Consolidated Plaintiffs are already being

harmed, thereby establishing a direct and immediate dilemma that is fit for resolution. [25-cv-

10677 Doc. No. 41 at 11–12].

      "The injunctive and declaratory judgment remedies are discretionary, and courts

traditionally have been reluctant to apply them to administrative determinations unless these

arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Laboratories v.*

*Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430

U.S. 99 (1977). The ripeness doctrine "prevent[s] the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also to protect the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148–149.

A ripeness analysis requires the court to "evaluate both the fitness of the issues for judicial

decision and the hardship to the parties of withholding court consideration." *Id.* at 149.

      As to the "fitness" prong, the "critical question . . . is whether the claim involves

uncertain and contingent events that may not occur as anticipated or may not occur at all."

*McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citation omitted). "The fact

that an event has not occurred can be counterbalanced in this analysis by the fact that a case turns

on legal issues not likely to be significantly affected by further factual development." *Id.*

(citation omitted). As to the "hardship" prong, the inquiry "typically turns upon whether the

challenged action creates a 'direct and immediate' dilemma for the parties." *Id.* (citation

omitted). "This inquiry encompasses the question of whether plaintiff is suffering any present

injury from a future contemplated event." *Id.*

      Consolidated Plaintiffs meet both the fitness and the hardship prongs. The issues are fit

for judicial review because the claims at issue do not involve uncertain or contingent events.

Consolidated Plaintiffs' claims are not based on an actual closure of the Department, but on the

effective incapacitation of the Department to carry out congressionally mandated functions

through the guise of what Defendants argue is a "reorganization." *See* [Doc. No. 95 at 13, 14, 19,

25, 28].[9] Defendants cannot have it both ways. While repeatedly referring to the mass

terminations as merely a "reorganization" not ripe for judicial review, Defendants simultaneously

sidestep that the mass terminations were *explicitly* implemented to shut down the Department.

Section 2 of the Executive Order is titled, "Closing the Department of Education and Returning

Authority to the States," and clearly directs the Secretary to "take all necessary steps to facilitate

---

[9] *See, e.g.*, [Doc. No. 1 at ¶ 156 (Count I – Separation of Powers: "Any instance where the President, by Executive Order or otherwise, directs that an agency authorized by Congress to perform statutory duties cease operations, effectively repeals the statutes that authorize that agency and thus violates the Separation of Powers doctrine"); ¶ 163 (Count II – Take Care Clause: "By issuing the Directive to dismantle an agency authorized by Congress, the President has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause"); 25-cv-10677 Doc. No. 1 at ¶ 227 (Count III – *Ultra Vires*: "Defendant[s]' actions to dismantle the Department, including the March 11 mass termination, the Executive Order, plans to transfer portions of the Department to other federal agencies, and subsequent steps to implement that Order, are outside of Defendants' authority to act"); ¶ 232 (Count IV – Actions Contrary to Constitutional Right under the APA: "Defendants' actions to dissolve the Department of Education, including by effectuating mass terminations of the Department's staff and planning to transfer portions of the Department to other federal agencies, usurp legislative authority conferred by the Constitution to Congress, in violation of the separation of powers"); ¶ 239 (Count V – Excess of Statutory Authority under the APA: "Defendants lack authority to dismantle the Department, in whole or in part, including by effectuating mass terminations of the Department's staff or otherwise implementing the Executive Order's directive")].

the closure of the Department of Education."[10] *See* [Doc. No. 71-1]; *see also* [Doc. No. 71-9]

(Reporting on President Trump's "desire to do away with the department entirely," his hope that

"Ms. McMahon would effectively put herself out of a job," and his desire "to close [the

Department] immediately")].

As explained in further detail with relevance to the parties' standing and irreparable harm

arguments, the Consolidated Plaintiffs have demonstrated that this is a case "in which the impact

of the [terminations] upon the petitioners is sufficiently direct and immediate as to render the

issue appropriate for judicial review at this stage." *Abbott*, 387 U.S. at 152; *see id.* at 153

("Where the legal issue presented is fit for judicial resolution, and where a regulation requires an

immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties

attached to noncompliance, access to the courts under the Administrative Procedure Act and the

Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual

circumstance, neither of which appears here"). A department without enough employees to

perform statutorily mandated functions is not a department at all. This court cannot be asked to

cover its eyes while the Department's employees are continuously fired and units are transferred

out until the Department becomes a shell of itself.[11]

---

[10] That this directive is qualified by the statement "to the maximum extent appropriate and permitted by law" does not make Defendants' actions lawful.

[11] The cases Defendants cite do not support them. *F.T.C. v. Standard Oil Co. of California*, 449 U.S. 232 (1980) (discussing finality of agency action as opposed to ripeness); *City of New York v. United States Dep't of Def.*, 913 F.3d 423 (4th Cir. 2019) (same). In *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90–91 (1st Cir. 2013), the First Circuit held that "enactment of the [challenged] Ordinance itself" showed there was "no doubt that the City intend[ed] to enforce the Ordinance," and that claim was ripe, but that the "claim concerning the potential future results of the application process" was not ripe because there were "further factual developments that could be relevant to the outcome of this case." Like *Roman Catholic*, the enactment of the RIF itself demonstrates Defendants' intentions of enforcing it. Further factual development is not necessary to make this issue ripe for resolution.

## IV.    STANDING

To establish standing, a "plaintiff must have suffered an 'injury in fact,'" . . . "the injury has to be 'fairly traceable to the challenged action of the defendant,'" and the injury must be likely redressable through a favorable decision of a court. *Lujan v. Defs. of Wildlife*, <u>504 U.S. 555, 560</u>–61 (1992) (cleaned up). Article III standing requires that a plaintiff "suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, <u>594 U.S. 413, 423</u> (2021). The injury must be "real, and not abstract." *Id*. at 424 (cleaned up). "Central to assessing concreteness is whether the asserted harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts"—such as physical harm, monetary harm, or various intangible harms. *Id.* at 414 (cleaned up). Furthermore, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, <u>568 U.S. 398, 409</u> (2013).

Contrary to Defendants' assertion, Consolidated Plaintiffs—who can be divided into three groups: Plaintiff States, School Districts, and Union Plaintiffs—have shown concrete, imminent harm sufficient to establish standing. Below, I list just a few examples of Consolidated Plaintiffs' harms due to the RIF. *See infra* Section VI.B (providing comprehensive summary of irreparable harms to Consolidated Plaintiffs as a result of the RIF, including financial uncertainty and delay, impeded access to vital research upon which students, districts, and educators rely, and loss of essential services provided by the Office for Civil Rights and Federal Student Aid.).

### A.    <u>Plaintiff States And School Districts</u>

As a result of the RIF, Plaintiff States have already experienced delays and disruptions in their receipt of primary and secondary education funding from the Department. [<u>Doc. No. 71-29</u>

at ¶ 25 (As of March 18, 2025, the New Jersey Department of Education ("NJDOE") "received a notice to expect delays in connecting to a live help desk agent because of severe staffing restraints" when attempting "to view and withdraw federal funds to use for its programs and to pay vendors.")]. I believe this delay and uncertainty in educational funding constitutes an injury in fact directly harming Plaintiff States, whose vital function is to provide quality education to their citizenry. *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954) ("[E]ducation is perhaps the most important function of state and local governments.).

Additionally, both Plaintiff States and School Districts have shown that such uncertainty and delay stemming from Defendants' actions are harming State Education Agencies ("SEA"s), Local Education Agencies ("LEA"s), colleges, and universities by making it extraordinarily difficult to plan, budget, and hire educators. For example, Somerville Public Schools "do not know whether [they] will be able to add staff before the 2025-26 school year, or whether [they] . . . will be able to provide summer school, or whether [they] will be able to retain staff . . . [w]ithout timely and predictable funding, Somerville would be forced to make cuts – including possibly premature cuts – to staff and programs, disrupting services for students and families. This instability makes long-term planning nearly impossible and weakens the district's ability to provide high-quality education and support." [25-cv-10677 Doc. No. 27-7 at ¶ 48]. RIDE, "a department and the operating arm of the Rhode Island Council on Elementary and Secondary Education," receives federal funding totaling over $60 million, which "are allocated to state education agencies which then subgrant directly to eligible entities. Funding delays or interruptions will compromise the ability of LEAs to ensure that their students are minimally proficient on State academic assessments, will hobble the capacity of LEAs to support, develop, and train qualified teachers, and will have an immediate and detrimental effect on the quality of education in Rhode Island. Interruptions or delays in the administration of Title I funding,

39

specifically, will be strongly felt, as over half of Rhode Island schools currently receive this funding." [Doc. No. 104 at ¶¶ 4, 15–16].

Given these uncontested declarations, School Districts have shown injury in fact sufficient to establish standing. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (Standing found where a defendant's actions "directly affected and interfered with [plaintiff's] core business activities."). Plaintiff States have shown additional grounds for standing through injury in fact to their SEAs and LEAs. *Biden v. Nebraska,* 600 U.S. 477, 489 (2023) (finding injury sufficient to confer standing to Missouri, where the Secretary of Education's plan harmed a nonprofit government corporation of the state, which performed the essential public function of helping Missourians access student loans to pay for colleges). It is also important to note that these injuries to Plaintiff States and School Districts would not have occurred in the absence of the RIF that they challenge. *Compare Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 45 n.25 (1976) (fairly traceable element of standing not met where "respondents' injuries might have occurred even in the absence of the IRS Ruling that they challenge").

### B.  Union Plaintiffs

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, Union Plaintiffs assert concrete injury on behalf of their members, who rely on federal student aid to afford their education and on positions created through federal work study, without which Union Plaintiffs' members would be forced to forgo higher education, default on existing loans, or potentially opt out of careers in

public service. [25-cv-10677 Doc. No. 27-13 at ¶¶ 3, 18–23 (The labor union SEIU is guided by a "vision for a just society where all workers are valued and all people are respected." SEIU's local chapter, CSUEU represents a bargaining unit of student assistants at California State University," and "[t]housands of these student assistants rely on aid via federal work study positions" as well as "to afford tuition, food, rent, other living expenses, and transportation off-campus internships.")]. Thus, taken together, Consolidated Plaintiffs have shown sufficient injury traceable to Defendants' actions to establish standing.

I am not convinced by Defendants' assertion that Consolidated Plaintiffs admit that they lack understanding of the Department's reorganization. In support of their contention, Defendants point to Consolidated Plaintiffs' statement that the Dear Education Stakeholders letter provided little detail about the cuts to OESE, OELA, and OSERS. To say that Consolidated Plaintiffs lack understanding of the reorganization based on a description of a Department communication ignores the numerous declarations from former Department employees, which describe in great detail the RIF's impact to specific offices within the Department. [Doc. No. 71-58; Doc. No. 71-61; Doc. No. 71-67; Doc. No. 71-68; Doc. No. 71-69; Doc. No. 102-8 (detailing impacts to FSA); Doc. No. 102-10 (detailing impacts to OESE); Doc. No. 71-64 (detailing impacts to IES); 25-cv-10677 Doc. No. 27-6 (detailing impacts to OGC); Doc. No. 71-48 (detailing impacts to OCR)].

Finally, Defendants argue that even if Consolidated Plaintiffs could show an imminent, actual harm, Defendants have exercised appropriate discretion in conducting a reorganization. I agree that there is "wide latitude traditionally granted to the government in dispatching its own internal affairs." *Gately v. Com. of Mass.*, 2 F.3d 1221, 1234 (1st Cir. 1993). But Consolidated Plaintiffs are not disputing that the Department has the authority to reorganize the Department

and implement an RIF *so long as such reorganization allows the Department to fulfill its statutory mandates*. [Doc. No. 121 at 10:7–25]. Here, Consolidated Plaintiffs allege that the Department has been effectively dismantled, through the RIF, resulting in a failure by the Department to meet its statutory mandates. Consolidated Plaintiffs have provided an extensive record, particularly through supporting declarations from former Department employees, that their harms stem from the Department's inability to effectuate vital statutory functions specifically tasked to it. Thus, Consolidated Plaintiffs have standing to challenge the Department's actions.

## V.     JURISDICTION

Another preliminary issue for resolution is whether the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191–216 (1978) (codified at 5 U.S.C. §§ 7101–35), divests this court of jurisdiction. The CSRA "provides for the original and exclusive administrative review of certain labor- and employment-related claims brought by federal employees and/or their unions." *Maryland v. United States Dep't of Agric.*, No. cv 25-0748, 2025 WL 973159, at *15 (D. Md. Apr. 1, 2025).

Defendants argue that the CSRA precludes Consolidated Plaintiffs' claims challenging the mass terminations, because the "essential nature of Plaintiffs' challenge" is the "employment at the Department of Education." [Doc. No. 95 at 21, 23]. According to Defendants, had the Department eliminated only a single program office or conducted a more limited RIF, the appropriate challenge would have been brought by aggrieved agency personnel before the Merit Systems Protection Board ("MSPB"), and the Union Plaintiffs' exclusive remedy is review before the Federal Labor Relations Authority ("FLRA"). I would agree with that scenario. But that is not the situation here. Rather, the magnitude and the proportion of the mass terminations accounting for 50% of the Department's workforce has effectively incapacitated the Department.

This case is not about unlawful terminations; this case is about the impact that those terminations have on the Department's ability to fulfill its congressional obligations. In any event, Consolidated Plaintiffs are not "current or former employees of the Department, nor are they labor unions." [Doc. No. 101 at 11]. Plaintiffs are "local school districts and teachers' unions that represent educators who work in state and local schools. They do not represent any federal employees at the Department of Education." [25-cv-10677 Doc. No. 41 at 18-19]. As such, the CSRA does not apply.

The CSRA "established a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto,* 484 U.S. 439, 455 (1988). Under the CSRA, aggrieved "federal employees may obtain administrative and judicial review of specified adverse employment actions," including "removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5-6 (2012) (citing 5 U.S.C. § 7512). Employees and labor unions may appeal decisions of the MSPB or FLRA to the federal courts of appeals. 5 U.S.C. §§ 7101 *et seq.* Consolidated Plaintiffs are not federal employees or labor unions who have access to the MSPB or FLRA under the CSRA. Though Defendants assert that the MSBP and the FLRA are the "exclusive means for federal employees, labor unions, and *other interested parties*" to raise challenges to adverse employment actions, [Doc. No. 95 at 21 (emphasis added)], they do not cite to any authority supporting that "other interested parties" are subject to the CSRA or define who these "other interested parties" are.[12]

---

[12] None of the cases Defendants cite involve any plaintiff other than an employee or union. *See, e.g.*, *Elgin*, 567 U.S. 1, 6-7 (employees suing over their dismissal for failure to register for the Selective Service); *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 635 (D.C. Cir. 2013) (unions and one employee suing over military uniform requirements); *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 75-753 (D.C. Cir. 2019) (unions suing over changes to federal labor-management relations scheme); *Fausto*, 484 U.S. 439 (employee suing over individual disciplinary action); *see also Maryland*, 2025 WL 973159, at *15 (collecting cases).

43

Rather, the plain text of the statute forecloses its application to any litigant who is not an individual, labor organization, or agency. *See* 5 U.S.C. § 7103(a)(1) (a "person" is an "individual, labor organization, or agency"); §7103(a)(2) (an "employee" is either an individual "employed in an agency" or whose employment "has ceased because of any unfair labor practice," as described in the statute); § 7103(a)(4) (a "labor organization" is "an organization composed in whole or in part of employees, in which employees participate and pay dues, and which has as a purpose the dealing with an agency concerning grievances and conditions of employment").

Further, Consolidated Plaintiffs' harms are "sufficiently distinct from the employee- and union-focused harms Congress intended to channel away from the district courts." *Maryland*, 2025 WL 973159, at *15.[13] Here too, Consolidated Plaintiffs "have suffered unique harms . . . irrespective of those harms' connection with the agency-employee relationship." *Maryland*, 2025 WL 800216, at *14. In *American Federation of Government Employees*, for example, the court held that it had jurisdiction over claims brought by public-sector unions concerning federal employee terminations. There, the court found that,

> [T]he public-sector unions' ultra vires or separation-of-powers claim is not about each employer agency's purported decision to terminate any or all of its employees. Instead, it is about a prior controlling event: Did the OPM exceed its authority when it directed all federal agencies to terminate their probationers *en masse*? This distinguishes these claims from others that have attacked, substantively or procedurally, one agency's decision about one employee or its own workforce, which are the kinds of claims appellate courts have channeled into the CSRA.

---

[13] In a closely analogous case, the District Court of Maryland conducted a thorough analysis of the application of the CSRA to States who sued over the government's implementation of a reduction in force that resulted in the mass layoffs of probationary employees. *See Maryland v. United States Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *13 (D. Md. Mar. 13, 2025); *Maryland*, 2025 WL 973159 (D. Md. Apr. 1, 2025). The Fourth Circuit recently granted the Government's motion to stay the injunction pending appeal. Though the Fourth Circuit granted the stay, stating "[t]he Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims, and the Government is unlikely to recover the funds disbursed to reinstated probationary employees," the court did not provide any reasoning for that conclusion. *Maryland v. United States Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025). I am not bound by the unexplained conclusion of the Fourth Circuit, and I rely on the Maryland District Court's reasoning as persuasive here.

No. 25-cv-01780, 2025 WL 900057, at *1, 3 (N.D. Cal. Mar. 24, 2025). (cleaned up). Here, the question is similar: Did Defendants exceed their authority in firing Department employees *en masse* to circumvent Congress's power to dismantle the Department? And, unlike in *American Federation*, Consolidated Plaintiffs here do not represent or purport to be employees of the Department. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-03698, 2025 WL 1358477, at *15 (N.D. Cal. May 9, 2025) ("[T]he Civil Service Reform Act says nothing at all about non-federal employee unions, non-profit organizations, or local governments"); *Winnebago Tribe of Nebraska v. Babbitt*, 915 F. Supp. 157, 165 (D.S.D. 1996) ("In any event, jurisdiction under the CSRA is dependent upon whether the plaintiff is an employee"). As another federal court also recently held in an analogous case, this case is "not simply an employment dispute." *Widakuswara et al. v. Lake et al.*, No. 25-cv-1015, 2025 WL 1166400, at *11 (D.D.C. Apr. 22, 2025) (granting in part preliminary injunction and finding court had jurisdiction over plaintiffs' claims arising out of a RIF dismantling a federal agency).

## VI.   PRELIMINARY INJUNCTION

Consolidated Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Consolidated Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. Among these four factors, the likelihood of success is the "main bearing wall" of the analysis. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (cleaned up). This Court accepts as true "all of the well-pleaded allegations of [Plaintiffs'] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

## A. **Likelihood of Success on the Merits**

### 1. **Constitutional Claims**

Defendants argue that Plaintiffs' constitutional claims are barred as purely statutory. For this proposition, Defendants rely primarily on *Dalton v. Specter*, 511 U.S. 462 (1994). However, *Dalton* is inapplicable here, and Defendants conceded at the motion hearing that the President's actions were not taken pursuant to any statutory authority. *See* [Doc. No. 121 at 49–50].

In *Dalton*, respondents sought to enjoin the Secretary of Defense from carrying out a decision by the President, pursuant to the Defense Base Closure and Realignment Act of 1990 (the "1990 Act") to close the Philadelphia Naval Shipyard. 511 U.S. at 464. Respondents alleged that the Secretary violated the 1990 Act in recommending closure of the Shipyard. *Id.* at 466. The Court held that the President's decision to accept a flawed recommendation "is not a 'constitutional' claim subject to judicial review under the exception recognized in *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), but simply a statutory claim." *Id.* at 462 (cleaned up). The Court rejected "the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," distinguishing "between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. However, the Court distinguished its holding in *Dalton* from its decision in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), where the Government did not rely on *any* statutory authorization for its actions.

The Court clarified that in *Youngstown*, as opposed to *Dalton*:

> The only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces. Because no statutory authority was claimed, the case necessarily turned on whether the Constitution authorized the President's actions. Youngstown thus involved the *conceded absence of any statutory authority*, not a claim that the President acted in excess of such authority. The case cannot be read for the proposition that an action

taken by the President in excess of his statutory authority necessarily violates the Constitution.

*Id.* at 473 (emphasis added).

I agree with Consolidated Plaintiffs that *Dalton* does not stand for the proposition that "action outside the scope of statutory authority can *never* give rise to a constitutional violation." [Doc. No. 101 at 16 (emphasis in original)]. Nevertheless, Consolidated Plaintiffs' constitutional claims are more akin to *Youngstown*, "where *no* statutory authority supported the President's actions." [*Id.* (emphasis in original)]. Consolidated Plaintiffs assert that "[i]n hobbling the Department, Defendants acted both without any supporting statutory authority and directly contrary to congressional intent. Their constitutional power was thus "at its lowest ebb." [*Id.* at 16–17 (citing *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring))]. Unlike in *Dalton*, where the 1990 Act was the ground for plaintiff's challenge, here, Consolidated Plaintiffs challenge the Directives as outside the scope of the executive's authority entirely. They do not allege a violation of the DEOA—rather, the Act simply evidences that the Department was created pursuant to Congress's authority and cannot be dismantled without it. *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110, 218 L. Ed. 2d 348 (2024) ("*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains *no limitations* on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available.") (cleaned up).

### a.  Separation of Powers And Take Care Clause

By "eliminating the staff required to meet Congress's requirements," Consolidated Plaintiffs argue that the Executive Branch is unlawfully abolishing the Department and its statutorily mandated components. [Doc. No. 70 at 38]. Amici members of Congress state that,

"Defendants' actions violate the Constitution's separation of powers under which Congress holds the sole power to make laws and the Executive faithfully executes those laws." [Doc. No. 106-1 at 8, citing U.S. Const. art. I; id. art. II, § 3). I find that Consolidated Plaintiffs are likely to succeed in showing that Defendants are effectively disabling the Department from carrying out its statutory duties by firing half of its staff, transferring key programs out of the Department, and eliminating entire offices and programs.

"All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. "To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction, the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees, and the fixing of the term for which they are to be appointed and their compensation—all except as otherwise provided by the Constitution." *Myers v. United States*, 272 U.S. 52, 129 (1926). The President "shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, but the "repeal of statutes, no less than enactment, must conform with Art. I." *INS v. Chadha,* 462 U.S. 919, 954 (1983). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("Executive must abide by statutory mandates and prohibitions").

The DEOA recognized that "the dispersion of education programs across a large number of Federal agencies has led to fragmented, duplicative, and often inconsistent Federal policies

relating to education," 20 U.S.C. § 3401, and therefore declared that "the establishment of a Department of Education is in the public interest, will promote the general welfare of the United States, will help ensure that education issues receive proper treatment at the Federal level, and will enable the Federal Government to coordinate its education activities more effectively." 20 U.S.C. § 3402. The Executive Order's direction to "facilitate the closure of the Department of Education and return authority over education to the States and location communities" goes directly against Congress's intent in creating the Department to "supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education." *Id.* While it may be true that the President has the power to remove executive officers, *see Myers*, 272 U.S. at 119, Defendants cite to no case that this power includes the power to dismantle Congressionally created departments and programs through mass terminations.[14] These actions violate the separation of powers by violating the executive's

---

[14] Defendants' cases cited in support of their argument that they were merely making permissible enforcement decisions with respect to the changes to the Office for Civil Rights do not apply. *See, e.g., Heckler,* 470 U.S. at 829 (FDA agency's decision not to institute enforcement proceedings under the Food, Drug, and Cosmetic Act with respect to drugs used for lethal injections was within agency's discretion); *United States v. Nixon*, 418 U.S. 683, 693 (1974) (Executive Branch has absolute discretion to decide whether to prosecute a case, and thus, "President's decision is final in determining what evidence is to be used in a given criminal case"). Here, Consolidated Plaintiffs do not challenge a "specific decision by Defendants regarding whether to pursue an enforcement action, or which enforcement actions to pursue." [Doc. No. 101 at 17]. "Rather, Plaintiffs argue that Defendants' actions to reduce OCR staff amount to an incapacitation of the Department's ability to meet its statutory obligations to begin with. The Department cannot, on its own, decide to render OCR incapable of performing the duties Congress established." [*Id.* (citing 20 U.S.C. § 3413)]. Defendants' cases supporting the idea that "implementation of such policy priorities is plainly within the purview of Defendants" also are inapposite, as they do not speak to Defendants' power to unilaterally dismantle a Congressionally created Department. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (refusing to find that an individual has standing merely by asserting a take care clause claim); *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111, 114 (1948) (finding that "the very nature of executive decisions as to foreign policy is political, not judicial," and therefore holding that the matters at issue were "political matters beyond the competence of the courts to adjudicate").

duties to take care to faithfully execute laws enacted by Congress, as well as its duties to expend

funds that Congress has authorized it to appropriate.[15] [16] *See Clinton*, 524 U.S. at 438

(President's actions in canceling provisions of certain budget and tax acts "in both legal and

practical effect . . . amended two Acts of Congress by repealing a portion of each. Statutory

repeals must conform with Art. I, but there is no constitutional authorization for the President to

amend or repeal") (citation omitted).

     **b.**  **Ultra Vires**[17]

     "To act *ultra vires* a government official is either acting in a way that is impermissible

under the Constitution or acting outside of the confines of his statutory authority." *Mesa Hills*

*Specialty Hosp. v. Becerra*, 730 F.Supp. 3d 342, 352 (W.D. Tex. 2024). "[A] claim alleging that

the President acted in excess of his statutory authority is judicially reviewable even absent an

applicable statutory review provision." *Am. Forest Res. Council*, 77 F.4th at 796. "Even when the

Congress gives substantial discretion to the President by statute, we presume it intends that the

President heed the directives contained in other enactments." *Id.* at 797. "The Congress can and

---

[15] The Supreme Court in *Myers* recognized that "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates. This view has since been repeatedly affirmed by this court." *Myers*, 272 U.S. at 117; *Aiken Cnty.*, 725 F.3d at 259 ("[T]he Executive must abide by statutory mandates and prohibitions. Those basic constitutional principles apply to the President and subordinate executive agencies"). If Defendants were correct that the Take Care clause only applies to the President, a President could evade Article II review by simply delegating the task to subordinates.

[16] Count IV of the Somerville Plaintiffs' Complaint alleges a separate claim under the APA that Defendants' actions are contrary to a Constitutional right. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B). For the same reasons that I find a likelihood of success on the merits of Consolidated Plaintiffs' constitutional claims, I also find a likelihood of success on this count.

[17] As explained above, *Dalton* does not preclude judicial review of the constitutional claims. *See Trump*, 2025 WL 1358477, at *18 (enjoining large-scale RIF, holding that "defendants misread plaintiffs' *ultra vires* theory against President Trump. Plaintiffs' claim is not that the President exceeded his statutory authority, as the *Dalton* plaintiffs claimed. Instead, Claim One is about the President acting without *any* authority, constitutional or statutory.") (emphasis in original).

often does cabin the discretion it grants the President, and it remains the responsibility of the judiciary to ensure that the President act within those limits." *Id.* "[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). "[F]ederal courts may in some circumstances grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

Defendants argue that any analysis of an *ultra vires* claims must be "confined to 'extreme' agency error where the agency has stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]" *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up). "Only error that is patently a misconstruction of the Act, that disregard[s] a specific and unambiguous statutory directive, or that violate[s] some specific command of a statute will support relief." *Id.* (cleaned up). Even under the extreme agency error standard, Defendants have likely acted *ultra vires*. As *Amici* Members of Congress explain, "no statute grants the Executive the authority to dismantle the Department because Congress has passed no 'statute that expressly authorizes' the Executive to dissolve the Department or transfer its congressionally mandated responsibilities to other agencies." [Doc. No. 110, at 35–36 (citing *Youngstown*, 343 U.S. at 585)]. As mentioned, the Agency Defendants have the authority to reorganize the Department how they see fit, so long as it can carry out Congress's mandates. However, as has been established, the Defendants have not made it a secret that their goal is to do away with the Department entirely; they have publicly and repeatedly stated so. These actions

are plainly beyond the bounds of what Defendants can do, and Defendants do not point to any authority to the contrary. Indeed, "[t]he simple proposition that the President may not, *without Congress*, fundamentally reorganize the federal agencies is not controversial." *Trump*, 2025 WL 1358477, at *18 (granting TRO arising from large-scale RIF) (emphasis in original).

### 2. **APA Claims**

#### a. **Final Agency Action**

As an initial matter, I find that the Agency Defendants' actions are final such that judicial review is available. "The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,' § 704, and applies universally except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law,' § 701(a)." *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (citing 5 U.S.C. §§ 701(a), 704). "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 177 (citation omitted).

As to the first condition, Defendants argue that the RIF "marks the initiation, not the consummation, of the agency's decision-making process" and that "Plaintiffs are unable to identify any concrete, final decision by the Department of Education to shut itself down." [Doc. No. 95 at 28]. But the record is clear that Defendants have made their decision: they intend to close the Department, without Congress's approval. Defendants do not purport to reverse the mass terminations, reinstate programs or offices that it closed, or bring back programs that it transferred out of the Department. *See Trump*, 2025 WL 1358477, at *21 (granting TRO and finding that defendants' actions in implementing the RIF "are done and final" because defendants

do not assert that actions are "subject to change" or that they may be "modified or rescinded," even though the "ultimate impacts of the RIFs may yet be unknown"). Nor do Defendants argue that they are still stewing on whether the Department is a "bureaucratic bloat," or that the Department is "inefficien[t] and [a] waste." [Doc. No. 95 at 12, 33]. Defendants' goal is clear, and their actions in furtherance of that goal are not subject to change.

As to the second condition, I find that there are "legal consequences [that] will flow" from the Agency Defendants' actions. *Bennett*, 520 U.S. at 177. "[A]ny agency's decision to dismiss an employee effects self-evident legal consequences for both parties and plainly marks the end of the agency's decision-making with respect to the employee involved." *Maryland*, 2025 WL 800216, at *11; *cf. Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025) ("OPM's direction to the other agencies [to dismiss probationary employees] constituted a final agency action for the purposes of the APA."). Here, Agency Defendants have already terminated half of the Department, shut down entire programs and offices, and transferred Congressionally mandated programs out of the Department. To the extent there is any room to argue that the Department may "reverse these actions at some unidentified point in the future . . . does not change the fact that the agency has made decisions, communicated them to their employees . . . and thereby altered their rights and obligations." *Widakuswara*, 2025 WL 1166400 at *12 (finding that "*final* does not mean *permanent*") (emphasis in original).

Contrary to Defendants' assertions, Consolidated Plaintiffs are not challenging some broad, abstract policy; they challenge the mass terminations designed to get rid of the Department. This case is not like *Lujan v. Nat'l Wildlife Fed'n.*, where the Court rejected a challenge to an agency's "land withdrawal review program." 497 U.S. 871 (1990). There, the Court held that the claims did not challenge a final agency action because the program is not "a

single [Bureau of Land Management] BLM order or regulation, or even a completed universe of particular BLM orders and regulations." *Id.* at 890. Rather, because the program "extends to . . . 1250 or so individual classification terminations and withdrawal revocations," the Court held that respondent "cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.* at 890-891 (citation omitted). Here, unlike in *Lujan*, Consolidated Plaintiffs' challenge is addressed squarely at a discrete set of final actions: the mass terminations of half the Department of Education, and the transfer of certain programs out of the Department. Issuing an injunction to that effect would not require this court to manage the day-to-day affairs of the Department, it would simply restore the status quo until this court can determine whether Defendants acted unlawfully.

### b. <u>Agency Action Committed To Discretion By Law</u>

Defendants' actions cannot be fairly categorized as mere managerial or staffing decisions that are typically afforded discretion. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," <u>5 U.S.C. § 702</u>, "except to the extent that . . . agency action is committed to agency discretion by law." <u>5 U.S.C. § 701(a)(2)</u>. "The Administrative Procedure Act creates a basic presumption of judicial review for one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, <u>586 U.S. 9, 22</u> (2018) (cleaned up). "Congress rarely intends to prevent courts from enforcing its directives to federal agencies. For that reason, this Court applies a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. E.E.O.C.*, <u>575 U.S. 480, 486</u> (2015) (cleaned up).

This presumption may be rebutted if an agency action is committed to agency discretion by law. *Weyerhaeuser*, 586 U.S. at 23. "A court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Id.* "To give effect to § 706(2)(A) and to honor the presumption of review, [the Supreme Court] ha[s] read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (citing *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

The Court has applied the exception in decisions involving allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 191, and reconsideration of a final action, *ICC v. Locomotive Engineers*, 482 U.S. 270, 282 (1987).[18] *Weyerhaeuser*, 586 U.S. at 23. In *Weyerhaeuser*, the Court held that an action challenging the Fish and Wildlife Service's designation of their land as a critical habitat for the dusky gopher frog under the Endangered Species Act "involves the sort of routine dispute that federal courts regularly review: An agency issues an order affecting the rights of a private party, and the private party objects that the agency did not properly justify its determination under a standard set forth in the statute." *Id.* at 23–24.

Defendants do not point to any analogous case holding that an agency's implementation of a RIF to dismantle itself falls within the narrow exception to judicial review under the APA.[19]

---

[18] *See also Lincoln*, 508 U.S. at 191 ("Over the years, we have read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion'"); *see Heckler v. Chaney*, 470 U.S. 821, 829 (1985) (FDA agency's decision not to institute enforcement proceedings under the Food, Drug, and Cosmetic Act with respect to drugs used for lethal injections was presumptively unreviewable); *Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (decision of Director of Central Intelligence to terminate an employee in the interests of national security was barred from judicial review under APA).

[19] To find that these actions fall within the narrow exception would greatly expand it—which I am unwilling to do. Further, the fact that the Department's actions prevent the effectuation of Congressionally mandated obligations itself demonstrates that these actions are not discretionary.

Defendants' cases cited in support of their arguments are inapposite, [20] especially where Courts

read the "exception for action committed to agency discretion 'quite narrowly.'" *Dep't of Com. v.*

*New York*, 588 U.S. 752, 772 (2019) (citing *Weyerhaeuser*, 586 U.S. at 23).

### c.  Beyond Statutory Authority

The Somerville Plaintiffs allege that the Secretary lacks the authority to abolish,

reorganize, or alter offices within the Department except in narrow circumstances provided by

the reorganization statute. *See* 20 U.S.C. § 3473. The Somerville Plaintiffs argue that Agency

Defendants exceeded their authority by abolishing offices that the reorganization statute

specifically prohibits, including: OESE, 20 U.S.C. § 3414; OSERS, 20 U.S.C. § 3417

(establishing OSERS), 20 U.S.C. § 1402 (requiring that OSEP, within OSERS, administer

IDEA); OCTAE, 20 U.S.C. § 3416; OCR, 20 U.S.C. § 3413, and others.

Under the reorganization statute in the DEOA, the Secretary,

> is authorized . . . to allocate or reallocate functions among the officers of the
> Department, and to establish, consolidate, alter, or discontinue such organizational
> entities within the Department as may be necessary or appropriate, but the authority
> of the Secretary under this subsection does not extend to-- (1) any office, bureau,
> unit, or other entity transferred to the Department and established by statute or any
> function vested by statute in such an entity or officer of such an entity, except as
> provided in subsection (b); (2) the abolition of organizational entities established
> by this chapter; or (3) the alteration of the delegation of functions to any specific
> organizational entity required by this chapter.

---

[20] *See Markland v. Off. of Pers. Mgmt.*, 140 F.3d 1031 (Fed. Cir. 1998) (no APA claim, and Federal Circuit
did not conclude that an agency's decision to institute an RIF was unreviewable, but rather that the RIF
was implemented in accordance with its regulations); *Union of Concerned Scientists v. Wheeler*, 954 F.3d
11, 17-18 (1st Cir. 2020) (First Circuit reversed district court's decision that a statute did not provide
meaningful standards that a reviewing court could apply because EPA "pointed [] to nary a case that
would suggest" that the agency decision in that case was "traditionally left to agency discretion"); *see
also Drake v. F.A.A.*, 291 F.3d 59, 70 (D.C. Cir. 2002) (FAA's decision to dismiss complaint brought by
flight attendant who alleged that airline violated drug testing regulations was not reviewable because this
decision "was equivalent to a decision not to commence an enforcement action"); *de Feyter v. Fed.
Aviation Admin.*, No. 10-cv-358, 2011 WL 1134657, at *5 (D.N.H. Mar. 25, 2011) (finding "the decision
not to impose civil penalties is generally the type of action committed to agency discretion").

20 U.S.C. § 3473(a)(1)–(3). The Secretary may alter or discontinue some entities within the

Department for other entities created by statute, including,

> (A) the Office of English Language Acquisition, Language Enhancement, and
> Academic Achievement for Limited English Proficient Students; (B) the Teacher
> Corps; (C) the Community College Unit; (D) the National Center for Education
> Statistics; (E) the National Institute of Education; (F) the Office of Environmental
> Education; (G) the Office of Consumers' Education; (H) the Office of Indian
> Education; (I) the Office of Career Education; (J) the Office of Non-Public
> Education; (K) the bureau for the education and training for the handicapped; (L)
> the administrative units for guidance and counseling programs, the veterans' cost
> of instruction program, and the program for the gifted and talented children.

20 U.S.C. § 3473(b)(1)(A)–(L). To the extent that the Secretary has discontinued offices that she

is not permitted to under the statute, such as the Office for Civil Rights, [Doc. No. 71-48 at ¶¶

22, 29], I find that the Somerville Plaintiffs are likely to prevail on this claim. To the extent that

the mass terminations are an effective dismantling of the entire Department, I also find that

Somerville Plaintiffs are likely to prevail. Defendants fail to cite to a single case that holds that

the Secretary's authority is so broad that she can unilaterally dismantle a department by firing

nearly the entire staff, or that her discretion permits her to make a "shell" department.

### d.  Arbitrary And Capricious

The APA requires that a court "hold unlawful and set aside agency action" that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). Under the APA, the arbitrary and capricious standard "is quite narrow: a reviewing

court 'may not substitute its judgment for that of the agency, even if it disagrees with the

agency's conclusions.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citing *River St.*

*Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). An agency action is arbitrary and

capricious only if the agency has "relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In making this determination, the reviewing court considers "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (cleaned up)). At bottom, this deferential standard requires that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce*, 588 U.S. at 785.

"Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). Here, I look to the March 11 Directive and the March 21 Directive for the Defendants' explanation. The March 11 Directive states that the 50% RIF was taken "[a]s part of the Department of Education's final mission." [Doc. No. 71-5 at 2]. The March 11 Directive also states that the RIF "reflects the Department of Education's commitment to efficiency, accountability, and ensuring that resources are directed

where they matter most: to students, parents, and teachers." [Doc. No. 71-5 at 2]. The Secretary also stated that the RIF was "a significant step toward restoring the greatness of the United States education system." [*Id.*]. As Defendants concede, the Secretary's March 14 "Dear Education Stakeholders" letter sent a few days after the announcement of the RIF also "includes only a cursory explanation." [Doc. No. 95 at 35]. The March 21 Directive was announced orally at a press conference by President Trump. There, President Trump stated that he has "decided that the SBA, the Small Business Administration, headed by Kelly Loeffler … will handle all of the student loan portfolio," that it will be "coming out of the Department of Education immediately," and that the "Health and Human Services Department, will be handling special needs and all the nutrition programs and everything else," explaining that it "will work out very well."[21]

None of these statements amount to a reasoned explanation, let alone an explanation at all. Indeed, the March 11 Directive contains two contradictory positions. It states that the goal of the RIF is to improve the Department's "efficiency" but also states that the RIF has been taken to further the Department's "final mission"—which is, incontrovertibly, its closure. Beyond that, Defendants have not shown how the RIF furthers its goals of "efficiency, accountability, and ensuring that resources are directed" to "parents, students, and teachers." *Dep't of Commerce*, 588 U.S. at 773 (a court must determine whether there is "a rational connection between the facts found and the choice made"). For instance, Defendants have not attempted to demonstrate that cutting a certain program in half has somehow made that program more efficient or returned necessary resources to the States. There is no indication that Defendants conducted any research to support why certain employees were terminated under the RIF over others, why certain offices

---

[21] Lexi Lonas Cochran, *Trump says student loans moving to SBA 'special needs to HHS*, The Hill (Mar. 21, 2025), https://thehill.com/homenews/education/5207597-trump-student-loans-sba-special-needs-disabled-students-hhs-mcmahon-kennedy.

were reduced or eliminated, or how any of those decisions further Defendants' purported goals of efficiency or effectiveness of the Department. This is especially so where Consolidated Plaintiffs have built a record demonstrating that those decisions have actually done the opposite. *See infra* Section VI.B; *See Amerijet*, 753 F.3d at 1350 ("[C]onclusory statements will not do; an agency's statement must be one of reasoning.") (cleaned up). To the extent that the Department's goals of efficiency and accountability or directing resources back to the States can amounts to an explanation, it is "incongruent with what the record reveals about the agency's priorities and decision-making process." *Dep't of Commerce*, 588 U.S. at 785. [22] Thus, I "cannot ignore the disconnect between the decision made and the explanation given." *Id.*

Additionally, Consolidated Plaintiffs have demonstrated that the Agency Defendants "failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. The Agency Defendants "entirely failed to grapple with the potential disruption to operations and interference with statutory and non-statutory functions a sudden elimination of nearly 50% of the Department's entire workforce would cause." [Doc. No. 70 at 35]. Nothing in the record indicates a consideration of the "substantial harms and reliance interests for students, educational institutions, Plaintiffs, and others." [*Id.* at 35–36]; *See Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions." (emphasis in original)). Defendants do not dispute this.

Rather, they suggest that the proper remedy is to remand the decision to the Department for additional explanation. This argument disregards a reviewing court's discretion to take any steps it deems necessary to prevent irreparable injury before a final judgment is reached. *See* 5

---

[22] The same is true as to the March 21 Directive, which provides no explanation, for example, how Congressionally mandated programs governing the facilitation of the federal student loan portfolios are made more efficient by being transferred to the Small Business Administration.

U.S.C. § 705 ("[T]o prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."). As discussed below, Consolidated Plaintiffs are likely to suffer irreparable harm should the status quo not be restored. While remand for further explanation by the agency is the typical remedy when the agency's actions are held arbitrary and capricious specifically because the agency fails to provide an adequate explanation for its actions, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985), Defendants' failure to provide a reasonable explanation is not the only ground for holding its actions unlawful. As discussed below, it is also likely that Defendants acted contrary to law. Such grounds for holding Defendants' actions unlawful are not necessarily contingent on a further development of the record or a more thorough explanation of Defendants' actions, and thus, remand for further explanation is not appropriate here. Moreover, courts have vacated and set aside agency action upon successful APA challenges. *See Massachusetts v. Nat'l Institutes of Health*, No. 25-cv-10338, 2025 WL 702163, at *34 (D. Mass. Mar. 5, 2025) (cleaned up), *judgment entered*, No. 25-cv-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) ("The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it").

### e.  Contrary To Law

Under the APA, a court must "hold unlawful and set aside" agencies actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A); *see also F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (Contrary to law "means, of course, any law, and not merely those laws that the agency itself is charged with administering"). The Agency Defendants' actions are contrary to law because "the Mass Termination amounts to a wholesale reorganization and

reduction in the size and scope of the Department in violation of 20 U.S.C. § 3473," the DEOA's

reorganization statute. [Doc. No. 70 at 36]. The Agency Defendants' actions in dismantling the

Department are further contrary to the DEOA inasmuch as it creates the Department, and

contrary to federal statutes that require the Department to carry out mandated functions including

implementing K–12 educational programs, disbursing funds, conducting mandatory data

collection and research, providing technical assistance, facilitating student loan programs,

implementing vocational education and rehabilitation programs, and enforcing civil rights laws.

      Consolidated Plaintiffs are likely to succeed on the merits of this claim. First, Defendants

have not pointed to any case that indicates that the Secretary's effective dismantling of the

Department is within her reorganization powers under § 3473. *See supra,* Section VI.A.2.c

(discussing Somerville Plaintiffs' claim that Secretary's actions exceed statutory authority).

Second, there are numerous federal laws that require the Department to carry out certain

functions. For example, the IDEA requires Defendants to "ensure" that children with disabilities

have access to educational opportunities, that their rights are protected, to "assist" states,

localities and other entities in providing effective and coordinated services to those children,

"support[]" coordinated research, technical assistance, technology development, and other

supports, and "assess, and ensure the effectiveness of, efforts to educate children with

disabilities." 20 U.S.C. § 1400(d)(1); [25-cv-10677 Doc. No. 26 at 31]. Congress also mandated

that the Department operate the OCR, which is charged with "identifying significant civil rights

or compliance problems," 20 U.S.C. §3143(b), employing staff "necessary to carry out the

functions" of the OCR, 20 U.S.C. § 3143(c), and review complaints from students and "make a

prompt investigation" of such complaints," 34 C.F.R. § 100.7; [25-cv-10677 Doc. No. 26 at 31].

Other statutes vest the Department with the responsibility to implement federal student aid, *see*

20 U.S.C. §§ 1018, 1087a(a), 1087b(a), 1087b(c), 3441(2)(C), administer mandatory formula funds for K-12 education and provide technical assistance to grantees, *see id.* §§ 6301, *et seq.*, and direct the Department to support English language learners, *see id.* § 3423d.

Finally, to the extent that the Agency Defendants' actions are an effective dismantling of the Department, I find that those actions are contrary to the DEOA's mandate that the Department itself must exist—not just in name only, but to carry out the functions outlined in the DEOA and other relevant operating federal statutes.

### B. Irreparable Harm

"'District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief.'" *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (citing *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989)). Importantly, "the measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Id.*, 587 F.3d at 485. Nonetheless, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Rather, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

An "'[i]rreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The movant has "the burden of demonstrating that a denial of interim injunctive relief would cause irreparable harm." *Ross-Simons of Warwick, Inc.*

*v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). Here, the Consolidated Plaintiffs have met their burden of showing that they are likely to suffer irreparable harm in the form of: (1) financial uncertainty and delay harming student education; (2) impeded access to vital knowledge upon which students, districts; and educators rely; and (3) loss of essential services provided by the office of Federal Student Aid and the Office for Civil Rights. Defendants do not dispute the veracity of the declarations submitted by Consolidated Plaintiffs, other than to say that they are speculative in nature.

### 1. Financial Uncertainty and Delay

#### a. Plaintiff States

According to supporting declarations, Plaintiff States are experiencing financial delays and uncertainty relating to the Department's administration of funds, resulting in harm to Plaintiffs States, including its student populations. [Doc. No. 71-29; Doc. No. 71-31]. For example, the New York State Education Department ("NYSED"), which is currently administering $15.7 billion in federal funding from the Department, is experiencing drawdowns delays for Education Stabilization Fund ("ESF") reimbursements since the RIF announcement, and "are awaiting on additional guidance and instructions for the approval of drawdown requests." [Doc. No. 71-31 at ¶¶ 6, 7]. The New Jersey Department of Education ("NJDOE") "received a notice to expect 'delays in connecting to a live help desk agent' because of 'severe staffing restraints'" when attempting "to view and withdraw federal funds to use for its programs and to pay vendors." [Doc. No. 71-29 at ¶ 25]. The Illinois State Board of Education ("ISBE") has been unable to access certain categories of funding since March 1, 2025. [Doc. No. 71-22 at ¶ 12]. Regarding Title I funds, the Office of Elementary and Secondary Education "provides preliminary allocation figures to States a few weeks after a continuing resolution is passed by Congress," which is important for States and local education agencies to plan their budget for the

upcoming year. [Doc. No. 102-10 at ¶ 12]. An employee at the OESE stated "[t]his year, however, that process has been disrupted, and we have not been able to get preliminary allocation figures to States despite a continuing resolution passing in March 2025." [*Id.*].

Plaintiff States ensure that federal funding is allocated to educational programs and services relating to special education, career readiness and technical education, bilingual education, early childhood education programs, and more. [Doc. No. 71-31; Doc. No. 104]. Absent an injunction, financial delay and uncertainty will irreparably harm Plaintiff States' SEAs, LEAs, students, and even payroll. *See* [Doc. No. 71-13 at ¶ 70 ("Untimely approvals and drawing of funds will significantly impact the State. Not only will that harm [California's] LEAs and students, but it will impact State payroll."); Doc. No. 104 at ¶¶ 4, 15–16 (RIDE, "a department and the operating arm of the Rhode Island Council on Elementary and Secondary Education", receives federal funding totaling over $60 million, which "are allocated to state education agencies which then subgrant directly to eligible entities. Funding delays or interruptions will compromise the ability of LEAs to ensure that their students are minimally proficient on State academic assessments, will hobble the capacity of LEAs to support, develop, and train qualified teachers, and will have an immediate and detrimental effect on the quality of education in Rhode Island. Interruptions or delays in the administration of Title I funding, specifically, will be strongly felt, as over half of Rhode Island schools currently receive this funding.")].

Plaintiff States have a clear interest in ensuring and protecting the education of its citizens. *See Brown*, 347 U.S. at 493 ("[E]ducation is perhaps the most important function of state and local governments."). I am convinced that the asserted harm to Plaintiff States' citizenry, particularly their student populations, constitutes irreparable injury to Plaintiff States for purposes of the preliminary injunction. *See Mediplex of Massachusetts, Inc. v. Shalala*, 39 F.

Supp. 2d 88, 99 (D. Mass. 1999) (finding that owner of a nursing facility had "an interest in protecting the health of its residents and [could] assert harm to them as irreparable harm for the purpose of [the] motion [for preliminary injunction]"); *see also Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121–22 (1st Cir. 2003) (cleaned up) (finding irreparable harm where "developmentally delayed and hearing-impaired teenager" experienced gap in interpreter services because even "a few months can make a world of difference in harm to a child's development"); *see also Plyler v. Doe,* 457 U.S. 202, 221 (1982) (noting the "lasting impact of [education's] deprivation on the life of the child," that "education has a fundamental role in maintaining the fabric of our society," and "the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.").

### b.  **School Districts**

School Districts have also suffered financial uncertainty hindering long term planning and undermining their mission to provide high quality education to students. [25-cv-10677 Doc. No. 27-7; 25-cv-10677 Doc. No. 27-9]. For example, Somerville Public Schools "do not know whether [they] will be able to add staff before the 2025-26 school year, or whether [they] will be able to provide summer school, or whether [they] will be able to retain staff . . . Ultimately without timely and predictable funding, Somerville would be forced to make cuts – including possibly premature cuts – to staff and programs, disrupting services for students and families. This instability makes long-term planning nearly impossible and weakens the district's ability to provide high-quality education and support." [25-cv-10677 Doc. No. 27-7 at ¶ 48; *cf.* 25-cv-10677 Doc. No. 27-9 at ¶ 29 (Easthampton School District facing similar challenges as Somerville Public Schools)].

As here, "[a]ctions by a defendant that 'make it more difficult' for' an organization 'to accomplish [its] primary mission . . . provide injury for purposes . . . irreparable harm.'" *Nat'l Treasury Emps. Union v. Vought*, No. 25-cv-0381, 2025 WL 942772, at *15 (D.D.C. Mar. 28, 2025) (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)); *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1126 (N.D. Cal. 2019), aff'd sub nom. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742 (9th Cir. 2020) (finding irreparable injury where the goals of providing healthcare and legal services were frustrated and that plaintiffs' changes to their programs and other diversions of resources constituted irreparable harm).

Furthermore, the detriment to Plaintiffs' organizational missions and to student education cannot be remedied through retroactive relief. [25-cv-10677 Doc. No. 27-7 at ¶ 46]. "[A]s students fall behind, it becomes harder to bring them back up." [*Id.*]; *see John T. v. Delaware County Intermediate Unit*, No. 98-cv-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time."). In Easthampton, without certainty regarding funds for IDEA and Title I, "the District would need to make several detrimental changes to programming[,]" including "cutting personnel and increasing class sizes," "instituting cuts in the District's discretionary spending, particularly arts, music, extracurricular activities, athletics, and other programs" and "cutting transportation funding, most notably high school busing." [25-cv-10677 Doc. No. 27-9 at ¶ 23]. Furthermore, "[t]here would additionally need to be cuts to professional development programming for staff, hindering the District's ability to support new teachers. If the funding situation got dire enough, the District would also need to close its preschool programming. All of these cuts would have profoundly negative effects on students, staff, and the teaching culture (i.e., pedagogical methods) of the District." [*Id.*].

Significantly, the School Districts have demonstrated that they lack sufficient financial resources to weather delays in funding. *See* [25-cv-10677 Doc. No. 27-7 at ¶ 42 (Somerville Public Schools "do not have sufficient financial resources to endure long periods of time without reimbursement, nor do [they] have the funds that would be required for us to spend money in [their] budget without knowing when or if [they] will receive reimbursement for those expenditures."); 25-cv-10677 Doc. No. 27-10 at ¶ 20 ("If the reimbursement were interrupted, it would be very difficult to fund [classroom aide] positions as the [Worcester Public School] District would not have other abilities to provide funding."); 25-cv-10677 Doc. No. 27-9 at ¶ 20 ("[The Easthampton School District"] do[es] not have sufficient financial resources to endure long periods of time without reimbursement, nor do[es] [it] have the funds that would be required [it] to spend money in [its] budget without knowing when or if [it] will receive reimbursement for those expenditures.")].

### c.  <u>Union Plaintiffs</u>

Union Plaintiffs' members, who serve as educators or education workers, are experiencing funding uncertainty, which will likely result in job loss and loss of employment benefits. [25-cv-10677 Doc. No. 27-11 at ¶¶ 10, 28 ("AFT members occupy a broad range of positions in education, including but not limited to: pre-K through 12th-grade teachers, early childhood educators, classroom aides, counselors, school nurses, paraprofessionals, and other school-related personnel; higher education faculty and professional staff at community colleges, colleges, and universities" and "delays or problems disbursing IDEA funds will harm AFT members through exacerbated workforce shortages, increased workloads, and job losses. [W]ithout reliable IDEA funds…money would either have to be reallocated away from other areas to maintain services, services would be reduced, and/or expectations would be placed upon fewer educators."); 25-cv-10677 Doc. No. 27-13 at ¶ 16 (Many SEIU members "whose salaries

are subsidized by the Department of Education's funding streams will be at risk of losing their jobs (and, accordingly, the salaries and health benefits they rely on to support themselves and their families)" if federal funding is delayed or cut); 25-cv-10677 Doc. No. 27-12 at ¶¶ 11, 14, 18 ("Title I funds the salaries" of teachers in "26 Massachusetts school districts that AFT Massachusetts members work in." If funding were cut or redirected, "[i]n Lynn, for example, it could mean the termination of approximately 84 teachers and 74 paraprofessionals.")

Here, "[w]hile [the Union] Plaintiffs' [are likely to] suffer the harm of losing employment, it is well settled that the loss of employment is not considered irreparable for the purposes of an injunction." *Massachusetts Correction Officers Federated Union v. Baker*, 567 F. Supp. 3d 315, 327 (D. Mass. 2021). I am also not convinced that the Union Plaintiffs' loss of associated employment benefits is enough to demonstrate irreparable harm for purposes of a preliminary injunction. Union Plaintiffs' cited cases, *United Steelworkers of Am. v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987), which specifically pertained to the benefit needs of 200 retired workers and a dispute regarding contracts outlining medical and life insurance benefits, and *Risteen v. Youth for Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002), which specifically involved a plaintiff who delayed "critical medical attention because he lost his health insurance," are distinguishable from the facts of this case, where Union Plaintiffs allege loss of benefits more generally.

## 2. Cuts To Vital Research, Data, Accreditation, And Compliance Services

### a. Impact To The Institute Of Education Studies At The Department

To understand the harms to Consolidated Plaintiffs, I first outline the lay of the land within the Institute of Education Studies at the Department. As a result of the RIF, three arms of the Institute of Education Studies at the Department, including the National Center for Education and Statistics ("NCES"), the National Center for Education Research ("NCER"), and the

National Center for Education and Evaluation ("NCEE"), which includes programs like What Works Clearinghouse and the Education Resources Information Center ("ERIC"), are unable to fulfill their mandates. [Doc. No. 71-64 at ¶¶ 5, 6, 8, 12]. Already, "cuts at NCES have had a major impact on the Department's collection and analysis of data." [Doc. No. 102-10 at ¶ 10]. With only three employees remaining, the NCES almost surely not be able to complete the National Assessment of Education Progress, "the largest continuing and nationally representative assessment of what the nation's students know and can do in subjects such as mathematics, reading, science, and writing," and "a congressionally mandated project administered by NCES," which previously thirty people used to work on alone. [Doc. No. 102-9 at ¶ 7a].

At NCER and NCEE, the only remaining employees are the two Commissioners. [Doc. No. 71-64 at ¶ 12]. The reduction also impacts other offices who rely on data provided by IES. For example, the Office of Elementary and Secondary Education ("OESE") within the Department relies on [NCES] data for their work," which cannot be ameliorated because "staff within OESE lack the subject matter expertise of many of the RIF'ed employees." [Doc. No. 102-10 at ¶ 10]. With regard to compliance services, a majority of employees at the Office of General Counsel were terminated and the Department is "[w]ithout legal advice from specialized OGC attorneys." [25-cv-10677 Doc. No. 27-6 at ¶¶ 10, 12].

### b. **Impact To Plaintiff States**

Plaintiff States have demonstrated they are likely to suffer irreparable harm to their educational systems because of cuts to research, data, accreditation, and compliance services at the Department. [Doc. No. 71-19; Doc. No. 71-36; Doc. No. 71-15]. More specifically, *see* [Doc. No. 71-19 at ¶¶ 17–18 ("The University of Hawai'i (UH) depends on IES data and analyses for strategic planning, policy development, program evaluation, and accreditation processes," which

"directly informs UH's initiatives to improve student retention, graduation rates, learning outcomes, and workforce readiness. Any reduction in IES support would not only compromise UH's institutional research and planning effectiveness but also undermine the State of Hawai'i's capacity to develop the competitive, skilled workforce needed for economic success."); Doc. No. 71-32 at ¶ 31 (SUNY relies on NCES and Integrated Postsecondary Education Data System data for benchmarking, which provides "critical context in regard to how SUNY is performing," and without it SUNY "will be less able…to provide its students with the best education possible."); Doc. No. 71-36 at ¶ 49 ("The elimination of all or most of the staff at IES/NCES and any associated delays, interruptions, or reductions in funding will likely have a debilitating effect on RIDE's [Rhode Island Department of Elementary and Secondary Education] ability to comply with the terms of this [statewide longitudinal data system] grant and carry out critical functions of this program."); Doc. No. 71-15 at ¶ 16 (Higher education institutions must report data to NCES by statute, and "with almost every employee working for NCES and IPED having been cut…this will likely lead to delays and issues with the data collection, which could be used to withhold or eliminate federal funding in Colorado institutions.")].

Plaintiff States have also shown that the pace of approval for critical recertification and change requests for Program Participation Agreements has slowed for colleges and universities, resulting in at least one close call shutdown of a campus. *See* [Doc. No. 71-43 at ¶¶ 7-12; Doc. No. 101 at 10 n.9]. After 18.5 weeks of uncertainty, a Washington technical college finally learned that its application had been approved, narrowly avoiding termination of their Tacoma campus lease, associated staffing positions, and program offerings. [Doc. No. 101 at 10 n.9]. Regarding accreditation, Plaintiff States have shown the RIF "jeopardizes the structure and

71

integrity of institutional accreditation, inflicting a loss of quality control to the detriment of students." [Doc. No. 71-19 at ¶ 18; *see also* Doc. No. 71-15 at ¶ 17].

### c. **Impact To School Districts**

Like Plaintiff States, the School Districts have demonstrated they are likely to suffer irreparable harm because cuts to vital resources and expertise will undermine the School Districts' ability to educate their students. *See* [25-cv-10677 Doc. No. 27-10 at ¶¶ 26–31 (Worcester regularly uses reports from IES to help it understand what types of innovation are effective and relies on technical assistance from the Department "continuously" to design its CTE curricula and to ensure compliance with Titles I through IV. If IES or the What Works Clearinghouse "were no longer available or were not kept current, the loss to school districts like Worcester would be irreparable" because of the constant need to innovate and because of the limited time to achieve results with each student and class year); *see also* 25-cv-10677 Doc. No. 27-7 at ¶¶ 28–31 (Somerville often relies on technical assistance from the Department, particularly through IES, and compromised access to such resources would impede Somerville's ability to provide its students with the "best possible education")]. Importantly, at least one school district has stated that they could not replace the Department's research. [25-cv-10677 Doc. No. 27-10 at ¶ 28 (Worcester "could never replicate the breadth and depth of [IES's] work")].

In particular, students with disabilities will be negatively impacted absent up-to-date data and technical assistance provided by the Department; without the Department's help, these students will be deprived of guidance and expertise essential to offering a quality education. *See* [25-cv-10677 Doc. No. 27-8 at ¶¶ 13–21 (For formula grants under IDEA which are subject to tight deadlines, states have historically worked closely with OSERS staff and relied on their

expertise to submit an application every year that includes assurances of how the state will ensure that schools will provide statutorily required free and appropriate public education, complaint resolution procedures for parent involvement, services for students in private schools, and more. OSERS staff work to correct application errors with states, which "if uncorrected could result in a student not receiving the services which they are entitled"); *see also* 25-cv-10677 Doc. No. 27-7 at ¶ 31 (Resources from the Department help Somerville in a variety of ways like providing "templates to IEP forms, suggestions for high-quality assistive technology; guidance on bullying prevention for students with disabilities; and webinars for helping educators communicate effectively with families through the IEP process")].

Furthermore, the closure of Office of English Language Acquisition will likewise irreparably harm Plaintiffs' ability to serve their English language learners. *See* [Doc. No. 102-12 at ¶ 13 (OELA was completely abolished and staff from the OESE are absorbing statutorily required work); Doc. No. 102-10 at ¶ 10–12 (outlining how the RIF is likely to have significant impacts on OESE's abilities to perform its core functions); 25-cv-10677 Doc. No. 27-7 at ¶ 20 (Title III funding helps pay for Somerville's English Language Learner program, and without access to the program, English learning students "would go without continuity in their language learning for about 10 weeks during the summer, which would cause a huge backslide in their learning."); 25-cv-10677 Doc. No. 27-10 at ¶ 16 (Worcester's Title III funding, amounting to $1.3 million, supports English learners through classroom instruction, programming tailored to English learners, professional development, and instructional coaches and supplemental programs, "both after school and during the summer to extend learning and prevent learning loss")].

73

Finally, "[w]ithout technical assistance provided by OGC lawyers, [] state agencies will be impeded in their ability to deliver federal funds, including funds appropriated in accordance with IDEA and ESEA, to local schools efficiently and on correct bases," further demonstrating irreparable harm. [25-cv-10677 Doc. No. 27-6 at ¶ 9].

### d.  Impact To Union Plaintiffs

Union Members also rely on data maintained by the Department for research for teaching in education programs, and to hold institutions and states accountable for meeting the needs of their communities. [25-cv-10677 Doc. No. 27-14 at ¶ 11 (Member of the American Association of University Professors who produces research that helps improve higher education uses data from IES when studying state policy and institutional productivity); 25-cv-10677 Doc. No. 71-64 at ¶ 15 ("Peer-reviewed educational research will no longer be available to everyone, but instead it will only be available to the elite who can pay to access it.")]. However, while I acknowledge that Union Plaintiffs engage in important work, I am not convinced the Union Plaintiffs have shown, at least at this stage, that they are likely to be irreparably harmed by the RIF's impacts to research.

### 3.  Essential Services Provided By FSA

### a.  The RIF's Impact To FSA

Again, to understand the harms to Consolidated Plaintiffs, I first outline the lay of the land within FSA itself. The RIF has resulted in the practical elimination of most, if not all, essential offices within the FSA. [Doc. No. 102-8]. For example, the Vendor Oversight Group ("VOG") was hit hard by layoffs, with almost all staff fired. [Id. at ¶¶ 37–38, 45]. For context, VOG previously enforced contractually required service level agreements ("SLA") to fulfill statutorily mandated oversight and compliance work – i.e. to ensure loan servicers issued proper

billing to the FSA and proper servicing to borrowers. [*Id.* at ¶¶ 18–20]. "Depending on the size of the loan servicer, failing a single SLA could cost a servicer and save taxpayers" amounts ranging from $150,000 to $2.5 million per SLA quarter; "VOG reduced the costs of administering student loan programs by tens of millions of dollars each year." [*Id.* at ¶¶ 23, 28].

As a result of the RIF, "all VOG's SLA work for the last quarter was immediately halted, and all of their work to date has been effectively lost." [*Id.* at ¶¶ 49–50]. "FSA's contracting officer will be forced to waive the SLA's requirements for 'interaction quality' and 'processing accuracy' for the previous quarter immediately costing taxpayers millions of dollars." [*Id.* at ¶ 50]. Significantly, "FSA will no longer have the capacity to measure interaction quality and processing accuracy, which inevitably results in a decline of customer service to borrowers and a cost increase to administer the student loan program." [*Id.* at ¶ 51].

In the medium term, the dramatic cuts to FSA will undermine FSA's ability to monitor and fix existing and new servicing issues. [*Id.* at ¶ 52]. For example, "VOG was tracking 183 open servicing issues that are no longer being effectively monitored and tracked to resolution." [*Id.*]. And in the longer term, "FSA is now like a house of cards" incapable of withstanding "any coming shocks to the federal student loan system." [*Id.* at ¶ 53]. This will likely materialize by October 2025, when approximately 9.5 million borrowers will be deemed to have defaulted on their student loans. [*Id.* at ¶ 54].

Additionally, six of eight School Participation Sections ("SPS") within the Office of Institutions of Higher Education ("IHE") Oversight & Enforcement have been eliminated. [Doc. No. 71-63 at ¶ 13; Doc. No. 71-52 at ¶ 12]. "IHE Oversight & Enforcement is responsible for administering eligibility, certification, financial analysis, and oversight of over 5,500 schools that participate in loan programs under Title IV," including for example Pell Grants and Federal Work

75

Study. [Doc. No. 71-63 at ¶ 5; *see also* Doc. No. 71-51 at ¶ 4; Doc. No. 71-52 at ¶¶ 4–6].

"Without staff adept at rooting out fraud, students will be taken advantage of, and taxpayer

money will be wasted." [Doc. No. 71-63 at ¶ 16]. These functions are critical for the success of

schools, the protection of students, and the safeguarding of taxpayer funds—and they are

required by statute and regulation. *See* 20 U.S.C. § 1018(c)(4); 34 C.F.R. § 668.171–77 (2025);

*see also* [Doc. No. 71-52 at ¶¶ 6–10]. FSA's Vendor Performance Division and Human Capital

Management Division was also eliminated by the RIF. [Doc. No. 71-68 at ¶¶ 7–9; Doc. No. 71-

69 at ¶¶ 6, 9–10, 13–16; Doc. No. 71-67 at ¶ 5]. The Office of the Ombudsman Federal Student

Aid was also heavily impacted by the Mass Termination. [Doc. No. 71-58 at ¶¶ 19, 20].

Regarding the Product Management Division within the Department, whose flagship

product is FAFSA, "the vast majority" of employees are subject to the RIF. [Doc. No. 71-61 at ¶¶

4, 7, 12]. "[I]t is not possible for the Product Management Division to fulfill its duties following

such vast cuts" and as a result "there will be regular technological problems and inaccurate

information that will impact schools and borrowers." [*Id.* at ¶¶ 13–14].

Importantly, former employees have stated given the quick termination and immediate

disabled access to work files and emails, they have not been able to transition work to others.

[Doc. No. 102-8 at ¶ 49; Doc. No. 71-63 at ¶ 11]. Finally, cuts to other offices, like the OGC,

impede the FSA's "ability to effectively manage the contracts for the FAFSA and loan servicers,

which must operate in accordance with highly specific federal authorities." [25-cv-10677 Doc.

No. 27-6 at ¶ 10].

### b. **Impact To Plaintiff States**

As already mentioned, Plaintiff States have also shown that the pace of approval for

critical recertification and change requests for Program Participation Agreements has slowed for

colleges and universities, resulting in at least one close call shutdown of a campus. [Doc. No. 71-43; Doc. No. 101 at 10 n.9; Doc. No. 71-16 at ¶ 7, 10 (In Fiscal Year 2024, FSA handled loan disbursement, servicing, and borrower assistance for 14,840 University of Connecticut students. Cuts would cause "substantial financial hardship for students impacted, causing them to discontinue their education…would result in fewer tuition and fee paying students, aided by the support of the FSA programs [], subsequently causing budget shortfalls…impacting potential employment opportunities for tax paying citizens in Connecticut and the United States."); Doc. No. 71-19 at ¶¶ 6–8 (University of Hawai'i "heavily depends on multiple FSA-administered programs," which "provide critical financial support to thousands of UH students annually." Loss of funding "would likely lead to higher student loan debt burdens, increased dropout rates, and potentially force students to work more hours, reducing their academic engagement and extending time to graduation . . . Any threat to [the Pell Grant Program] would have immediate, measurable impacts on enrollment, student success metrics, and economic mobility."); Doc. No. 71-25 at ¶¶ 9–10 ("Thirty-three percent of the Commonwealth [of Massachusetts'] public higher education students receive Pell Grants." Without these federally funded student aid programs, which currently amount to $251 million, the aid-cost gap would further widen and "likely make the Commonwealth's last dollar program in their current form cost prohibitive."); Doc. No. 71-30 at ¶¶ 8, 11 ("In the 2023-24 aid year, Rutgers students received over $491 million in federal aid through Pell Grants, Supplemental Educational Opportunity Grants, Federal Work-Study, and Direct Loans," and "for the current aid year, 2024-25, which is in progress, over $626 million in federal aid has been awarded-to-date to Rutgers students." The RIF "will likely delay the availability of federal financial aid if the [FAFSA] forms are not processed on time, creating cash flow challenges for Rutgers.")].

Additionally, the Department's actions risk the FAFSA system, on which federal student aid and Plaintiffs' public universities rely. [Doc. No. 71-32 at ¶¶ 18–19 (Completing the FAFSA is essential for Pell Grant eligibility and New York State-based financial aid programs, of which more than 100,000 SUNY students rely on and which provide approximately $340 million in financial aid to SUNY students. "Current high school seniors are in the midst of the FAFSA submission process right now, and a fully functioning FAFSA is essential to their families' ability to make college acceptance decisions for the fall."); Doc. No. 71-16 at ¶ 9 (RIF "is especially concerning in light of recent complications associated with accurate and timely transmission of FAFSA results to higher education institutions in 2024 via the FAFSA Simplification initiative, and even though some staff were reinstated "it is especially troubling that [RIF] included some of the staff who were instrumental in improving upon this critical step and may hold unique knowledge on how to avoid a repeat of the 2024 FAFSA simplification errors.")].

### c.  Impact To School Districts

Like Plaintiff States, School District Plaintiffs have shown cuts at the FSA are likely to irreparably harm their core mission: providing quality student education. [25-cv-10677 Doc. No. 27-7; 25-cv-10677 Doc No. 27-10]. "Without Federal Student Aid Services, including the FAFSA and student loan and grant programs, college would be out of reach for the vast majority of Somerville's students." [25-cv-10677 Doc. No. 27-7 at ¶ 32]. Furthermore, Somerville college counselors and other staff "rely heavily on materials produced by FSA" to help guide and support their students as they apply for federal student aid, including "guides, videos, checklists, and forms." [25-cv-10677 Doc. No. 27-7 at ¶ 33; *see also* 25-cv-10677 Doc No. 27-10 at ¶¶ 32–33 (Worcester's "work preparing students for college relies heavily on resources from the Department, such as how-to guides on assisting students filling out the FAFSA.")].

#### d. __Impact To Union Plaintiffs__

Similarly, regarding the Union Plaintiffs and their members, cuts to FSA will likely result in loss of access to materials that help their members understand loan repayment options. *See* [25-cv-10677 Doc. No. 27-12; 25-cv-10677 Doc. No. 27-13]. For example, AFT Massachusetts has assisted members that rely on the Public Service Loan Forgiveness program through student debt clinics and relies on the Department for technical assistance such as guidance documents, loan repayment calculator, and more. [25-cv-10677 Doc. No. 27-12 at ¶ 27]. Furthermore, Union Plaintiffs and its members rely on federal student aid to afford their education and on positions created through federal work study, without which Union Plaintiffs' members would be forced to forgo higher education, default on existing loans, or potentially opt out of careers in public service. [25-cv-10677 Doc. No. 27-13 at ¶¶ 18–23 ("CSUEU represents a bargaining unit of student assistants at California State University," and "[t]housands of these student assistants rely on aid via federal work study positions" as well as "to afford tuition, food, rent, other living expenses, and transportation off-campus internships.")]. In this instance, where they have shown reliance on federal work study positions and public service loan forgiveness programs, Union Plaintiffs' have demonstrated their members are likely to be directly and irreparably harmed due to cuts at the FSA.

#### 4. __Essential Services Provided By OCR__

#### a. __RIF Impact To OCR__

Again, to understand the harms to Consolidated Plaintiffs, I first outline the lay of the land within OCR. As part of the RIF, OCR staff has been cut by approximately fifty percent. [Doc. No. 71-48 at ¶ 22]. By June 2025, seven of the twelve regional offices—Boston, Dallas, New York, Chicago, Cleveland, San Francisco, and Philadelphia—will be closed. [*Id.* at ¶ 23]. As of March 21, 2025, staff in these offices were put on administrative leave. [*Id.*]. "To remove

79

seven of the twelve regional offices and approximately half of OCR's enforcement personnel means the office will exist in name but not in actual function." [*Id.* at ¶ 30]. Caseloads, which were already high, will only increase—already the average case load increased from 50 cases per investigator to 80 cases per investigator, and will likely jump as much as 120 cases per investigator.  [*Id.* at ¶¶ 25–26].

### b.  Impact To Plaintiff States

Absent an injunction, Plaintiff States will no longer be able to rely on OCR to investigate civil rights complaints about educational institutions within their jurisdictions. *See* [Doc. No. 71-29 at ¶ 20–23 ("Staff [at the New Jersey Department of Education] tried multiple times to get in touch with the New York Regional Office, but all telephone calls went to voicemail and no response has been received to date.")]. The result will be "an increase in the need for state enforcement of civil rights protections," but already overburdened states will struggle fill the gap. [Doc. No. 71-31 at ¶ 9; *see also* Doc. No. 71-42 at ¶ 20 (In Washington, "the responsibility for ensuring compliance with civil rights laws, disability rights laws, and appropriate accommodations for students with special needs will fall on already overburdened state resources" risking the safety of Washington's students); *see also* Doc. No. 71-22 at ¶ 15 ("ISBE does not have the capacity to also investigate, mediate, or adjudicate claims of discrimination under Section 504 or other claims of educational discrimination that are currently handled by OCR. Already . . . ISBE is experiencing an increase in technical assistance calls from parents and districts seeking help with Section 504 plans.")].

This is not a situation where Plaintiff States are merely being delegated tasks previously handled by the OCR. Rather, this is a case where the Department can no longer effectuate vital statutory functions specifically tasked to it, and which Plaintiff States are scrambling to fill. [Doc. No. 71-48 at ¶ 30 ("Given my experience," [as twice served Assistance Secretary for

Office for Civil Rights], I believe the Department's RIF will render the Department unable to

fulfill its statutory functions."); Doc. No. 102-12 ("OCR-Dallas' work is mandated by statutes

like the Civil Rights Act of 1964 and the American with Disabilities Act…I, [as a former Civil

Rights Attorney at the OCR], do not believe OCR's statutorily mandated work can [be]

completed by the few staff remaining in OCR, especially with impossibly heavy caseloads.")].

Cuts to OCR have already resulted in stalled or dropped investigations, further burdening

Plaintiff States and its students. [Doc. No. 102-7 at ¶ 7; Doc. No. 110 at 20–21]. For example, in

California, a parent of a student with a disability reached out to the California Department of

Education's ("CDE") Special Education division about concerns that an OCR decision

identifying violations of a LEA would not be enforced due to the RIF. [Doc. No. 110 at 20–21].

Such complaints, historically handled by OCR, "will place an extraordinary additional burden on

the CDE" that does not have the requisite staff or budget capacity. [Doc. No. 102-7 at ¶ 8; *see*

*also* Doc. No. 110 at 20 (After recent staff terminations, many parents have not received updates

or responses to their inquiries about their children's pending cases); 25-cv-11042 Doc. No. 20-16

at ¶¶ 18–24 (A Michigan student who withdrew from public school due to harassment was

informed on February 5, 2025 that OCR had paused its investigation into his complaint. "OCR

has not contacted [the student's] family to schedule the mediation since then, nor has it indicated

that any progress has been made . . . [The family] has no reason to believe the school will take

steps to keep A.J. safe in public school without OCR's intervention. As a result, [the family]

cannot send A.J. back to public school this coming fall.").].

Finally, without direct and ongoing guidance about anti-discrimination laws provided by

OCR, Plaintiff States will struggle to proactively combat discrimination and harassment. *See*

[Doc. No. 71-32]. "For example, to combat antisemitism and other forms of discrimination and

harassment, SUNY has taken extensive steps to fulfill its responsibilities under Title VI of the

Civil Rights Act of 1964 . . . These efforts by SUNY which "would not have been possible

without the direct and ongoing guidance from OCR." [*Id.* at ¶ 23]. These steps include

"mandatory Title VI training for all SUNY faculty and staff; requiring that campuses complete

Title VI checklists before relevant events; and promulgating guidance with expectations for how

students can submit and campuses will receive Title VI complaints." [*Id.*]; *see also* [Doc. No. 71-

48 at ¶ 14 (OCR "provides trainings and technical assistance to state and local educational

agencies nationwide" by "answer[ing] questions from schools, community organizations, and

parent associations on topics including the laws in OCR's jurisdiction, OCR process, and types

of civil rights harms.")]. Such examples further demonstrate that absent an injunction, Plaintiff

States will suffer irreparable harm.

Taken together, Plaintiff States have shown that such cuts to the OCR will likely

irreparably harm Plaintiff States, absent an injunction. Through supporting declarations, Plaintiff

States have shown that their ability to investigate civil rights complaints and adjudicate claims of

discrimination are likely to be impeded as a result the RIF. Thus, given the impact to its citizenry,

Plaintiff States have demonstrated a sufficient risk of irremediable harm for purposes of the

preliminary injunction. *See E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738, 745 (1st Cir. 1996)

(finding irreparable harm "because the Commission's ability to investigate charges of

discrimination and to enforce anti-discrimination laws has been and continues to be impeded").

### c.  <u>Impact To School Districts</u>

Similarly, the School Districts and its students will no longer be able to rely on the OCR,

in its current state, for civil rights enforcement, training, and investigation, demonstrating

irreparable harm. For example, "the training and information" that Easthampton has "gained

from OCR has enabled the District to respond to issues with compassion and empathy, rather

than punitive measures…creating a healthier school environment." [25-cv-10677 Doc. No. 27-9

at ¶ 33]. When Easthampton encountered an issue "related to racial bias and discrimination[,]" OCR's assistance "investigating and rectifying the issue was invaluable. [*Id.* at ¶ 31; *see also* 25-cv-10677 Doc. No. 27-8 at ¶¶ 41-43 (describing the benefits of the OCR complaint resolution process)].

Without an injunction, Easthampton will no longer be able to "rely on the guidance put out by the Department of Education to know how to respond legally and adequately." [25-cv-10677 Doc. No. 27-9 at ¶ 34; *see also id.* at ¶¶ 38–39 (describing reliance on OCR's "technical support," "technical assistance" and "guidance, funding, and training"); 25-cv-10677 Doc. No. 27-11 at ¶ 62 (describing the "significant technical assistance to support school districts" that is provided by OCR); 25-cv-10677 Doc. No. 27-8 at ¶ 41 (OCR provides a "critical enforcement mechanism" for students and their families "to vindicate their rights"); *id.* at ¶ 42 ("OCR offers critical resolution processes" that "allow issues to be resolved in a timely manner" and "frequently help[] restore the working relationship between the family and the school and school district.")].

### d. Impact To Union Plaintiffs

Union Plaintiffs' members rely on OCR's investigation and resolution processes, without which they will be irreparably harmed. [25-cv-10677 Doc. No. 27-11 at ¶ 61; 25-cv-10677 Doc. No. 27-12 at ¶ 28 ("Shutting down OCR would reduce teacher efficacy to address systemically hostile school environments, harming the workplace and students.")]. For example, AFT members file complaints with OCR on behalf of themselves, in instances of retaliation, or students, in instances of harassment. [25-cv-10677 Doc. No. 27-11 at ¶ 60]. Likewise, Union Plaintiffs' members who are students rely on the investigation and complaint procedures provided by OCR and "will be harmed if these complaint and investigation processes are less effective or less timely." [25-cv-10677 Doc. No. 27-13 at ¶ 20].

83

5. **Irreparable Harm Summary**

Here, "[e]ven though, as established above, the likelihood of success on the merits is great, which would allow a movant [to] show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief, the allowance is unnecessary." *Nat'l Institutes of Health*, No. 25-cv-10338, 2025 WL 702163, at *31. Through supporting declarations of former Department employees, universities and colleges, local and state education agencies, union members, and educators, Consolidated Plaintiffs have shown that they are likely to suffer irreparable harm in the form of financial uncertainty and delay damaging student education, (2) impeded access to vital knowledge upon which students, districts, and educators rely, and (3) loss of essential services provided by the office of Federal Student Aid and the Office for Civil Rights.

More specifically, Plaintiff States and Schools Districts are experiencing delays and uncertainty in their receipt of federal educational funding, amounting in the millions, which jeopardize their missions of ensuring an educated citizenry and providing quality education. Such delays and uncertainty raise immediate predicaments about whether there will be sufficient staff and student programming for the 2025-2026 school year and hinder long term planning. Students will feel these effects in the form of lower quality of education, further demonstrating irreparable harm. Regarding cuts to IES, two of the country's most vulnerable student populations, English language learners and students with special needs, will be particularly harmed. Absent an injunction, Plaintiff States and School Districts will no longer have access to data and research that guide student education and educational programming, which can range from bullying prevention for students with disabilities to technical assistance for how to implement IDEA and Title III funding appropriately.

There is more. Consolidated Plaintiffs have overwhelmingly shown that the RIF has resulted in the practical elimination of most, if not all, essential offices within the FSA. The Department's actions have directly impacted the FAFSA system and risk its functionality. It is undisputed that current high school students are applying to and rely on FAFSA to make decisions about their higher education as soon as Fall 2025. Where the majority of employees have been eliminated in the Department division whose flagship product is FAFSA, Consolidated Plaintiffs face imminent harm. Similarly, students and former students, including Union Plaintiffs, and universities alike rely on federal funding through programs like Federal Work Study, Pell Grants, Direct Loans, and Public Service Loan Forgiveness, which are at risk. Finally, Consolidated Plaintiffs will no longer be able to rely on the OCR, in its current state, for civil rights enforcement, training, and investigation, demonstrating irreparable harm. Cuts to OCR have already resulted in stalled or dropped investigations, further burdening Consolidated Plaintiffs.

Taken together, the detriment to state and local educational institutions and to both former and current students cannot be remedied through retroactive relief or money damages. Thus, I am convinced that, absent an injunction, the risk of harm to Consolidated Plaintiffs is immediate and irreparable.

### C.  **Balance Of The Equities And The Public Interest**

"A plaintiff seeking a preliminary injunction must establish…that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. When the Government is the opposing party, as here, the balance of the equities and public interest analyses merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The balance of the equities tips in favor of Consolidated Plaintiffs because "there is a substantial public interest in having governmental agencies abide by the federal laws that govern

their existence and operations." *Newby*, 838 F.3d at 12. Further, Consolidated Plaintiffs have demonstrated a "high likelihood of success on the merits," which "is a strong indicator that a preliminary injunction would serve the public interest." *Id.* On the other hand, Defendants argue that the public is suffering irremediable harm because a preliminary injunction would "displace and frustrate the President's decision" as to how to "set[] his policy priorities for the Department of Education" and that the Government will be harmed if it is "forced to compensate employees for unneeded and unnecessary services." [Doc. No. 95 at 36]. However, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12.

Furthermore, a preliminary injunction would serve the public interest because there is a substantial risk that, without it, there will be significant harm to the functioning of public and higher education, particular in Plaintiff States. It is well established that an educated citizenry provides the foundation for our democracy. As the Supreme Court has articulated:

> [E]ducation is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society . . . It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

*Brown*, 347 U.S. at 493. There exists a reciprocal relationship: the citizens of the Plaintiff States have a right to education under their respective constitutions and the Plaintiff States have an interest in an educated citizenry as evidenced by their compulsory education laws. As stated in Members of Congress's amicus brief, "Congress created the Department in the wake of the Supreme Court's decision in *Brown v. Board of Education,* a time when Congress recognized, from past experience, that 'the enforcement of the civil rights laws' could face 'an inhospitable climate' depending on the executive in power and the politics of the era." [Doc. No. 110 at 17

(citing Legislative History, Pub. L. No. 96-88, 125 Cong. Rec. H14487 (June 12, 1979)

(Remarks of Rep. Rosenthal))]. "But now, the Trump administration is engaging in precisely the

'short-circuit[ing] Congress worked to prevent." [*Id.*]. Here, Consolidated Plaintiffs have

detailed the consequences that Defendants' actions will have on students, parents, teachers, and

core education programs. *See supra* Section VI.B. Thus, the balance of the equities and the

public interest strongly favor Plaintiffs. *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit

Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006) ("[T]he

public has an important interest in making sure government agencies follow the law").

## VII.   BOND

Pursuant to Federal Rules of Civil Procedure 65(c), a "court may issue a preliminary

injunction . . . only if the movant gives security in an amount that the court considers proper to

pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained." However, "[t]he First Circuit has recognized an exception to the bond requirement in

suits to enforce important federal rights or public interests," as is precisely the case here.

*Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 129 (D. Mass. 2003)

(cleaned up). Accordingly, I find that no security is necessary under Rule 65(c). *See also, e.g.*,

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-00333, 2025 WL 573764,

at *30 (D. Md. Feb. 21, 2025) (cleaned up) (imposing nominal bond of zero dollars where bond

would "essentially forestall Plaintiffs' access to judicial review")

\* \* \*

87

## VIII.   CONCLUSION

For the reasons stated above, Consolidated Plaintiffs' Motion for Preliminary Injunction,

[Doc. No. 69; 25-cv-10677 Doc. No. 25], is GRANTED.  The Department must be able to carry

out its functions and its obligations under the DEOA and other relevant statutes as mandated by

Congress.

It is therefore ORDERED, until further order of this Court, that:

1. The Agency Defendants are enjoined from carrying out the reduction-in-force announced on March 11, 2025; from implementing President Trump's March 20, 2025 Executive Order; and from carrying out the President's March 21, 2025 Directive to transfer management of federal student loans and special education functions out of the Department;

2. The Agency Defendants are enjoined from implementing, giving effect to, or reinstating the March 11, 2025, the President's March 20, 2025 Executive Order, or the President's March 21, 2025 Directive under a different name;

3. The Agency Defendants shall reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the reduction-in-force announced on March 11, 2025 to restore the Department to the status quo such that it is able to carry out its statutory functions;

4. The Agency Defendants shall provide notice of this Order of Preliminary Injunction within 24 hours of entry to all their officers, agents, servants, employees, attorneys, and anyone acting in concert with them;

5. The Agency Defendants shall file a status report with this Court within 72 hours of the entry of this Order, describing all steps the Agency Defendants have taken to comply with this Order, and every week thereafter until the Department is restored to the status quo prior to January 20, 2025; and

6. This Preliminary Injunction shall become effective immediately upon entry by this Court. The Preliminary Injunction Order shall remain in effect for the duration of this litigation and until a merits decision has been issued.

SO ORDERED, this 22nd day of May 2025 at 10:30 A.M.

/s/ Myong J. Joun
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-10601-MJJ |
| LINDA McMAHON, in her official capacity as Secretary of Education, *et al.*, | |
| *Defendants*. | |

|  |  |
|---|---|
| SOMERVILLE PUBLIC SCHOOLS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-10677-MJJ |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## <u>NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that all Defendants hereby appeal to the United States Court of Appeals for the First Circuit from this Court's May 22, 2025 Memorandum and Order on Consolidated Plaintiffs' Motions for Preliminary Injunction entered in *State of New York, et al. v. McMahon, et al.*, No. 1:25-cv-10601-MJJ (ECF No. 128) and *Somerville Public Schools, et al. v. Trump, et al.*, No. 1:25-cv-10677-MJJ (ECF No. 45).

Dated: May 22, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG (DC Bar No. 467513)
Special Counsel
MICHAEL BRUNS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone:  202-514-3374
Email: brad.rosenberg@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants.

Dated: May 22, 2025

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG
Special Counsel