# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

———————————

SOMERVILLE PUBLIC SCHOOLS, *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————

## EMERGENCY MOTION FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
LEAH B. FOLEY
  *United States Attorney*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
MELISSA N. PATTERSON
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 305-8648*
  *Steven.A.Myers@usdoj.gov*

**INTRODUCTION**

It is no secret that the President would like the Department of Education to be abolished. The President campaigned on that proposal, and a March 2025 executive order reflects his view that "[c]losing the Department of Education would provide children and their families the opportunity to escape a system that is failing them." Exec. Order No. 14,242, *Improving Education Outcomes by Empowering Parents, States, and Communities*, 90 Fed. Reg. 13,679, 13,679 (Mar. 20, 2025). It is undisputed, however, that the Department cannot be closed unless and until Congress enacts legislation closing it. *See, e.g.*, Hr'g Tr. 42 (government counsel: "[T]he Department of Education is not closed and it is not closing absent an act of Congress.").

This litigation is therefore not about an Executive Branch attempt to unilaterally shutter a Cabinet department. It is instead about a personnel action: a reduction in force (RIF) affecting about a third of the employees working at the Department on Inauguration Day, leaving more than two thousand employees to perform the Department's statutory functions. *See* U.S. Department of Education, *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://perma.cc/7485-CZFU (RIF Press Release). That RIF does not undermine the Department's commitment to "deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking." *Id.* The district court enjoined that RIF, ordering the Department to return to the status quo prior to

January 20, 2025; this Court should enter an immediate administrative stay and a stay pending appeal.

There are numerous reasons why the district court lacked authority to entertain these consolidated challenges, which are brought by states, schools, and unions representing teachers. At the outset, those claims depend upon speculation that the Department cannot perform its statutory functions with its remaining employees, but Article III does not permit standing to rest upon speculation. Instead, as a court recently recognized in rejecting a similar challenge, if the Department fails to perform a particular action to which plaintiffs claim legal entitlement, they may challenge the purported failure then. *See Carter v. Department of Education*, No. 25-744, 2025 WL 1453562, at *13 (D.D.C. May 21, 2025).

Moreover, Congress has divested district courts of jurisdiction to entertain challenges to federal personnel actions. In the Civil Service Reform Act, Congress authorized federal employees to challenge their own terminations before the Merit Systems Protection Board, with judicial review in the Federal Circuit. That scheme does not permit federal-services beneficiaries to challenge terminations. The court's exercise of jurisdiction flouts Congress's unambiguous determination about how federal-personnel challenges should be heard.

Even putting aside jurisdiction, plaintiffs' claims fail on the merits. The Executive Branch is not seeking to unilaterally close the Department—so to the extent the district court's analysis proceeded on a contrary assumption, it was chasing

phantoms. And insofar as the district court believed the Department would function less effectively given the challenged RIF, such determinations are entrusted to the Executive Branch, and the Administrative Procedure Act does not authorize a blunderbuss challenge to an agency's day-to-day operations. *See Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 64 (2004). The district court did not even attempt to confine its sweeping relief to discrete agency duties mandated by statute or to relief within the court's traditional equitable powers, instead ordering Department leadership to reinstate employees and return to the prior administration's choices about how many employees are appropriate to carry out both discretionary and mandatory statutory functions.

Finally, the equities and the public interest favor the government. The injunction represents an extraordinary incursion on the Executive Branch's authority to manage its workforce. Beyond that, it requires the government to indefinitely retain and pay employees whose services it no longer requires, and the government cannot recoup those salaries if it prevails on appeal. On the other side of the ledger, plaintiffs' claims of irreparable harm all depend upon their speculation that the Department will no longer function as Congress intended.

To correct those errors and prevent extraordinary harm to the government, this Court should enter an immediate administrative stay and a stay pending appeal. The government respectfully requests that the Court act on this request by Tuesday, May

27, at noon, so that the government may seek relief from the Supreme Court if the Solicitor General determines that doing so is warranted. Plaintiffs oppose the motion.

## STATEMENT

**1.** Congress created the Department of Education in 1979. *See* Pub. L. No. 96-88, 93 Stat. 668 (1979). That legislation established the Department, *see id.* § 201, as well as numerous offices within it, *see id.* §§ 203-214. As of January 20, 2025, the Department employed 4,133 employees. *See* RIF Press Release.

President Trump campaigned on a proposal to abolish the Department. *See, e.g.*, The American Presidency Project, 2024 Republican Party Platform, https://www.presidency.ucsb.edu/documents/2024-republican-party-platform. Once in office, the President signed an executive order reiterating that "[c]losing the Department of Education would provide children and their families the opportunity to escape a system that is failing them." Exec. Order No. 14,242. The executive order does not actually order the Department's closure; instead, it directs the Secretary to facilitate closure "to the maximum extent appropriate and permitted by law." *Id.* § 2. The government has repeatedly acknowledged—and acknowledges again now—that the Department cannot be closed without an act of Congress.[1]

---

[1] *See* Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs (Secretary of Education: "We know we'll have to work with Congress" to close Department); Defs.' PI Opp'n, No. 1:25-cv-10677, ECF 38, at 13 ("[The] Department of Education is not closed. And it will

**2.** Although the Executive Branch cannot unilaterally close the Department, it retains significant authority to control the contours of the Department's workforce. That authority includes the ability to conduct a RIF, which permits an agency to release employees for a variety of reasons. *See* 5 C.F.R. § 351.201(a)(2); *see generally* 5 U.S.C. § 3502.

On March 11, 2025, the Department announced a RIF affecting approximately a third of the Department's workforce.[2] *See* RIF Press Release. Affected employees were placed on administrative leave on March 21, and "all impacted employees will receive full pay and benefits until June 9th." *Id.*

The announcement stated that the Department would "continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking." *Id.* In letters to stakeholders, the Department reiterated that the RIF "will not directly impact students and families," that "critical functions for elementary and secondary education will not be impacted by these cuts," that "funds will continue to flow normally, and program functions will not be disrupted," and that the

---

not be closing without congressional action."); Hr'g Tr. 42 (Government counsel: "Our brief comes out and acknowledges that the Department of Education is not closed and it is not closing absent an act of Congress.").

[2] The press release indicates that the RIF affects "nearly 50% of the Department's workforce," but that figure includes 572 employees who opted for deferred resignation or voluntary separation. *See* RIF Press Release. Plaintiffs are not seeking relief regarding those employees. *See, e.g.,* Hr'g Tr. 44.

RIF will "not affect the Department's critical work supporting individuals with disabilities." No. 1:25-cv-10601, ECF 71-6; *see also id.* ECF 71-7 (similar commitment concerning higher education functions). Unless Congress closes the Department, the only activities intended to be eliminated are those left to agency discretion.

Finally, on March 21, the President indicated at a press conference that he had "decided" that the Small Business Administration would take over the Department's student loan portfolio, and that the Department of Health and Human Services would handle special education, nutrition, and related services. Op. 59. Neither plaintiffs nor the district court have identified any concrete steps taken by the agency to effectuate any such transfer.

**3.** The Civil Service Reform Act (CSRA) "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal major adverse personnel actions to the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 7512, 7513(d), 7701. Employees subject to RIFs may also pursue challenges before the MSPB, where class-wide litigation is possible. *See* 5 C.F.R. §§ 1201.27, 351.901. The CSRA empowers the MSPB to order relief, including reinstatement. 5 U.S.C. §§ 1204(a)(2), 7701(g). Employees aggrieved by final decisions of the MSPB may obtain review in the Federal Circuit. *Id.* § 7703(a)(1), (b)(1).

The Federal Service Labor–Management Relations Statute (FSLMRS) governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Review of the FLRA's decisions is available in the courts of appeals. *Id.* § 7123(a).

**4.** This appeal involves two consolidated lawsuits—one filed by states, and one by schools and unions representing teachers and other school and university employees. Each turns on plaintiffs' belief that the RIF will render the Department unable to perform its statutory functions, causing plaintiffs harm as beneficiaries of Department services. Each plaintiff demanded that the Department be enjoined from proceeding with the RIF. *See* Somerville PI Mem., No. 1:25-cv-10677, ECF 26, at 34 (seeking "a preliminary injunction of the Mass Termination Order"); States PI Mem., No. 1:25-cv-10601, ECF 70, at 40 (similar); *see also* Hr'g Tr. 13.

On May 22, 2025, the district court granted plaintiffs' motions for a preliminary injunction. *See* No. 1:25-cv-10601, ECF 128 (Op). Notwithstanding the government's concessions that it cannot unilaterally close the Department, the opinion proceeds from the premise that the case concerns "an attempt by Defendants to shut down the Department without Congressional approval." Op. 2. Rejecting the government's argument that plaintiffs only speculated about future harms, the court found that plaintiffs "are already being harmed" by what the court deemed the

"effective incapacitation of the Department to carry out congressionally mandated functions" through the RIF. Op. 35-36. The court found that plaintiffs had standing for similar reasons. Op. 38.

The district court rejected the government's contention that the CSRA divested it of jurisdiction. In so holding, it reasoned that plaintiffs "are not federal employees or labor unions who have access to the MSPB or FLRA." Op. 43. The court found persuasive a district court decision in a different challenge to a purported RIF brought by non-employee plaintiffs, *see Maryland v. USDA*, --- F. Supp. 3d. ----, 2025 WL 973159 (D. Md. Apr. 1, 2025)—even though the Fourth Circuit stayed that decision after concluding that the district court likely lacked jurisdiction. *See Maryland v. USDA*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025).

The district court held that the plaintiffs were likely to succeed on the merits. Again casting this case as a unilateral effort to close the Department, the court found that such actions would violate the separation of powers, Op. 46-50, and be ultra vires, Op. 50-52. The court further found that plaintiffs were likely to succeed on their APA claims, finding that defendants had made a "decision" to "close the Department, without Congress's approval." Op. 52. In the court's view, plaintiffs were "not challenging some broad, abstract policy," but rather "the mass terminations designed to get rid of the Department." Op. 53. The district court then reasoned that such actions were beyond the agency's authority and arbitrary and capricious. Op. 54-63.

The district court concluded that the remaining factors favored plaintiffs. The court held that plaintiffs "are likely to suffer irreparable harm in the form of financial uncertainty and delay damaging student education, (2) impeded access to vital knowledge upon which students, districts, and educators rely, and (3) loss of essential services provided by the office of Federal Student Aid and the Office for Civil Rights." Op. 84. And the equitable balance favored plaintiffs, the court decided, given the public interest in following the law and the importance of education. Op. 85-87.

The court thus entered a preliminary injunction. Among other things, the court enjoined the government "from carrying out the reduction-in-force announced on March 11, 2025; from implementing President Trump's March 20, 2025 Executive Order; and from carrying out the President's March 21, 2025 Directive to transfer management of federal student loans and special education functions out of the Department." Op. 88. The order further requires the government to "reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the reduction-in-force announced on March 11, 2025 to restore the Department to the status quo such that it is able to carry out its statutory functions." *Id.* And the court required the government to submit weekly status reports, starting next week, "until the Department is restored to the status quo prior to January 20, 2025." *Id.*

Although the government had preemptively requested that the district court stay any injunction pending appeal, *see* Defs.' PI Opp'n, No. 1:25-cv-10677, ECF 38, at 27, the injunction is "effective immediately upon entry," Op. 88.  After appealing, the government filed a separate stay motion in district court, noting its intention to seek relief from this Court today.  *See* Defs.' Mot., No. 1:25-cv-10601, ECF 133.  The district court denied that motion this morning.  *See* No. 1:25-cv-10601, ECF 136.

## ARGUMENT

A stay pending appeal is plainly warranted. The government is likely to succeed on the merits and will face irreparable injury absent a stay, and the balance of equities and public interest support a stay.  *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### I.  The Government Is Likely To Prevail On The Merits.

#### A. The District Court Lacked Jurisdiction.

The district court lacked jurisdiction for at least two reasons.  First, under Article III, plaintiffs cannot bring a nebulous challenge to the purported closure of the Department, nor can they rest their claim to standing on speculation that, contrary to the Secretary of Education's judgment, the Department's remaining 2,183 employees will be unable to perform the Department's statutory functions.  Second, plaintiffs' challenges to the RIF are precluded by the CSRA, which requires that challenges to personnel actions be brought by affected employees before the MSPB.

1.  **Article III Standing**

      a.      Plaintiffs lack standing to bring a broad, prospective challenge to the

operation of the Department by its politically accountable leadership based on

speculation about the Department's inability to perform its statutory obligations.

Under Article III, "[f]ederal courts do not exercise general legal oversight of the

Legislative and Executive Branches," but instead address concrete injuries to specific

interests. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). Article III thus

requires "that the plaintiff have suffered an invasion of a legally protected interest

which is … concrete and particularized, and that the dispute is traditionally thought to

be capable of resolution through the judicial process." *Raines v. Byrd*, 521 U.S. 811,

819 (1997) (first alteration in original) (citation and quotation marks omitted).

      Plaintiffs' principal contention is that the Executive Branch is encroaching on

the Legislative Branch's prerogatives by closing an agency established by statute. This

interest in vindicating the separation of powers is exactly the sort of abstract and

generalized grievance that cannot be redressed by a federal court. First, even

(wrongly) assuming the truth of plaintiffs' allegations, a generalized dispute over

whether an agency will perform its statutory duties or have sufficient resources to do

so involves no "legally and judicially cognizable" harm that is "traditionally thought to

be capable of resolution through the judicial process." *Raines*, 521 U.S. at 819. Such

suits have no "ground[ing] in historical practice" or "close relationship to a harm that

has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

Second, plaintiffs lack a particularized interest in safeguarding the separation of powers, because "[a]ll citizens" share "an interest in the independence of each branch of Government." *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 220, 226 (1974). This "generalized interest … is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.* at 227.

Third, such a programmatic injury is not redressable, as it would require "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of … administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (citation omitted).

**b.** Any personal harms plaintiffs identify are plainly speculative. A plaintiff seeking injunctive relief to protect against future injury must demonstrate that the injury is "certainly impending," for "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *accord, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("speculative" injuries insufficient).

Instead of attempting to satisfy this demanding standard, the district court principally focused on harms that *could* or *might* occur. *See, e.g.*, Op. 3 (reasonable to "expect" RIF to cause harms); Op. 19 (delay of funding "threatens" disruption of operations); Op. 23 (focusing on what plaintiffs "claim," "contend" and "argue" will

occur); Op. 25 (positing that "any RIF-induced loss of funding threatens to reduce school staff"); Op. 26 (plaintiffs "fear" educational access restriction); Op. 30 (if federal funding is "uncertain" then cuts "may" have to be made). The district court's obvious disagreement with the Department's assessment of appropriate staffing levels does not establish Article III jurisdiction. *See OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) (granting government's stay application because organizations' allegations that they may be denied agency services are, "under established law, … presently insufficient to support" standing); *Carter*, 2025 WL 1453562, at *8 (rejecting similar challenge to Department RIF where declarations were "conclusory").

### 2. CSRA Preclusion

Even if plaintiffs had standing, the district court would still lack jurisdiction to adjudicate their challenges to the Department's personnel decisions. In the CSRA, Congress "established a comprehensive system" that provides the "exclusive means" for reviewing such matters. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted); *accord Rodriguez v. United States*, 852 F.3d 67, 82 (1st Cir. 2017) (CSRA is "the exclusive mechanism for challenging adverse personnel actions in federal employment"). And those "exclusive means" are MSPB proceedings brought by affected employees or FLRA proceedings brought by their unions, not lawsuits by third parties in district court. *See, e.g.*, *Gonzalez v. Velez*, 864 F.3d 45, 51 (1st Cir. 2017) (absent inapplicable statutory exceptions, CSRA "precludes resort to

other forms of redress"); *Berrios v. Department of the Army*, 884 F.2d 28, 31 (1st Cir. 1989) ("The legislative history of the CSRA establishes beyond dispute that Congress intended that statute to provide an exclusive procedure for challenging federal personnel decisions.").

The district court never disputed that if this lawsuit were brought by the real parties in interest—affected employees—it could proceed only through the statutory scheme. *See, e.g.*, Op. 42. Yet it concluded that those statutory limitations are irrelevant because of the RIF's "magnitude" and because states cannot pursue judicial or administrative review under the CSRA. Op. 42-44.

That analysis is fundamentally backward. There is no statutory exception to the CSRA's exclusivity based on the number of employees affected. *See Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.) (rejecting "collateral, systemwide challenge" and explaining that "what you get under the CSRA is what you get"). And when a comprehensive remedial scheme permits review at the behest of some types of plaintiffs but not others, the proper inference is that the excluded parties cannot bring claims at all. In *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), the Supreme Court considered a statute that permitted dairy handlers—but not consumers—to obtain review of "market orders." *Id.* at 346. When consumers sought review, the Supreme Court explained that "[i]n a complex scheme of this type, the omission of such a provision [permitting consumers to participate] is sufficient

reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

Courts have faithfully applied those principles to the CSRA. In *United States v. Fausto*, 484 U.S. 439 (1988), the Supreme Court applied *Block* to conclude that federal employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter." *Id.* at 448. As the Court explained, "the absence of provision for these employees to obtain judicial review" is a "manifestation of a considered congressional judgment that they should not have statutory entitlement to review." *Id.* at 448-49. And more recently, after a district court reinstated various terminated federal employees in litigation brought by state governments, the Fourth Circuit entered a stay because the government was "likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims." *Maryland*, 2025 WL 1073657, at *1. Thus, while plaintiffs here cannot invoke the CSRA, that does not mean that they may circumvent it. It instead means that they may not sue at all. *See Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

It is no answer that plaintiffs are bringing claims "distinct" from those typically presented under the CSRA. *See* Op. 44 (citing *Maryland*, 2025 WL 973159, at *15, *stayed pending appeal*, 2025 WL 1073657). Plaintiffs contend that a federal personnel action was unlawful, and they persuaded a district court to reverse that action through

a preliminary injunction. Undoing a personnel action is exactly the relief that federal employees routinely seek through the CSRA, and constitutional claims are not exempt from the CSRA's scheme. *See Elgin*, 567 U.S. at 22 (constitutional claims fall within the CSRA scheme where they are "the vehicle by which [plaintiffs] seek to reverse the removal decisions").

At bottom, Congress did not leave a gaping hole in the CSRA by permitting third parties to challenge federal employees' terminations in district court actions. If Congress had wanted to authorize review by other parties who suffer downstream injuries when a federal employee is terminated—his state of residence, spouse, creditors, etc.—it could have done so. Instead, Congress limited review of federal employment actions to actions by affected employees themselves.

### B. Plaintiffs' Claims Fail On The Merits.

Even if the Court had jurisdiction, plaintiffs' claims would still fail. As noted above, the district court's analysis assumes that defendants seek to unilaterally close the Department. That assumption is wrong, but even if correct it still would not justify an injunction that goes far beyond ensuring the Department's continued existence and instead directs the Department to return to its "status quo prior to January 20, 2025."[3]

---

[3] With respect to the district court's injunction barring the Department from "carrying out the President's March 21, 2025 Directive to transfer management of federal student loans and special education functions out of the Department," Op. 88,

In actuality, plaintiffs are trying to thwart the current Department leadership's efforts to implement the President's policy goals "to the maximum extent appropriate and permitted by law," Exec. Order No. 14,242, § 2, and to freeze the Department in the form a prior administration considered appropriate. The Department lacks discretion to close itself, *see* Op. 54-55, but the Department obviously has enormous discretion about the composition of its workforce, *see* 5 U.S.C. § 701(a)(2). Indeed, the government has "traditionally been granted the widest latitude in the 'dispatch of its own internal affairs,'" and courts are "quite wrong" to "routinely apply[] … traditional standards governing more orthodox" requests for equitable relief. *Sampson v. Murray*, 415 U.S. 61, 83-84 (1974). It violates neither the Constitution nor any other law for the government to endeavor to operate as efficiently as possible or for politically accountable officials to make and implement their own judgments about staffing levels needed to carry out any statutory mandates. And plaintiffs cannot cast their statutory claims in constitutional garb by simply asserting that actions taken in violation of statutory authority are unconstitutional. *See Dalton v. Specter*, 511 U.S. 462,

---

three points bear emphasis. First, plaintiffs have identified no basis to conclude that any transfer of the Department's handling of student loans or special education is imminent. Second, the Department acknowledges that it cannot "transfer" its statutorily assigned functions to another Department in violation of statutory provisions. Third, while the Department does not understand the injunction to prohibit the Department from entering agreements pursuant to which another agency would assist the Department with its statutory functions, to the extent that the district court meant to enjoin such a future agreement, it identified no reason why such an agreement would be illegal.

474 (1994); *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *5 (D.C. Cir. May 3, 2025). Nor do plaintiffs come close to the satisfying the demanding standards that apply to nonstatutory *ultra vires* claims. *See, e.g.*, *Fed. Express Corp. v. Department of Comm.*, 39 F.4th 756, 763-64 (D.C. Cir. 2022).

Beyond that, plaintiffs' attempts to shoehorn this case into the APA framework cannot succeed because plaintiffs do not challenge reviewable agency action. *See* 5 U.S.C. §§ 704, 551(13). As the Supreme Court has explained, a reviewable "action" is limited to the set of "circumscribed, discrete agency actions" identified in the statute. *SUWA*, 542 U.S. at 62. The APA thus does not permit "general judicial review of [an agency's] day-to-day operations," *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990), nor does it authorize agencies to oversee "the common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). Under these principles, agency plans, strategies, and "intention[s]," Op. 2, are not reviewable. *Fund for Animals*, 460 F.3d at 20.

To be sure, a RIF may constitute a reviewable action—but only through the CSRA's mechanisms. *See supra* pp.13-16. The premise of the district court's order, however, is that plaintiffs bring *more* than a garden-variety "unlawful terminations employment action," Op. 3, attacking more broadly how the Department performs its assigned statutory functions. That is not a viable APA claim. *See Carter*, 2025 WL

1453562, at *9 (claim challenging Department's "general operations" and complaint-processing speed not cognizable under APA).

Ultimately, if a harm about which plaintiffs are concerned actually occurs, they could seek a judicial remedy at that time. Should the Department fail to take a discrete, mandatory agency action to which plaintiffs believe that they are legally entitled, they may bring an APA action to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *accord Carter*, 2025 WL 1453562, at *8 (plaintiffs' claims sound in unreasonable delay). Or should the Department fail to disburse funds that they believe the Department is obligated to pay, plaintiffs could pursue remedies in the Court of Federal Claims under the Tucker Act. *See* 28 U.S.C. § 1491. But plaintiffs may not evade the limits on such actions (and Article III) by a premature suit. *See Carter*, 2025 WL 1453562, at *13 (challenge to anticipated future delays are premature and unripe).

At minimum, the district court lacked authority to order reinstatement of terminated employees to active status. Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement to active status is not a remedy that was traditionally available at equity. *See Sampson*, 415 U.S. at 83. While the CSRA authorizes reinstatement, *Elgin*, 567 U.S. at 6, the APA does not. The district court's order reinstating 1,000-plus federal employees vastly exceeded its remedial authority.

## II.     The Equitable Factors Favor A Stay.

The equitable factors overwhelmingly favor a stay.  Every day that the

injunction is in effect causes irreparable injuries to the government and the public,

whose interests "merge" here.  *Nken*, 556 U.S. at 435.  The Executive Branch officials

responsible for running the Department have determined that the Department can

perform its statutory functions with a lower headcount; in our constitutional order,

politically accountable Article II actors—not Article III courts—are responsible for

making such judgment calls.  The preliminary injunction wrests that responsibility and

the accompanying accountability from Department leadership, both undermining

implementation of an important presidential policy and disserving the public interest

(and fisc) by requiring the government to continue employing individuals whose

services it no longer requires.  Those harms are particularly acute here, where the

injunction appears to require the Department to return the employees to active status,

such that the Department is "restored to the status quo prior to January 20, 2025,"—

effectively usurping the Executive Branch's authority to manage itself and forcing

adherence to a prior administration's judgment about how, and with how many

employees, the Department should function.  Op. 88.  Endeavoring to comply with

this injunction, especially on the ordered timeframe, poses extraordinary burdens on

Executive Branch functions that warrant immediate relief.

In addition, the government can never recover the salaries that it is being

ordered to continue paying if it eventually wins this case.  That harm could

theoretically have been addressed by a bond under Rule 65(c), but the district court did not require one. *See* Op. 87. As the Supreme Court recently confirmed, such considerations counsel in favor of a stay. *See Department of Educ. v. California*, 145 S. Ct. 966, 968-69 (2025) (per curiam) (staying preliminary injunction where "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed" and "the District Court declined to impose bond").

On the other side of the ledger, plaintiffs have not established irreparable injury warranting extraordinary relief even outside the government-personnel context, let alone made a showing that "override[s] the[] factors cutting against the general availability of preliminary injunctions in Government personnel cases." *Sampson*, 415 U.S. at 84. This Court need not credit plaintiffs' speculation that the Department cannot perform its statutory functions. But even if plaintiffs fail to receive federal funds to which they believe they are entitled, at that time "they can recover any wrongfully withheld funds through suit in an appropriate forum." *Department of Educ.*, 145 S. Ct. at 969. Finally, even if plaintiffs had established irreparable injury—and they have not—any such injury is "plainly outweigh[ed]" by the need to permit the Executive Branch to exercise its own judgment about how to best serve the public interest through the effective and efficient management of the Department. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008).

**CONCLUSION**

The Court should grant a stay pending appeal and an immediate administrative stay. The government respectfully requests that the Court act on this request by Tuesday, May 27, at noon, so that the government may seek relief from the Supreme Court if the Solicitor General determines that doing so is warranted.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
LEAH B. FOLEY
  *United States Attorney*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
MELISSA N. PATTERSON

 */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 305-8648*
  *Steven.A.Myers@usdoj.gov*

May 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5187 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Garamond typeface.

/s/ Steven A. Myers
STEVEN A. MYERS

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2025, I electronically filed the foregoing

motion with the Clerk of the Court for the United States Court of Appeals for the

First Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

/s/ Steven A. Myers
STEVEN A. MYERS

ADDENDUM

# TABLE OF CONTENTS

Memorandum and Order on Consolidated Plaintiffs' Motions for Preliminary
Injunction
(May 22, 2025) (No. 1:25-cv-10601, Dkt. No. 128) .................................... ADD.1

Transcript of Preliminary Injunction Hearing
(Apr. 25, 2025) (No. 1:25-cv-10601)............................................................ ADD.89

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-10601-MJJ |
| | ) | |
| LINDA MCMAHON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| SOMERVILLE PUBLIC SCHOOLS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-10677-MJJ |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER ON CONSOLIDATED PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

May 22, 2025

JOUN, D.J.

For over 150 years, the federal government has played a crucial role in education.

Congress created the Department of Education (the "Department") in 1979 to streamline federal

support of education into a single, Cabinet-level department. The Department's role in education

across the nation cannot be understated: it administers the federal student loan portfolio, provides

research and technological assistance to states and their educational institutions, disburses federal

education funds, and monitors and enforces compliance with numerous federal laws. Congress enacted these laws to promote equality and anti-discrimination in schools, assist students with special needs and disabilities, ensure student privacy, and much more.

This case arises out of an attempt by Defendants to shut down the Department without Congressional approval. President Trump has publicly and repeatedly promised to shut down the Department "immediately."[1] On March 11, 2025, Defendants announced a massive reduction in force ("RIF"), cutting the Department's staff by half. On March 20, 2025, President Trump issued an executive order directing the Secretary to "take all necessary steps to facilitate the closure of the Department of Education." On March 21, 2025, President Trump further announced that the federal student loan portfolio as well as the special needs programs would be transferred out of the Department. Defendants argue that the RIF was implemented to improve "efficiency" and "accountability" in the Department. The record abundantly reveals that Defendants' true intention is to effectively dismantle the Department without an authorizing statute.

Since the implementation of the RIF, Plaintiffs—a group of states, school districts, non-profit organizations, and labor unions—have provided an in-depth look into how the massive reduction in staff has made it effectively impossible for the Department to carry out its statutorily mandated functions. As one example, Defendants have shut down seven out of twelve offices of the Office for Civil Rights, a statutorily created program that protects students from discrimination on the basis of race, sex, and disability. The supporting declarations of former Department employees, educational institutions, unions, and educators paint a stark picture of the irreparable harm that will result from financial uncertainty and delay, impeded access to vital

---

[1] Defendants admit that "President Trump ran on the promise to close the Department of Education."

knowledge on which students and educators rely, and loss of essential services for America's most vulnerable student populations. Indeed, prior to the RIF, the Department was already struggling to meet its goals, so it is only reasonable to expect that an RIF of this magnitude will likely cripple the Department. The idea that Defendants' actions are merely a "reorganization" is plainly not true.

Defendants do acknowledge, as they must, that the Department cannot be shut down without Congress's approval,[2] yet they simultaneously claim that their legislative goals (obtaining Congressional approval to shut down the Department) are distinct from their administrative goals (improving efficiency). There is nothing in the record to support these contradictory positions. Not only is there no evidence that Defendants are pursuing a "legislative goal" or otherwise working with Congress to reach a resolution, but there is also no evidence that the RIF has actually made the Department more efficient. Rather, the record is replete with evidence of the opposite. Consolidated Plaintiffs have demonstrated that the Department will not be able to carry out its statutory functions—and in some cases, is already unable to do so—and Defendants have proffered no evidence to the contrary. Defendants fail to understand Plaintiffs' claims which is evident by their attempt to frame this case as an unlawful terminations employment action. As fully explained below, a preliminary injunction is warranted to return the Department to the status quo such that it can comply with its statutory obligations.

***

---

[2] The Court acknowledges the amici brief in support of Plaintiffs by 192 members of Congress. [Doc. No. 110].

On March 13, 2025, 21 states[3] ("Plaintiff States") filed suit against Defendants Secretary of Education Linda McMahon (the "Secretary"), in her official capacity, the U.S. Department of Education (the "Department"), (together with the Secretary, the "Agency Defendants"), and President Donald J. Trump ("President Trump"), in his official capacity, (collectively, "Defendants"). Two days prior, on March 11, 2025, Defendants announced a large-scale reduction in force ("RIF") of the Department of Education (the "March 11 Directive").[4] [Doc. No. 1]. The March 11 Directive announced that the Department would cut approximately 2,183, or slightly more than 50% of its 4,133 employees. [*Id.* at ¶ 3]. The Plaintiff States allege that the RIF is not only unlawful, but also so severe and sweeping that it is an impermissible step toward dismantling the Department of Education in its entirety. [*Id.* at ¶ 5]. The Plaintiff States allege that the March 11 Directive violates the Constitution's Separation of Powers doctrine (Count I), violates the Take Care Clause of the Constitution (Count II), is *ultra vires* (Count III), and violates the Administrative Procedure Act ("APA") because it is contrary to law (Count IV), and arbitrary & capricious (Count V). [*Id.* at ¶¶ 149–195].

On March 20, 2025, President Trump issued an executive order (the "Executive Order") directing the Secretary to "take all necessary steps to facilitate the closure of the Department of Education." [Doc. No. 71-1]. On March 24, 2025, Plaintiffs Somerville Public Schools, Easthampton Public Schools, the American Federation of Teachers, American Federation of Teachers Massachusetts, AFSCME Council 93, American Association of University Professors,

---

[3] The Plaintiff States consist of: New York, Massachusetts, Hawai'i, California, Arizona, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Washington, Wisconsin, and Vermont.

[4] As explained below, 25-cv-10601 and 25-cv-10677 are being consolidated. Citations to the docket herein are citations to filings entered in 25-cv-10601, unless noted otherwise. *E.g.*, [Doc. No. __; 25-cv-10677 Doc. No. __].

and the Service Employees International Union (collectively, "Somerville Plaintiffs," together with the Plaintiff States, "Consolidated Plaintiffs") sued Defendants for injuries stemming from the March 11 Directive and the Executive Order. [25-cv-10677 Doc. No. 1]. The Somerville Plaintiffs assert the same causes of action against Defendants as the Plaintiff States, [*see id.* at Counts I-III, V-VII], as well as additional APA claims alleging that the Agency Defendants' actions are contrary to a constitutional right, [*id.* at Count IV], and exceed the Secretary's statutory authority, [*id.* at Count V].

On March 24, 2025, the Plaintiff States filed a Motion for Preliminary Injunction seeking to enjoin the Agency Defendants from implementing the RIF, and from carrying out a directive announced by President Trump orally at a press conference, which directed the immediate transfer of the federal student loan portfolio and special education programs out of the Department ("March 21 Directive"). [Doc. No. 69; Doc. No. 70 at 22; 25-cv-10677 Doc. No. 1 at ¶¶ 75–76]. Plaintiff States also ask this court to direct the Agency Defendants to reinstate federal employees whose employment was terminated as part of the RIF. [Doc. No. 69 at 2]. On April 1, 2025, the Somerville Plaintiffs filed a Motion for Preliminary Injunction seeking the same relief, on largely the same grounds, as the Plaintiff States. [25-cv-10677 Doc. No. 25]. On April 11, 2025, Defendants filed a Consolidated Opposition to both Motions. [Doc. No. 95; 25-cv-10677 Doc. No. 38]. On April 18, 2025, the Consolidated Plaintiffs filed their Reply briefs. [Doc. No. 101; 25-cv-10677 Doc. No. 41]. A hearing on the Motions was held on April 25, 2025. [Doc. No. 118].

## I.    CONSOLIDATION

Rule 42(a) of the Federal Rules of Civil Procedure governs consolidation, providing that "[i]f actions before the court involve a common question of law or fact, the court may: (1) join

for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). The power to consolidate related actions falls within the broad inherent authority of every court "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 192 (4th Cir. 1982) ("The decision whether to sever or to consolidate whole actions or sub-units for trial is necessarily committed to trial court discretion."). Here, the parties have not moved to consolidate the two actions. "Normally the district court would be acting quite within its discretion in taking steps to consolidate or otherwise avoid the duplication of such closely similar cases, whatever the substantive rights of the parties." *Sutcliffe Storage & Warehouse Co. v. United States*, 162 F.2d 849, 851 (1st Cir. 1947). "A district court can consolidate related cases under Federal Rule of Civil Procedure 42(a) *sua sponte*" when the actions involve a "common question of law or fact." *Devlin v. Transportation Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (quoting Fed. R. Civ. P. 42(a)).

Here, the Consolidated Plaintiffs' claims largely overlap and arise from the same event: the March 11 Directive. On April 4, 2025, Defendants filed a motion seeking leave to file a Consolidated Opposition because Consolidated Plaintiffs "seek similar relief under similar sets of arguments," and granting the motion "would promote judicial efficiency for the related arguments to be addressed simultaneously, on the same schedule, in the same set of briefings." [Doc. No. 88 at 2]. Consolidated Plaintiffs agreed. [*Id.*]. In line with these principles, I find it appropriate to exercise my discretion and consolidate the two cases.

## II.     BACKGROUND

### A.   <u>The Creation Of The Department Of Education</u>

The federal government has supported education for over 150 years, addressing gaps in state and local education resources by providing substantial funds, support, and technical assistance to local school districts and educators. [25-cv-10677 Doc. No. 1 at ¶¶ 10–11]. In 1979, Congress established the Department of Education—along with many of its offices—by statute through the enactment of the Department of Education Organization Act ("DEOA"). [Doc. No. 1 at ¶ 46]; *see* 20 U.S.C. §§ 3401–3510. Creating the Department allowed Congress to streamline federal support for education, consolidating programs that were dispersed across several departments "into a single Cabinet-level department." [25-cv-10677 Doc. No. 1 at ¶ 11]. While the primary responsibility for funding and creating policy for elementary and secondary education lies with the States, the Department is responsible "for administering federal elementary, secondary, and postsecondary education programs." [25-cv-10601 Doc. No. 1 at ¶ 47 (quoting Rebecca R. Skinner et al., *A Summary of Federal Education Laws Administered by the U.S. Department of Education* (2024))].

At the direction of Congress, the Department distributes funds to schools in all 50 states. [25-cv-10677 Doc. No. 1 at ¶ 13]. During the 2020-21 school year for instance, the Department distributed $101 billion in federal funds, representing, on average, 11% of all funding for elementary and secondary schools in the country. [*Id.*]. In some states, that number was as high as 20%. [*Id.*]. In particular, this funding notably advances two central aspects of the Department's mission: increasing support for low-income students and students with disabilities. [*Id.* at ¶ 15]. Accordingly, almost 95% of all school districts, and 60% of all public schools, are eligible to receive some level of federal funding to support low-income students, and more than

seven million students with disabilities are supported through the Individuals with Disabilities Education Act. [*Id.*].

Since its creation, Congress has enacted statutes authorizing additional functions for the Department and appropriating additional funds for it to administer. [Doc. No. 1 at ¶ 48]. The major statutes administered by the Department include:

a.  The Elementary and Secondary Education Act (ESEA): enacted in 1965 and last reauthorized in 2015 by the Every Student Succeeds Act (ESSA), Pub. L. No. 114-95, 129 Stat. 1802 (codified as amended at 20 U.S.C. § 6301 *et seq.*). Title I-A, the largest ESEA program, provides compensatory grants to local education agencies. Congress appropriates funds for ESEA on an annual basis. [Doc. No. 1 at ¶ 48].

b.  The Individuals with Disabilities Education Act (IDEA): enacted in 1975 and last reauthorized in 2004. Pub. L. No. 108-446, 118 Stat. 2647 (codified as amended at 20 U.S.C. §§ 1400–82). IDEA authorizes grant programs that support early intervention and special education services for children (up to age 21) with disabilities. Over 90% of IDEA funds are appropriated for Part B to fund special education services for school-aged children. The appropriations for Part B are permanently authorized. "Funds for Part C—which authorizes state grants for infants and toddlers with disabilities—and Part D—which authorizes national activities—have been appropriated on an annual basis." [Doc. No. 1 at ¶ 48].

c.  Higher Education Act of 1965 (HEA): enacted in 1965 and last comprehensively reauthorized by the Higher Education Opportunity Act of 2008 (HEOA), Pub. L. No. 110-315, 122 Stat. 3078 (codified as amended at 20 U.S.C. § 1001 *et seq.*). Title IV of HEA authorizes various student aid programs that assist students with postsecondary education expenses, including the Federal Pell Grant program, the William D. Ford Federal Direct Loan

program, and the Federal Work-Study program. The HEA also provides federal support

directly to institutions of higher education through Title III and Title V. Appropriations for

certain HEA programs are mandatory, while others are discretionary. Mandatory funding for

the Direct Loan and Federal Pell Grant programs is permanently appropriated, but funding

for other HEA programs is appropriated on an annual basis. [Doc. No. 1 at ¶ 48].

d.  Rehabilitation Act of 1973: funds vocational rehabilitation services to assist individuals with

disabilities. 29 U.S.C. §§ 701–18. The primary program under the statute is the State

Vocational Rehabilitation Services Program, to which Congress appropriates funding on an

annual basis. [Doc. No. 1 at ¶ 48].

e.  Civil Rights Laws: the Department is responsible for enforcing various civil rights laws that

prohibit discrimination in all programs or activities (unless otherwise specified) receiving

federal funds. [*Id.*]. These laws include: Title VI of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000d *et seq.*; Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–89;

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Age Discrimination Act

of 1975, 42 U.S.C. §§ 16101–07; and Title II of the Americans with Disabilities Act of 1990,

42 U.S.C. §§ 12101–03.

f.  Privacy Laws: the Department enforces laws protecting student privacy rights, such as the

Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and the Protection

of Pupil Rights Amendment (PPRA), 20 U.S.C. § 1232h. [Doc. No. 1 at ¶ 48].

Congress granted the Secretary of Education limited discretion to reallocate functions

within the Department. [*Id.* at ¶ 49]. Specifically, the Secretary is allowed to "allocate or

reallocate functions among the officers of the Department, and to establish, consolidate, alter, or

discontinue such organizational entities within the Department as may be necessary or

appropriate." 20 U.S.C. § 3473(a). However, the Secretary's authority under these provisions

"does not extend to: (1) any office, bureau, unit, or other entity transferred to the Department and

established by statute or any function vested by statute in such an entity or officer of such an

entity, except as provided in subsection (b); (2) the abolition of organizational entities established

by this chapter; or (3) the alteration of the delegation of functions to any specific organizational

entity required by this chapter." *Id.* Moreover, under the statute, there are fourteen offices that the

Secretary may consolidate, alter, or discontinue, or whose functions the Secretary may reallocate.

20 U.S.C. § 3473(b)(1). However, even with respect to these offices, the Secretary must first give

the Committee on Labor and Human Resources of the Senate and the Committee on Education

and Labor of the House of Representatives "a full and complete statement of the action proposed

to be taken pursuant to this subsection and the facts and circumstances relied upon in support of

such proposed action," and then wait ninety days after the committees receive the statement

before acting. 20 U.S.C. § 3473(b)(2).

### B.  The Functions Of The Department Of Education

The Department's programs touch on many aspects and levels of education. [Doc. No. 1

at ¶ 54]. Every year, the Department's elementary and secondary programs serve nearly 18,200

school districts and over 50 million students attending roughly 98,000 public schools and 32,000

private schools. [*Id.*]. In addition, the Department's higher education programs provide services

and support to more than 12 million postsecondary students. [*Id.*]. What follows is a description

of some of these critical programs and functions.

### 1.  Birth To Grade 12 Educational Programs

The federal government provides 13.6% of the funding for public K–12 education

throughout the country. [*Id.* at ¶ 56]. In fiscal year 2024, the Department spent 25.4% of its funds

on state and local governments. [*Id.*]. The two largest sources of federal funding for schools are Title I funding and IDEA funding. [*Id.* at ¶ 57]. The Department distributes over $18 billion under the Title I program to assist schools with high-poverty populations and disburses over $15 billion in IDEA funding to help cover the costs of special education. [*Id.*]. While the amount of funding that K–12 public schools receive in each state varies significantly, every state receives considerable federal funding and services from the Department. [*Id.* at ¶ 58]. The Department's K–12 funding supports a wide variety of educational programs and needs, including but not limited to: "special education, including paying for assistive technology for students with disabilities; the payment of teacher salaries, and benefits, school counselors, and homeless liaisons; the professional development and salaries for special education teachers, paraprofessionals, and reading specialists; transportation to help children receive the services and programming they need; and physical therapy, speech therapy, and social workers." [*Id.* at ¶ 59]. Additionally, through initiatives like the Preschool Development Grant Birth through Five program—a $250 million competitive federal grant—the Department "supports early childhood education for children from birth through kindergarten." [*Id.* at ¶ 62].

Under IDEA, "a core obligation of the Department of Education is supporting students with disabilities and the schools, parents, and teachers who educate students with disabilities." [25-cv-10677 Doc. No. 1 at ¶ 91]. Congress passed IDEA to ensure that all children receive a "free [and] appropriate public education." [*Id.* at ¶ 90 (citing 20 U.S.C. § 1412(1))]. Specifically, the office within the Department that was designated by Congress to administer IDEA is the Office of Special Education and Rehabilitative Services ("OSERS"), which designs policies intended to help children with disabilities reach their full potential. [*Id.* at ¶¶ 92–94]. Namely, IDEA authorizes grants to states, institutions of higher education, and non-profit organizations

with the aim of helping children with disabilities by "support[ing] research, pilot programs, technology and personnel development, and centers to provide parents with training and information." [*Id.* at ¶ 95]. Also, the Office of Special Education Programs ("OSEP") within OSERS provides over $13 billion in IDEA grants every year "to support early intervention (birth to age 2), preschool, K-12 education, and other services through age 21 (for students with disabilities who have not earned a regular diploma)." [*Id.*]. In addition, OSEP assists states and localities in complying with obligations under IDEA, and OSEP staff is critical in helping states and other grantees promptly receive and effectively use IDEA funds. [*Id.* at ¶¶ 95, 106]. In fiscal year 2024, at least 10% of the student population in every state was supported by IDEA funds, and in some states that number was as high as 20%. [*Id.* at ¶ 101]. During the 2022-23 school year, one in every five Massachusetts students received some form of IDEA-funded support. [*Id.* at ¶ 102].

As part of its mission, the Department also works to implement "improvements in the quality and usefulness of education through federally supported research, evaluation and sharing of information." [Doc. No. 1 at ¶ 63 (citing 20 U.S.C. § 3402(4))]. The Department does so by collecting and analyzing data, identifying optimal pedagogical practices, and disseminating such research to educators. [*Id.* at ¶ 64].[5] This research guides educators and school districts in meeting academic standards, educating children who are English language learners, improving school safety, bullying, and chronic absenteeism, supporting children with significant behavioral

---

[5] The Department operates several National Centers housed within the Institute of Education Sciences, all of which conduct research, collect and analyze data, and provide technical assistance to educators, parents, students, policymakers, and the public on a range of topics aimed at improving academic achievement for children and ensuring the effectiveness of educational programs. *See* 20 U.S.C. §§ 3419, 9511(a) (establishing Institute of Education Sciences); 20 U.S.C. § 9531(a) (establishing National Center for Educational Research); 20 U.S.C. § 9541(a) (establishing National Center for Education Statistics); 20 U.S.C. § 9561(a) (establishing National Center for Education Evaluation and Regional Assistance); 20 U.S.C. § 9567(a) (establishing National Center for Special Education Research). [Doc. No. 1 at ¶ 64].

issues, and in other important areas. [*Id.*]. The Department also has offices to support the needs

of specific students and aspects of public education. For instance, the Department's Office of

English Language Acquisition, Language Enhancement and Academic Achievement for Limited

English Proficient Students addresses the educational needs of linguistically and culturally

diverse students. [*Id.* at ¶ 65]. Moreover, the Department's Office of Safe and Healthy Schools

works on policy for drug and violence prevention programs, character and civic education, and

programs supporting students' physical and mental health. [*Id.* at ¶ 67].

### 2. <u>Equal Access To Public Education</u>

The Department is also instrumental in safeguarding equal access to public education

through transparency and accountability. [*Id.* at ¶ 71]. Congress created the Department's Office

for Civil Rights ("OCR"), which has historically focused on ensuring that diverse student bodies

receive equal access to education. [*Id.* (citing 20 U.S.C. § 3413)]. OCR was created primarily to

enforce landmark federal civil rights laws that ban discrimination based on race, sex, and

disability, in schools that receive federal funds under the following: Title VI of the Civil Rights

Act of 1964, which bans race discrimination and race-based harassment; Title IX of the

Education Amendments of 1972, which bans sex discrimination and sexual harassment; Section

504 of the Rehabilitation Act of 1973, which bans disability discrimination; and Title II of the

Americans with Disabilities Act, which bans disability discrimination by public entities. [25-cv-

11042 Doc. No. 1 at ¶¶ 2, 17].[6] Title VI and Title IX expressly direct the Department to enforce

---

[6] On April 21, 2025, the Victim Rights Law Center ("VRLC"), a nonprofit legal organization representing
student victims of discrimination in schools, along with students and parents that VRLC represents
("VRLC Plaintiffs"), filed a related lawsuit in this action against Defendants, as well as Craig Trainor, in
his official capacity as Acting Assistant Secretary for Civil Rights, arising out of the mass terminations
that have resulted in the termination of half of the OCR's staff and closure of seven of its twelve regional
offices. To describe the statutory functions of the OCR and the impacts of the RIF on the OCR, I cite to
the VRLC's Complaint as [25-cv-11042 Doc. No. 1 at ¶ __]. Plaintiffs' Motion for Preliminary Injunction,
seeking similar relief as Consolidated Plaintiffs, is currently pending. [25-cv-11042 Doc. No. 18].

their anti-discrimination mandates. [*Id.* at ¶ 18 (citing 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682)]. Federal regulations also require OCR to investigate and resolve potential violations of Title VI, Section 504, Title IX, and Title II. [*Id.* at ¶ 19]. These requirements include ensuring that there is a Department official that can "make a prompt investigation wherever a compliance review, report, complaint, or any other information indicates a possible failure to comply" with regulations implementing Title VI, and initiate "periodic compliance reviews" to assess whether recipients are compliant with Title VI regulations. [*Id.* (citing 34 C.F.R. § 100.7(a), (c))]. These requirements are incorporated by reference in the regulations implementing Title IX and Section 504. [*Id.* (citing 34 C.F.R. § 104.61; 34 C.F.R. § 106.81)]. The regulations implementing Title II also require OCR to investigate Title II complaints. [*Id.* (citing 28 C.F.R. § 35.171)].

OCR's Case Processing Manual requires OCR to ensure that "the actions it[] takes in investigations are legally sufficient, supported by evidence, and dispositive of the allegations." [*Id.* at ¶ 20 (citing Case Processing Manual at 15)]. Once OCR concludes its investigation, it must issue a letter of finding as to whether there has been a violation. [*Id.* at ¶ 22]. If there has been a violation, OCR must attempt to negotiate a resolution agreement to remedy the discrimination and prevent similar instances in the future. [*Id.*]. The manual sets strict deadlines for the completion of these negotiations. [*Id.*]. When OCR resolves a case through a voluntary resolution agreement, it must monitor it to ensure that the recipient complies with the agreement. [*Id.* at ¶ 21]. In the case where there is a violation but OCR is unable to negotiate a resolution within the specified timeframe, OCR must take enforcement action by choosing to either initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance from the Department to the recipient, or refer the case to the Department of Justice for judicial proceedings. [*Id.* at ¶ 23]. OCR also must provide technical assistance to help

institutions comply with civil rights laws. [*Id.* at ¶ 24 (citing 35 C.F.R. §§ 100.6(a); § 100.12(b))]. This includes providing documents, FAQs, pre-recorded webinars and webcasts, resources for drafting policies that comply with civil rights statutes, and others. [*Id.*].

OCR plays a vital role in enforcing civil rights laws in schools. OCR has designed a process that allows students to file complaints without having to pay for an attorney, and OCR itself assists with the investigation and helps to negotiate a resolution with the schools without the need for costly discovery, motion briefing, or trial. [*Id.* at ¶¶ 27–28]. OCR can also investigate complaints based on claims that students would not otherwise be able to raise in a private lawsuit, including by minimizing the elements that students are required to prove, thereby reducing the burden of fact finding. [*Id.* at ¶¶ 28–31]. OCR has helped make changes to school policies, procedures, and practices to prevent future violations of federal civil rights laws, relief that private litigants often cannot obtain through a private lawsuit. [*Id.* at ¶ 32].

Before the RIF, OCR struggled with a "persistent backlog" of cases. [*Id.* at ¶ 45]. For three consecutive years, from 2022 through 2024, OCR received the highest number of complaints in its history, with a record high of 20,687 complaints in 2024. [*Id.* at ¶ 45]. However, OCR lacked the resources to keep up with demand; from 2021 through 2024, OCR received approximately 14,547 more complaints than it resolved. [*Id.*]. To meet these demands, Congress allocated OCR a budget of $140 million to support 557 employees. [*Id.* at ¶ 46].

However, as a result of the RIF, OCR's staff has been cut in half and seven of its twelve regional offices have been closed. [*Id.* at ¶ 4]. The VRLC Plaintiffs, along with Consolidated Plaintiffs, contend that OCR cannot fulfill its statutory and regulatory mandates with only half of its staff. [*Id.* at ¶ 47]. Indeed, the VRLC Plaintiffs allege it is impossible to do so. [*Id.*]. The closed offices in Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco

cover some of the largest population centers of the country, had an aggregate of 208 full-time and part-time investigators, and the closure of these regional offices make OCR incapable of completing investigations and resolving cases promptly and fairly. [*Id.* at ¶¶ 48–49].

For example, the VRLC's complaint details how the RIF has prevented two students from returning to school. Plaintiff T.R., a twelve-year-old child attending school in Falls City, Nebraska, experienced persistent race-based harassment from 2022 to 2023, in which students called T.R. racial slurs, and physically assaulted him at recess. [*Id.* at ¶¶ 10, 59]. One of these incidents resulted in teachers finding T.R. crying in fetal position after a student pushed T.R. to the ground and stomped on his head. [*Id.* at ¶ 59]. The harassment was so severe that T.R.'s mother, Plaintiff Tara Blunt, was forced to pull T.R. out of school. [*Id.*]. In December 2023, OCR opened an investigation into the school's response to the harassment, but due to the RIF, OCR has stopped processing T.R. and Plaintiff Blunt's complaint entirely, making it impossible for OCR to resolve the investigation so that T.R. can return to public school. [*Id.* ¶¶ 61–63]. Similarly, Plaintiff A.J., a ten-year-old child with life threatening allergies, was severely harassed for his allergies throughout school. [*Id.* at ¶ 11]. These incidents included students pulling off A.J.'s glasses, shoving, pushing, and tripping him, and even taunting and surrounding A.J. with food containing life-threatening allergens. [*Id.* at ¶¶ 11, 65]. A.J.'s mother, Plaintiff Karen Josefosky, withdrew A.J. from public school. [*Id.* at ¶ 11]. OCR opened an investigation and was beginning the process of a mediation, but following the RIF, OCR stopped processing the complaint and the mediation did not go forward. [*Id.*].

### 3.  Higher Education: The Federal Student Loan System

The Department additionally plays a vital role in making higher education more affordable for students across the country, including in Plaintiff States, by administering federal

student loan programs under Title IV of the Higher Education Act of 1965 ("HEA"). [Doc. No. 1 at ¶ 76]. Specifically, the Department's Office of Federal Student Aid ("FSA") manages the federal student loan system by handling loan disbursement, servicing, and borrower assistance. [*Id.* at ¶ 77]. Through Pell Grants, work-study programs, and subsidized loans, the Department collectively awards over $120 billion to roughly 13 million students. [*Id.* at ¶ 78]. A significant portion of these funds is sent directly to colleges and universities, including public colleges and universities in the Plaintiff States. [*Id.*].

FSA also manages the Free Application for Federal Student Aid ("FAFSA") form and, alongside vendors, processes over 17.6 million FAFSA forms each year. [*Id.* at ¶ 79]. The deadline for FAFSA applications is June 30, 2025, but many students apply earlier given that their decisions about which colleges they will attend hinges on the amount of financial aid they are able to receive. [*Id.*]. The Department is also tasked with ensuring that institutions receiving such funds are financially responsible and avoid wasteful spending. [*Id.* at ¶ 80]. As required under the HEA, the Secretary of Education determines and enforces the standard of financial responsibility. [*Id.*].

In addition to distributing federal aid to higher-education institutions, the Department collects and monitors large amounts of data from colleges and universities and enforces their reporting and compliance obligations under Congressional Acts that pertain to campus safety, drug and alcohol use, and sexual violence or harassment. [*Id.* at ¶¶ 82–85]. The Department also works with educational institutions, states, and third-party accreditation authorities to ensure that accredited institutions meet certain quality standards and furnish degrees with value in the workplace. [*Id.* at ¶ 88]. Department-informed accreditation standards help discourage institutional practices that put profits above long-term student welfare and success. [*Id.*].

### 4. <u>Vocational Education And Rehabilitation</u>

The Department also helps individuals prepare for and maintain employment through its vocational education and vocational rehabilitation programs. [*Id.* at ¶ 89]. For instance, the Department's Office of Vocational and Adult Education assists adults with obtaining a high school diploma (or equivalent) and pursuing postsecondary, career, or technical education. [*Id.* at ¶ 90]. Moreover, the Department's Office of Career, Technical, and Adult Education ("OCTAE") administers and coordinates programs related to career and technical education, adult education and literacy, and community colleges for advancing workforce development. [*Id.* at ¶ 91]. Through grant programs under the Carl D. Perkins Career and Technical Education Act, OCTAE's Division of Academic and Technical Education ("DATE") prepares adult students for high-skill, high-wage, or high-demand occupations by providing career and technical education. [*Id.* at ¶¶ 92-93]. OCTAE's Division of Adult Education and Literacy ("DAEL") also operates programs that help adults acquire basic skills like reading, writing, math, English language proficiency, and problem-solving. [*Id.* at ¶ 95]. In addition, OCTAE improves access to postsecondary education by bolstering community colleges and enhancing their ability to provide high-quality and affordable education. [*Id.* at ¶¶ 97–98].

Regarding vocational rehabilitation services, the Department supports individuals with disabilities through its Rehabilitation Services Administration ("RSA")—a component of OSERS—helping such individuals become more independent and competitive in the labor market. [*Id.* at ¶ 99]. The RSA runs and funds programs such as disability employment programs, an independent living program, technical assistance centers, training programs, and disability innovation fund programs. [*Id.* at ¶ 100]. For example, one such program funds the use of evidence-based practices in state agencies aimed at transitioning individuals with disabilities into high-quality employment opportunities. [*Id.* at ¶ 109].

### 5.  <u>Impact Aid</u>

The Department is also the primary agency charged with distributing payments to local school districts under the Impact Aid program. [*Id.* at ¶ 111]. The Impact Aid program was created to ensure the financial viability of school districts who cannot rely on local property taxes for funding due to their location near non-taxable federal land. [*Id.* at ¶ 110]. School districts seeking Impact Aid can submit applications to the Department, which reviews the applications and processes payments based on congressional appropriations each fiscal year. [*Id.* at ¶ 111]. Many school districts within Plaintiff States rely heavily on Impact Aid funding and receive hundreds of millions of dollars each year used for construction, special education, maintenance, and operations. [*Id.* at ¶ 112]. Therefore, any delay in Impact Aid funding threatens to immediately disrupt these school districts' day-to-day operations, including utility payments and payroll. [*Id.* at ¶ 113].

### C.  <u>The President's Directive And The RIF</u>

President Trump has made his intention to dismantle the Department of Education publicly well-known, referring to the Department as a "a big con job" and saying he would "like to close it immediately." [*Id.* at ¶ 114]. In a campaign video from September 2023, President Trump claimed that "very early in the administration" he would be "closing up the Department of Education in Washington, D.C." [25-cv-10677 Doc. No. 1 at ¶ 45]. On March 12, 2025, after President Trump was inaugurated, he said, "[w]e're going to move the Department of Education, we're going to move education into the states . . . so that the states can run education." [*Id.* at ¶ 46 (omission in original)]. Moreover, he told the new Secretary of Education, Defendant Linda McMahon, to put herself "out of a job." [Doc. No. 1 at ¶ 114]. For her part, Secretary McMahon has been steadfast in her support of President Trump's mission, affirming during her

confirmation process that she "wholeheartedly support[s] and agree[s]" that "the bureaucracy in Washington should be abolished," [25-cv-10677 Doc. No. 1 at ¶ 48 (alterations in original)], and asking Department employees to join her in "perform[ing] one final, unforgettable public service to future generations of students" by dismantling the Department. [Doc. No. 1 at ¶ 115]. On March 6, 2025, news outlets reported that the White House had drafted an executive order calling on the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education (DOE) and return authority over education to the States and local communities, [to] the maximum extent allowed by law." [*Id.* at ¶ 116].

Five days later, on March 11, 2025, pursuant to what Secretary McMahon characterized as its "final mission," [25-cv-10677 Doc. No. 1 at ¶ 52], the Department announced that its workforce was being cut in half via a vast reduction in force initiative affecting "[a]ll divisions within the Department." [Doc. No. 1 at ¶ 117]. According to Department figures, the RIF was set to place approximately 1,378 employees on administrative leave, relieving them of all duties, beginning on March 21, 2025. [*Id.* at ¶ 118; 25-cv-10677 Doc. No. 1 at ¶ 69]. Pursuant to the RIF, those affected staff would be terminated by June 2025. [25-cv-10677 Doc. No. 1 at ¶ 69]. When combined with the 259 employees who accepted resignation as part of the "Fork in the Road" initiative,[7] as well as the 313 employees who accepted a "Voluntary Separation Incentive Payment,"[8] the Department's total numbers after the RIF is estimated at 1,950 employees—

---

[7] On January 28, 2025, the U.S. Office of Personal Management ("OPM") sent an email to federal employees presenting a deferred resignation offer, also known as the "Fork in the Road" offer. The offer presented federal workers with a choice of remaining in their position without "assurance regarding the certainty of [their] position or agency" or to resign and "retain all pay and benefits . . . until September 30, 2025." U.S. OFFICE OF PERSONNEL MANAGEMENT, https://www.opm.gov/fork/original-email-to-employees (last visited May 21, 2025).

[8] The Voluntary Separation Incentive Payment Authority allows agencies that are restructuring or downsizing to offer employees payments up to $25,000, also known as voluntary separation incentive

roughly a 50% reduction from the Department's 4,133 employees at the beginning of President

Trump's second term. [Doc. No. 1 at ¶ 118]. For context, the mass terminations on March 11,

2025, occurred after the Department fired 65 probationary employees the previous month,

though those employees have since been reinstated pursuant to a court order. [25-cv-10677 Doc.

No. 1 at ¶ 60].

Secretary McMahon claimed that the mass firings were meant to improve "efficiency,

accountability, and ensuring that resources are directed where they matter most." [*Id.* at ¶ 54].

Similarly, President Trump maintained that his administration only "want[ed] to cut the people

that aren't working or . . . doing a good job" and "keep[] the best people." [*Id.* at ¶ 55]. Yet

Secretary McMahon also admitted that the terminations were intended to dismantle the

Department, explaining that "[President Trump's] directive to [her], clearly, is to shut down the

Department of Education." [*Id.* at ¶ 58]. Moreover, on the same day that the RIF was initiated,

Secretary McMahon told Laura Ingraham of Fox News that the workforce reductions were the

first steps in shutting down the Department. [Doc. No. 1 at ¶ 119].

On March 20, 2025, President Trump went further to sign an Executive Order entitled

"Improving Education Outcomes by Empowering Parents, States, and Communities," which

directs the Secretary of Education to "take all necessary steps to facilitate the closure of the

Department of Education." [25-cv-10677 Doc. No. 1 at ¶ 63]. However, the Executive Order also

maintains that the Department should only be closed "to the maximum extent . . . permitted by

law," and instructs the Secretary to ensure the "effective and uninterrupted delivery of services,

---

payments ("VSIP") "as an incentive to voluntarily separate." With authorization from the Office of
Personnel Management, agencies may offer VSIP to certain employees who volunteer to separate from
the agency, allowing agencies to minimize or avoid involuntary separations. U.S. OFFICE OF
PERSONNEL MANAGEMENT, https://www.opm.gov/policy-data-oversight/workforce-
restructuring/voluntary-separation-incentive-payments (last visited May 21, 2025); *see* 5 U.S.C. § 3521.

programs, and benefits on which Americans rely." [*Id.* at ¶ 64]. The next day, President Trump

gave an interview in which he publicized plans to move key programs out of the Department.

[*Id.* at ¶ 75]. He explained that "the student loan portfolio" would be "coming out of the

Department of Education immediately" and "moved to the Small Business Administration." [*Id.*

at ¶ 76]. He also claimed that the Department of Health and Human Services would replace the

Department of Education's role in "handling special needs." [*Id.* at ¶ 77].

### D.  Impacts Of The RIF On Department Functions

Before the RIF, the Department of Education had the smallest staff compared to the 15

other cabinet-level executive Departments [*Id.* at ¶ 65 ("[C]ompare just over 4,000 employees at

the Department of Education with the approximately 80,000 employees at the Department of

State, for example")]. As a result of the layoffs after the RIF, Consolidated Plaintiffs allege that

key components of the Department have been effectively gutted, thus leaving the agency

incapable of performing many of its core, statutorily mandated functions. [Doc. No. 1 at ¶¶ 120,

134 ("In sum, on information and belief, the RIF has so severely impaired the Department of

Education that it can no longer function and cannot comply with its statutory requirements.")].

For instance, Consolidated Plaintiffs allege that the Office of General Counsel ("OGC")

has been devastated, as "every single division [within the OGC] except for the division of post-

secondary education was abolished" and nearly three-quarters of its staff removed. [25-cv-10677

Doc. No. 1 at ¶ 66; Doc. No. 1 at ¶ 124]. All OGC attorneys specializing in K–12 grants, IDEA

grants, and equity grants have been fired, along with the majority of OGC attorneys handling

privacy issues. [Doc. No. 1 at ¶ 125]. Moreover, all attorneys who advise on regulations or

informal guidance, elementary and secondary education, civil rights, legislation, ethics

obligations, contract issues, labor and employment issues, and the Freedom of Information Act,

were fired. [25-cv-10677 Doc. No. 1 at ¶ 66]. Consolidated Plaintiffs claim that the OGC's gutting will interfere with the Department's statutory duties of advising many units and offices across the Department on this wide array of topics. [Doc. No. 1 at ¶ 124].

Consolidated Plaintiffs also contend that the RIF has significantly harmed the Department's Financial Student Aid ("FSA") programs and functions, which provide financial assistance to almost 12.9 million students across approximately 6,100 postsecondary educational institutions. [*Id.* at ¶ 128]. Consolidated Plaintiffs argue that before the RIF, the agency was already unable "to provide any communication to schools, servicers, or borrowers about how to navigate the changes that [were] coming" under the Trump administration. [*Id.* at ¶ 129 (quoting *Dismantling of Education Department Puts Future of Trillions of Dollars in Student Loans in Question*, CNN (Mar. 7, 2025, 2:51 PM), https://edition.cnn.com/2025/03/07/politics/student-loans-education-trump)]. Additionally, many employees with institutionalized knowledge about FSA programs had quit or been fired. [*Id.*].

After the RIF, many Department employees in various units under the FSA umbrella were terminated, which has further hamstrung the Department's ability to carry out its student-aid-related duties. [*Id.* at ¶¶ 131-33]. For instance, many employees in the FSA's School Eligibility and Oversight Services Group—"responsible for administering a program of eligibility, certification, financial analysis, and oversight of schools participating in [FSA] programs"— were fired, thus diminishing the Department's ability to ensure that schools remain compliant with Title IV requirements for federal funding. [*Id.* at ¶ 131]. Furthermore, the FSA's Vendor Oversight Division has been effectively eliminated. [*Id.* at ¶ 132]. The Vendor Oversight Division ensures that loan servicers meet contractual and Departmental obligations and is key in verifying compliance with the requirements of the Public Service Loan Forgiveness (PSLF)

program and the Income-Based Repayment plan before student debt under these programs is

discharged. [*Id.*]. The RIF has also removed employees in FSA's Product Management Group

who managed various tools and applications that assisted borrowers in tasks such as certifying

their qualifying employment for the PSLF Program. [*Id.* at ¶ 133]. Additionally, the entire team

that supervises FAFSA was eliminated. [25-cv-10677 Doc. No. 1 at ¶ 66].

Other parts of the Department which Consolidated Plaintiffs allege the RIF has

effectively abolished or materially impacted include: OSERS, including the entire staff that

provides IDEA-implementation guidance to states and other grantees, and the entire

communications staff that sends key information to students, parents, schools, and states, [Doc.

No. 1 at ¶ 126; *see also* 25-cv-10677 Doc. No. 1 at ¶ 66]; the Office of Elementary and

Secondary Education's State and Grantee Relations Team, "which partners with stakeholders and

connects them to the resources and relationships they need to support and educate students

nationally," [Doc. No. 1 at ¶ 127]; the Institute of Education Sciences, where "almost the entire

staff . . . has been eliminated," [*Id.* at ¶ 121]; the entire staff of the Office of English Language

Acquisition, [25-cv-10677 Doc. No. 1 at ¶ 66]; the entire staff responsible for managing grant

operations, grant-related fiscal risk, and contract procurement across the Department, [*Id.*]; and

the entire Office of International and Foreign Language Education, [*Id.*].

### E. **Harm To Plaintiff States**

Plaintiff States allege that the Department's effective dismantling will cause serious harm

to them and their residents. [Doc. No. 1 at ¶ 135]. To begin with, Plaintiff States claim that the

RIF will lead to the loss of or delay in funds intended to support many aspects of K–12 education

within their borders, such as salary funding, support for students with disabilities, and afterschool

programs. [*Id.* at ¶ 136]. Schools in Plaintiff States use federal funding to pay the salaries of

teachers, special education teachers, paraprofessionals, reading specialists, physical therapists, speech therapists, and social workers. [*Id.*]. Therefore, any RIF-induced loss of funding threatens to reduce school staff, increase class sizes, exacerbate teacher shortages, diminish educational opportunities for students, terminate afterschool programs, and erode support services for students with disabilities. [*Id.*]. Despite whatever alternative sources of support are substituted for the Department, Plaintiff States contend that by itself its "dismantling will create and has created chaos, disruption, uncertainty, delays and confusion for [them] and their residents." [*Id.* at ¶ 137]. For instance, states expecting federal funds do not know who to contact about those disbursements, and students at state universities are left in the dark about the status of their federal student aid packages, including whether the packages will be processed and available before the Fall 2025 semester begins. [*Id.*].

Plaintiff States point to updates on one of the Department's websites following the RIF as an example of the type of chaos likely to ensue. [*Id.* at ¶ 138]. Immediately after the RIF, the Department's website for administering federal funds (referred to as the "G6" system) was shut down. [*Id.*]. G6 "allowed schools to request payments, adjust drawdowns, and return cash to the Department for many Title IV programs." [*Id.*]. On March 12, 2025, the day after the RIF was announced, the G6 website stated: "G6.ed.gov will no longer exist, G5.gov will be the correct URL. To access G5, external users should enter their G5 email ID and their G5 email password." [*Id.*]. Users who subsequently navigated to the G5.gov system to get funds disbursed then encountered an alert on the G5 website warning them to "expect delays in connecting to a live help desk agent for assistance with G5." [*Id.* at ¶ 139]. Here in Massachusetts, a G5-user working for the state's Department of Elementary and Secondary Education tried to access the G5 system

to request disbursements of anticipated federal funds but was unable to access the system for hours due to a "system glitch." [*Id.* at ¶ 140].

Plaintiff States also allege that the impacts to and eliminations of the various Department units and offices discussed above will each produce their own forms of harm [*Id*. at ¶ 141]. With an incapacitated OCR for instance, Plaintiff States fear that equal access to quality education may be restricted within their states. *See supra*, Section II.B.2; [*Id.* at ¶ 142]. Moreover, student complaints of discrimination, sexual harassment, and sexual assault may be ignored, and students with pending complaints are likely to be deprived of meaningful and timely resolutions of their cases due to the reduction in OCR staff. [*Id.*]. The hollowing out of OGC is also likely to have adverse effects, depriving employees of ethical guidance and interfering with the Department's ability to award K–12 grants, IDEA grants, and equity grants to Plaintiff States. [*Id.* at ¶ 144]. Furthermore, the effective elimination of the Office of Elementary and Secondary Education's State and Grantee Relations Team will result in Plaintiff States losing a critical partner in their mission to support and educate their students. [*Id.* at ¶ 145]. Higher education is also likely to become more expensive for students in Plaintiff States as the RIF will put federal funding for Pell grants, work-study programs and subsidized loans at risk, reducing the pool of students able to attend college and posing an existential threat to many state university systems such as those intended to serve first generation college students. [*Id.* at ¶ 143]. Even if these programs and grants were to remain fully funded, Plaintiff States claim that the RIF will prevent the Department from effectively operating these programs. [*Id.*].

The RIF's impacts on FSA will also harm student aid programs in multiple respects. [*Id.* at ¶ 146]. For instance, with the loss of employees in the School Eligibility and Oversight Services Group, "the Department has lost the tool responsible for administering a program of

eligibility, certification, financial analysis, and oversight of schools participating in Federal Student Aid programs." [*Id.*]. With the elimination of the FSA's Vendor Oversight Division, Plaintiff States are also hindered in their ability to ensure that loan servicers are complying with their contractual requirements, and the process by which loan servicers discharge student debt will be crippled as this division gives instructions to the loan servicers about discharging student debt under FSA programs. [*Id.* at ¶¶ 146, 148]. Additionally, the administration of FAFSA applications will be disrupted, resulting in "mass uncertainty regarding whether and how FAFSA applications will be processed" and therefore leaving students in limbo regarding their plans for attending college. [*Id.* at ¶¶ 79, 147]. As the college admissions process is presently in full swing—with the FAFSA application deadline less than six weeks away—the harm which will result from delays in application processing is imminent. [*Id.*].

### F. Harm To Somerville Plaintiffs

A description of the Somerville Plaintiffs is in order before discussing their alleged harm.

a.  *Plaintiff Somerville Public Schools ("Somerville")*, a public school district located in Massachusetts, operates eleven schools serving about 5,000 students and employing roughly 440 full-time teachers. [25-cv-10677 Doc. No. 1 at ¶ 20]. Federal funds (including from the Department) provide approximately 6% of Somerville's total budget. [*Id.*]. Nearly $3.5 million of this funding comes from federal grants administered by the Department. [*Id.*].

b.  *Plaintiff Easthampton Public Schools ("Easthampton")*, another public school district in Massachusetts, operates two schools serving approximately 1,400 students and employing about 118 full-time teachers. [*Id.* at ¶ 21]. During the 2024-25 school year, the Department provided Easthampton with more than $800,000 in federal funding. [*Id.*].

c.  *Plaintiff the American Federation of Teachers ("AFT")* is an AFL-CIO-affiliated organization headquartered in Washington, D.C., representing 1.8 million members residing

in every U.S. state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands. [*Id.* at ¶ 22]. AFT members include "pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals." [*Id.*]. By securing fair pay and benefits for its workers and fighting for safe working conditions, AFT furthers its mission of "promot[ing] fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities." [*Id.*].

d.  *Plaintiff American Federation of Teachers Massachusetts ("AFT Massachusetts")*, a labor union in Massachusetts, is an independent nonprofit organization created under Section 501(c)(5) of the Internal Revenue Code. [*Id.* at ¶ 23]. Representing over 25,000 public school employees, higher education faculty and staff, and public librarians, AFT Massachusetts works to further "collaborative education reform" for the benefit of students and educators. [*Id.*]. Its members include "teachers, paraprofessionals, guidance counselors, school nurses, social workers, and other school employees," roughly 22,500 of whom work in public school districts across Massachusetts for pre-K through 12th-grade students. [*Id.*].

e.  *Plaintiff AFSCME Council 93* is a council of labor unions in Maine, Massachusetts, New Hampshire, and Vermont. [*Id.* at ¶ 24]. The organization is headquartered in Boston, Massachusetts and is affiliated with the American Federation of State, County and Municipal Employees, AFL-CIO. [*Id.*]. AFSCME Council 93 represents thousands of public-school employees in Massachusetts, including paraprofessionals, instructional aides, counselors, cafeteria workers, bus drivers, safety officers, and maintenance and administrative staff. [*Id.*]. Its members work in at least 12 school districts and 27 institutions of higher education in Massachusetts. [*Id.*].

f.  *Plaintiff the American Association of University Professors ("AAUP")* is a nonprofit membership association incorporated in Washington, D.C., representing over 43,000 faculty, librarians, graduate students, and academic professionals working at institutions of higher education in every state. [*Id.* at ¶ 25]. Its purpose is to "advanc[e] academic freedom and shared governance, defin[e] fundamental professional values and standards for higher education, promot[e] the economic security of academic workers, and ensur[e] higher education's contribution to the common good." [*Id.*].

g.  *Plaintiff the Service Employees International Union ("SEIU")* is a labor union representing about two million workers in the public-service, property-service, and healthcare spaces throughout the United States, Canada, and Puerto Rico. [*Id.* at ¶ 26]. Among its members are public school employees in K-12 districts, such as "professionals, paraprofessionals, administrative employees, janitors, bus drivers, food service employees, and other educational support staff;" as well as "higher education employees, including faculty, librarians, counselors, student workers, administrative employees, and janitors." [*Id.*]. In Massachusetts alone, SEIU represents around 7,000 education workers. [*Id.*]. SEIU aims to provide quality public services and secure equitable access to education for all students. [*Id.*].

Regarding the harm alleged by Somerville Plaintiffs, the RIF has led to uncertainty with respect to the availability of federal funds, which risks disrupting services for students and programs within Somerville and Easthampton. [*Id.* at ¶¶ 81–85]. In addition to reducing staff and programs, the ability of these school districts to engage in long-term planning is in jeopardy as the result of budget uncertainty. [*Id.* at ¶ 84]. Federal funds amount to almost 6% of Somerville's school budget, helping to pay for at least 28 staff members, keep class sizes smaller, run summer schools to maintain learning gains for students over the summer, provide services to children with disabilities, offer free preschool, pay for low-income students to take advanced placement

classes, and more. [*Id.* at ¶ 79]. Federal funds similarly play an important role within Easthampton's budget, helping the district pay for staff and student transportation, keeping class sizes smaller, and funding extracurricular activities such as art, music, and athletics, among other things. [*Id.* at ¶¶ 80, 85]. School districts tend to make important planning decisions months in advance, and without assurance that federal funds will be available to support their plans, they are left in a precarious position. [*Id.* at ¶ 81].

Take Somerville's summer programs for instance: decisions involving food-nutrition services and city-run parks and recreation programs are finalized as early as March. [*Id.* at ¶ 82]. Moreover, by early May, Somerville schools must establish summer staffing and programming, typically relying on previously approved federal funds in the process. [*Id.*]. Unsure whether federal funds will be readily available, Somerville may be unable to plan for and provide certain essential summer services. [*Id.*]. Somerville's plans for the full academic year are also disrupted as the result of federal-funds uncertainty. [*Id.* at ¶ 83]. Decisions for the full academic year, including staffing commitments, must be made by May 15. [*Id.*]. If federal funding is uncertain, cuts may have to be made to educators and staff who provide vital student services. [*Id.*].

Furthermore, Somerville Plaintiffs will be impacted by the loss of IDEA funding stemming from the RIF. [*Id*. at ¶¶ 115–16]. For instance, many members of AFT and AFT Massachusetts are special education teachers who rely on IDEA funding to pay their salaries. [*Id.* at ¶ 116]. IDEA also funds the provision of assistive technologies—including text-to-speech and word-prediction devices, Braille displays, and talking calculators—that support students with visual impairments. [*Id.*]. Without such technologies, AFT members will experience difficulty effectively communicating with and teaching students with disabilities. [*Id.*]. Moreover, AFT members risk losing other support provided by the Department, such as professional development assistance and guidance on technology and instructional methods, further

interfering with their ability to educate students with disabilities. [*Id.*]. Members of AFSCME Council 93 and SEIU likewise rely on IDEA funding. [*Id.* at ¶ 117]. School districts employing the paraprofessionals and instructional aides represented by these organizations use IDEA funding to pay for these educators' salaries, professional development and continuing education, as well as critical classroom resources and technology. [*Id.*].

School districts themselves will also be impacted by the loss of IDEA funding. [*Id.* at ¶ 118]. Somerville uses the nearly $1.8 million it receives in IDEA funds to support special education teachers, paraprofessionals, and other specialists, as well as to support students with disabilities directly via summer school, smaller class sizes, special-education-oriented supplies and materials, translation services, and individualized student education plans, among other things. [*Id.* at ¶ 119]. Given the wide array of IDEA-supported special education services in Somerville, any reduction or delay in IDEA funds risks impairing the district's ability to adequately support students with disabilities. [*Id.*]. Similarly, Easthampton uses the approximately $550,000 it receives in IDEA funds for many purposes, including staff salaries, direct services to students, summer programming, staff trainings, and extended-year special education—a disruption in such funds will therefore harm the district's ability to support students with disabilities. [*Id.* at ¶ 120].

The lack of adequate staff to administer Title I funds—relied on by school districts around the country to benefit students via increased resources and instructional support—will also have an adverse effect on Somerville Plaintiffs, resulting in funding delays, an absence of advice to states on how to spend the funds effectively, and barriers to obtaining the waivers which allow for greater flexibility in how the funds are spent. [*Id.* at ¶¶ 172–77]. Department staff work with states to help them submit the state plans required by statute to receive Title I funds, and they also provide technical assistance, advice, and support to the states on effectively

spending those funds to ensure that the state's educational goals are satisfied. [*Id.* at ¶¶ 174–75]. Interference with these functions will hamstring the use of Title I funds, thereby diminishing the ability of AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members to optimally serve their students as educators. [*Id.* at ¶ 178]. Members of these organizations leverage the Title I program to access training and development to support the needs of their students. [*Id.*]. Moreover, states and schools utilize Title I funds to help pay teacher salaries. [*Id.* at ¶ 179]. As funds are denied or delayed, larger class sizes, less instructional support, increased workloads, and job losses will harm educators and make their jobs more difficult. [*Id.*].

School districts like Easthampton and Somerville also depend on the availability of Title I funds to plan their budgets and pay their bills, so disruptions in the availability and timing of these funds will affect their ability to plan for future programing and avenues of student support. [*Id.* at ¶¶ 179, 181]. Somerville, for instance, receives $1.1 million dollars in Title I funding, which it uses to support reading teachers, math interventionists, pre-kindergarten educators, tutors, and professional-development services for staff. [*Id.* at ¶ 181]. Meanwhile, Easthampton receives more than $250,000 in Title I funding, using it to support reading specialists, intervention services, and K-8 school-wide programming. [*Id.*].

Somerville Plaintiffs allege they will further be harmed by the RIF's impact on the Department's federal student aid services. [*Id*. at ¶ 141]. A core mission of school districts like Somerville and Easthampton is to support their students in attending higher education, and they rely on the support of FSA services to accomplish that goal. [*Id.*]. Without services like FAFSA and the student loan and grant programs, college will become unaffordable for many of these districts' students. [*Id.*]. FSA services also benefit AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members. [*Id.* at ¶ 142]. For instance, thousands of AFT, AFT Massachusetts, and SEIU members have received federal student loans or grants through the student aid program,

and they use repayment programs to manage loan repayment while working as teachers and in other essential professions. [*Id.* at ¶ 143]. Similarly, many AFSCME Council 93 members rely on federal student loans and grants to fund their education and training, using FSA programs and resources to identify repayment options that make sense for them. [*Id.* at ¶ 148]. FSA and its loan servicers support the operation of these programs by providing technical assistance to guide students on optimal repayment options. [*Id.* at ¶ 143]. Delays in the provision of such assistance, or "in any aspect of loan administration, including processing repayments and applications for deferral or forbearance," risks harming the members of these organizations who count on the smooth operation of FSA programs to effectively manage their loans. [*Id.*].

AFT and SEIU also support their members in receiving loan forgiveness through the PSLF program, which allows government or nonprofit employees to have their student loans forgiven after ten years of repayment. [*Id.* at ¶¶ 144–46]. AFT and SEIU host clinics to educate their members about repayment options like PSLF, and rely heavily on Department resources like guidance documents, loan repayment calculators, and instructions to advise borrowers on which student loan forgiveness program is best for them. [*Id.* at ¶¶ 145–47]. Thus, a reduction in Department assistance and resources threatens to harm these organizations by interfering with their ability to support their members effectively through the loan repayment process. [*Id.* at ¶ 147]. Moreover, the fact that the entire office tasked with supervising the contractors processing PSLF payments was eliminated will disable AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members from leveraging the PSLF program to reduce their debt burdens. [*Id.* at ¶ 150].

The mass OCR office closures and terminations of OCR employees further risk harming Somerville Plaintiffs, hindering the Department's ability to effectively enforce civil rights laws and provide guidance to schools regarding compliance with these laws. [*Id.* at ¶ 159]. The significant reduction in OCR resources will render the timely review of complaints filed by

students, parents, and teachers much more difficult, thus diminishing the protections of student

rights and potentially propelling students, parents, teachers, and schools into costly litigation. [*Id.*

at ¶ 160]. Students, educators and staff—including AFT, AFT Massachusetts, AFSCME Council

93, AAUP, and SEIU members—benefit from effective OCR enforcement of civil rights. [*Id.* at ¶

161]. For example, an educator facing retaliation for acting as a whistleblower can file a

complaint with OCR to prevent the school from further retaliating. [*Id.*]. Moreover, graduate

students—including AAUP and SEIU members—experiencing issues like sexual harassment at

universities are also protected by OCR. [*Id.* at ¶ 162]. School districts like Somerville and

Easthampton will also be harmed by the dismantling of OCR given that they rely on OCR

guidance to remain compliant with civil-rights obligations, distributing OCR resources to help

their students and families navigate civil-rights protections. [*Id.* at ¶ 167].

The incapacitation of various other Department functions risks creating additional harm

for the students, schools, and teachers represented by Somerville Plaintiffs [*Id.* at ¶ 182]. These

other functions include: programs designed to support rural school districts, which are sparsely

populated and typically less resourced than urban and suburban districts; career and technical

education ("CTE") services, which provide practical instruction for youth and adult students to

prepare them for jobs in critical, well-paying industries like advanced manufacturing, health

sciences, and information technology; the Office of English Language Acquisition, Language

Enhancement, which supports English learners via grants and educational research; and the

Institute of Education Sciences ("IES"), which evaluates the efficacy of federal education

programs, collects education statistics, and funds education sciences. [*Id.* at ¶¶ 182–208].

## III.    RIPENESS

This case is ripe for review. Defendants disagree and argue that Consolidated Plaintiffs'

claims are not ripe because the Department has not actually closed, and "cannot be closed absent

action by Congress." [Doc. No. 95 at 24]. They argue that any harms flowing from Defendants'

actions are hypothetical and that Consolidated Plaintiffs have only speculated that the

Department will cease providing services in the middle of its "reorganization." [*Id.* at 24–25].

But Defendants' attempts to characterize Consolidated Plaintiffs' claims as based entirely on the

actual closure of the Department is a red herring. The record "makes plain that Defendants intend

to dismantle the Department—and effectively close it—*without* Congressional authorization,"

[Doc. No. 101 at 11–12], and are using a large-scale RIF to do so. Additionally, Defendants have

not provided evidence to meaningfully counter that Consolidated Plaintiffs are already being

harmed, thereby establishing a direct and immediate dilemma that is fit for resolution. [25-cv-

10677 Doc. No. 41 at 11–12].

      "The injunctive and declaratory judgment remedies are discretionary, and courts

traditionally have been reluctant to apply them to administrative determinations unless these

arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Laboratories v.

Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430

U.S. 99 (1977). The ripeness doctrine "prevent[s] the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also to protect the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148–149.

A ripeness analysis requires the court to "evaluate both the fitness of the issues for judicial

decision and the hardship to the parties of withholding court consideration." *Id.* at 149.

      As to the "fitness" prong, the "critical question . . . is whether the claim involves

uncertain and contingent events that may not occur as anticipated or may not occur at all."

*McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citation omitted). "The fact

that an event has not occurred can be counterbalanced in this analysis by the fact that a case turns

on legal issues not likely to be significantly affected by further factual development." *Id.*

(citation omitted). As to the "hardship" prong, the inquiry "typically turns upon whether the

challenged action creates a 'direct and immediate' dilemma for the parties." *Id.* (citation

omitted). "This inquiry encompasses the question of whether plaintiff is suffering any present

injury from a future contemplated event." *Id.*

Consolidated Plaintiffs meet both the fitness and the hardship prongs. The issues are fit

for judicial review because the claims at issue do not involve uncertain or contingent events.

Consolidated Plaintiffs' claims are not based on an actual closure of the Department, but on the

effective incapacitation of the Department to carry out congressionally mandated functions

through the guise of what Defendants argue is a "reorganization." *See* [Doc. No. 95 at 13, 14, 19,

25, 28].[9] Defendants cannot have it both ways. While repeatedly referring to the mass

terminations as merely a "reorganization" not ripe for judicial review, Defendants simultaneously

sidestep that the mass terminations were *explicitly* implemented to shut down the Department.

Section 2 of the Executive Order is titled, "Closing the Department of Education and Returning

Authority to the States," and clearly directs the Secretary to "take all necessary steps to facilitate

---

[9] *See, e.g.*, [Doc. No. 1 at ¶ 156 (Count I – Separation of Powers: "Any instance where the President, by
Executive Order or otherwise, directs that an agency authorized by Congress to perform statutory duties
cease operations, effectively repeals the statutes that authorize that agency and thus violates the
Separation of Powers doctrine"); ¶ 163 (Count II – Take Care Clause: "By issuing the Directive to
dismantle an agency authorized by Congress, the President has failed to faithfully execute the laws
enacted by Congress in violation of the Take Care Clause"); 25-cv-10677 Doc. No. 1 at ¶ 227 (Count III –
*Ultra Vires*: "Defendant[s]' actions to dismantle the Department, including the March 11 mass
termination, the Executive Order, plans to transfer portions of the Department to other federal agencies,
and subsequent steps to implement that Order, are outside of Defendants' authority to act"); ¶ 232 (Count
IV – Actions Contrary to Constitutional Right under the APA: "Defendants' actions to dissolve the
Department of Education, including by effectuating mass terminations of the Department's staff and
planning to transfer portions of the Department to other federal agencies, usurp legislative authority
conferred by the Constitution to Congress, in violation of the separation of powers"); ¶ 239 (Count V –
Excess of Statutory Authority under the APA: "Defendants lack authority to dismantle the Department, in
whole or in part, including by effectuating mass terminations of the Department's staff or otherwise
implementing the Executive Order's directive")].

the closure of the Department of Education."[10] *See* [Doc. No. 71-1]; *see also* [Doc. No. 71-9]

(Reporting on President Trump's "desire to do away with the department entirely," his hope that

"Ms. McMahon would effectively put herself out of a job," and his desire "to close [the

Department] immediately")].

As explained in further detail with relevance to the parties' standing and irreparable harm

arguments, the Consolidated Plaintiffs have demonstrated that this is a case "in which the impact

of the [terminations] upon the petitioners is sufficiently direct and immediate as to render the

issue appropriate for judicial review at this stage." *Abbott*, 387 U.S. at 152; *see id.* at 153

("Where the legal issue presented is fit for judicial resolution, and where a regulation requires an

immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties

attached to noncompliance, access to the courts under the Administrative Procedure Act and the

Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual

circumstance, neither of which appears here"). A department without enough employees to

perform statutorily mandated functions is not a department at all. This court cannot be asked to

cover its eyes while the Department's employees are continuously fired and units are transferred

out until the Department becomes a shell of itself.[11]

---

[10] That this directive is qualified by the statement "to the maximum extent appropriate and permitted by law" does not make Defendants' actions lawful.

[11] The cases Defendants cite do not support them. *F.T.C. v. Standard Oil Co. of California*, 449 U.S. 232 (1980) (discussing finality of agency action as opposed to ripeness); *City of New York v. United States Dep't of Def.*, 913 F.3d 423 (4th Cir. 2019) (same). In *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90–91 (1st Cir. 2013), the First Circuit held that "enactment of the [challenged] Ordinance itself" showed there was "no doubt that the City intend[ed] to enforce the Ordinance," and that claim was ripe, but that the "claim concerning the potential future results of the application process" was not ripe because there were "further factual developments that could be relevant to the outcome of this case." Like *Roman Catholic*, the enactment of the RIF itself demonstrates Defendants' intentions of enforcing it. Further factual development is not necessary to make this issue ripe for resolution.

## IV.    STANDING

To establish standing, a "plaintiff must have suffered an 'injury in fact,'" . . . "the injury has to be 'fairly traceable to the challenged action of the defendant,'" and the injury must be likely redressable through a favorable decision of a court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). Article III standing requires that a plaintiff "suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The injury must be "real, and not abstract." *Id*. at 424 (cleaned up). "Central to assessing concreteness is whether the asserted harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts"—such as physical harm, monetary harm, or various intangible harms. *Id.* at 414 (cleaned up). Furthermore, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Contrary to Defendants' assertion, Consolidated Plaintiffs—who can be divided into three groups: Plaintiff States, School Districts, and Union Plaintiffs—have shown concrete, imminent harm sufficient to establish standing. Below, I list just a few examples of Consolidated Plaintiffs' harms due to the RIF. *See infra* Section VI.B (providing comprehensive summary of irreparable harms to Consolidated Plaintiffs as a result of the RIF, including financial uncertainty and delay, impeded access to vital research upon which students, districts, and educators rely, and loss of essential services provided by the Office for Civil Rights and Federal Student Aid.).

### A.    <u>Plaintiff States And School Districts</u>

As a result of the RIF, Plaintiff States have already experienced delays and disruptions in their receipt of primary and secondary education funding from the Department. [Doc. No. 71-29

at ¶ 25 (As of March 18, 2025, the New Jersey Department of Education ("NJDOE") "received a notice to expect delays in connecting to a live help desk agent because of severe staffing restraints" when attempting "to view and withdraw federal funds to use for its programs and to pay vendors.")]. I believe this delay and uncertainty in educational funding constitutes an injury in fact directly harming Plaintiff States, whose vital function is to provide quality education to their citizenry. *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954) ("[E]ducation is perhaps the most important function of state and local governments.).

Additionally, both Plaintiff States and School Districts have shown that such uncertainty and delay stemming from Defendants' actions are harming State Education Agencies ("SEA"s), Local Education Agencies ("LEA"s), colleges, and universities by making it extraordinarily difficult to plan, budget, and hire educators. For example, Somerville Public Schools "do not know whether [they] will be able to add staff before the 2025-26 school year, or whether [they] . . . will be able to provide summer school, or whether [they] will be able to retain staff . . . [w]ithout timely and predictable funding, Somerville would be forced to make cuts – including possibly premature cuts – to staff and programs, disrupting services for students and families. This instability makes long-term planning nearly impossible and weakens the district's ability to provide high-quality education and support." [25-cv-10677 Doc. No. 27-7 at ¶ 48]. RIDE, "a department and the operating arm of the Rhode Island Council on Elementary and Secondary Education," receives federal funding totaling over $60 million, which "are allocated to state education agencies which then subgrant directly to eligible entities. Funding delays or interruptions will compromise the ability of LEAs to ensure that their students are minimally proficient on State academic assessments, will hobble the capacity of LEAs to support, develop, and train qualified teachers, and will have an immediate and detrimental effect on the quality of education in Rhode Island. Interruptions or delays in the administration of Title I funding,

specifically, will be strongly felt, as over half of Rhode Island schools currently receive this funding." [Doc. No. 104 at ¶¶ 4, 15–16].

Given these uncontested declarations, School Districts have shown injury in fact sufficient to establish standing. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (Standing found where a defendant's actions "directly affected and interfered with [plaintiff's] core business activities."). Plaintiff States have shown additional grounds for standing through injury in fact to their SEAs and LEAs. *Biden v. Nebraska,* 600 U.S. 477, 489 (2023) (finding injury sufficient to confer standing to Missouri, where the Secretary of Education's plan harmed a nonprofit government corporation of the state, which performed the essential public function of helping Missourians access student loans to pay for colleges). It is also important to note that these injuries to Plaintiff States and School Districts would not have occurred in the absence of the RIF that they challenge. *Compare Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 45 n.25 (1976) (fairly traceable element of standing not met where "respondents' injuries might have occurred even in the absence of the IRS Ruling that they challenge").

## B.  Union Plaintiffs

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, Union Plaintiffs assert concrete injury on behalf of their members, who rely on federal student aid to afford their education and on positions created through federal work study, without which Union Plaintiffs' members would be forced to forgo higher education, default on existing loans, or potentially opt out of careers in

public service. [25-cv-10677 Doc. No. 27-13 at ¶¶ 3, 18–23 (The labor union SEIU is guided by a "vision for a just society where all workers are valued and all people are respected." SEIU's local chapter, CSUEU represents a bargaining unit of student assistants at California State University," and "[t]housands of these student assistants rely on aid via federal work study positions" as well as "to afford tuition, food, rent, other living expenses, and transportation off-campus internships.")]. Thus, taken together, Consolidated Plaintiffs have shown sufficient injury traceable to Defendants' actions to establish standing.

I am not convinced by Defendants' assertion that Consolidated Plaintiffs admit that they lack understanding of the Department's reorganization. In support of their contention, Defendants point to Consolidated Plaintiffs' statement that the Dear Education Stakeholders letter provided little detail about the cuts to OESE, OELA, and OSERS. To say that Consolidated Plaintiffs lack understanding of the reorganization based on a description of a Department communication ignores the numerous declarations from former Department employees, which describe in great detail the RIF's impact to specific offices within the Department. [Doc. No. 71-58; Doc. No. 71-61; Doc. No. 71-67; Doc. No. 71-68; Doc. No. 71-69; Doc. No. 102-8 (detailing impacts to FSA); Doc. No. 102-10 (detailing impacts to OESE); Doc. No. 71-64 (detailing impacts to IES); 25-cv-10677 Doc. No. 27-6 (detailing impacts to OGC); Doc. No. 71-48 (detailing impacts to OCR)].

Finally, Defendants argue that even if Consolidated Plaintiffs could show an imminent, actual harm, Defendants have exercised appropriate discretion in conducting a reorganization. I agree that there is "wide latitude traditionally granted to the government in dispatching its own internal affairs." *Gately v. Com. of Mass.*, 2 F.3d 1221, 1234 (1st Cir. 1993). But Consolidated Plaintiffs are not disputing that the Department has the authority to reorganize the Department

and implement an RIF *so long as such reorganization allows the Department to fulfill its statutory mandates*. [Doc. No. 121 at 10:7–25]. Here, Consolidated Plaintiffs allege that the Department has been effectively dismantled, through the RIF, resulting in a failure by the Department to meet its statutory mandates. Consolidated Plaintiffs have provided an extensive record, particularly through supporting declarations from former Department employees, that their harms stem from the Department's inability to effectuate vital statutory functions specifically tasked to it. Thus, Consolidated Plaintiffs have standing to challenge the Department's actions.

## V.    JURISDICTION

Another preliminary issue for resolution is whether the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191–216 (1978) (codified at 5 U.S.C. §§ 7101–35), divests this court of jurisdiction. The CSRA "provides for the original and exclusive administrative review of certain labor- and employment-related claims brought by federal employees and/or their unions." *Maryland v. United States Dep't of Agric.*, No. cv 25-0748, 2025 WL 973159, at *15 (D. Md. Apr. 1, 2025).

Defendants argue that the CSRA precludes Consolidated Plaintiffs' claims challenging the mass terminations, because the "essential nature of Plaintiffs' challenge" is the "employment at the Department of Education." [Doc. No. 95 at 21, 23]. According to Defendants, had the Department eliminated only a single program office or conducted a more limited RIF, the appropriate challenge would have been brought by aggrieved agency personnel before the Merit Systems Protection Board ("MSPB"), and the Union Plaintiffs' exclusive remedy is review before the Federal Labor Relations Authority ("FLRA"). I would agree with that scenario. But that is not the situation here. Rather, the magnitude and the proportion of the mass terminations accounting for 50% of the Department's workforce has effectively incapacitated the Department.

This case is not about unlawful terminations; this case is about the impact that those terminations have on the Department's ability to fulfill its congressional obligations. In any event, Consolidated Plaintiffs are not "current or former employees of the Department, nor are they labor unions." [Doc. No. 101 at 11]. Plaintiffs are "local school districts and teachers' unions that represent educators who work in state and local schools. They do not represent any federal employees at the Department of Education." [25-cv-10677 Doc. No. 41 at 18-19]. As such, the CSRA does not apply.

The CSRA "established a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto,* 484 U.S. 439, 455 (1988). Under the CSRA, aggrieved "federal employees may obtain administrative and judicial review of specified adverse employment actions," including "removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5-6 (2012) (citing 5 U.S.C. § 7512). Employees and labor unions may appeal decisions of the MSPB or FLRA to the federal courts of appeals. 5 U.S.C. §§ 7101 *et seq*. Consolidated Plaintiffs are not federal employees or labor unions who have access to the MSPB or FLRA under the CSRA. Though Defendants assert that the MSBP and the FLRA are the "exclusive means for federal employees, labor unions, and *other interested parties*" to raise challenges to adverse employment actions, [Doc. No. 95 at 21 (emphasis added)], they do not cite to any authority supporting that "other interested parties" are subject to the CSRA or define who these "other interested parties" are.[12]

---

[12] None of the cases Defendants cite involve any plaintiff other than an employee or union. *See, e.g.*, *Elgin*, 567 U.S. 1, 6-7 (employees suing over their dismissal for failure to register for the Selective Service); *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 635 (D.C. Cir. 2013) (unions and one employee suing over military uniform requirements); *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 75-753 (D.C. Cir. 2019) (unions suing over changes to federal labor-management relations scheme); *Fausto*, 484 U.S. 439 (employee suing over individual disciplinary action); *see also Maryland*, 2025 WL 973159, at *15 (collecting cases).

Rather, the plain text of the statute forecloses its application to any litigant who is not an individual, labor organization, or agency. *See* 5 U.S.C. § 7103(a)(1) (a "person" is an "individual, labor organization, or agency"); §7103(a)(2) (an "employee" is either an individual "employed in an agency" or whose employment "has ceased because of any unfair labor practice," as described in the statute); § 7103(a)(4) (a "labor organization" is "an organization composed in whole or in part of employees, in which employees participate and pay dues, and which has as a purpose the dealing with an agency concerning grievances and conditions of employment").

Further, Consolidated Plaintiffs' harms are "sufficiently distinct from the employee- and union-focused harms Congress intended to channel away from the district courts." *Maryland*, 2025 WL 973159, at *15.[13] Here too, Consolidated Plaintiffs "have suffered unique harms . . . irrespective of those harms' connection with the agency-employee relationship." *Maryland*, 2025 WL 800216, at *14. In *American Federation of Government Employees*, for example, the court held that it had jurisdiction over claims brought by public-sector unions concerning federal employee terminations. There, the court found that,

> [T]he public-sector unions' ultra vires or separation-of-powers claim is not about each employer agency's purported decision to terminate any or all of its employees. Instead, it is about a prior controlling event: Did the OPM exceed its authority when it directed all federal agencies to terminate their probationers *en masse*? This distinguishes these claims from others that have attacked, substantively or procedurally, one agency's decision about one employee or its own workforce, which are the kinds of claims appellate courts have channeled into the CSRA.

---

[13] In a closely analogous case, the District Court of Maryland conducted a thorough analysis of the application of the CSRA to States who sued over the government's implementation of a reduction in force that resulted in the mass layoffs of probationary employees. *See Maryland v. United States Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *13 (D. Md. Mar. 13, 2025); *Maryland*, 2025 WL 973159 (D. Md. Apr. 1, 2025). The Fourth Circuit recently granted the Government's motion to stay the injunction pending appeal. Though the Fourth Circuit granted the stay, stating "[t]he Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims, and the Government is unlikely to recover the funds disbursed to reinstated probationary employees," the court did not provide any reasoning for that conclusion. *Maryland v. United States Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025). I am not bound by the unexplained conclusion of the Fourth Circuit, and I rely on the Maryland District Court's reasoning as persuasive here.

No. 25-cv-01780, 2025 WL 900057, at *1, 3 (N.D. Cal. Mar. 24, 2025). (cleaned up). Here, the

question is similar: Did Defendants exceed their authority in firing Department employees *en*

*masse* to circumvent Congress's power to dismantle the Department? And, unlike in *American*

*Federation*, Consolidated Plaintiffs here do not represent or purport to be employees of the

Department. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-03698, 2025 WL

1358477, at *15 (N.D. Cal. May 9, 2025) ("[T]he Civil Service Reform Act says nothing at all

about non-federal employee unions, non-profit organizations, or local governments");

*Winnebago Tribe of Nebraska v. Babbitt*, 915 F. Supp. 157, 165 (D.S.D. 1996) ("In any event,

jurisdiction under the CSRA is dependent upon whether the plaintiff is an employee"). As

another federal court also recently held in an analogous case, this case is "not simply an

employment dispute." *Widakuswara et al. v. Lake et al.*, No. 25-cv-1015, 2025 WL 1166400, at

*11 (D.D.C. Apr. 22, 2025) (granting in part preliminary injunction and finding court had

jurisdiction over plaintiffs' claims arising out of a RIF dismantling a federal agency).

## VI.    PRELIMINARY INJUNCTION

Consolidated Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil

Procedure 65. "A preliminary injunction is an extraordinary remedy never awarded as of right."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Consolidated Plaintiffs "must

establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable

harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and

that an injunction is in the public interest." *Id.* at 20. Among these four factors, the likelihood of

success is the "main bearing wall" of the analysis. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10

(1st Cir. 2013) (cleaned up). This Court accepts as true "all of the well-pleaded allegations of

[Plaintiffs'] complaint and uncontroverted affidavits filed in support of the motion for a

preliminary injunction." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

A. **Likelihood of Success on the Merits**

1. **Constitutional Claims**

Defendants argue that Plaintiffs' constitutional claims are barred as purely statutory. For this proposition, Defendants rely primarily on *Dalton v. Specter*, 511 U.S. 462 (1994). However, *Dalton* is inapplicable here, and Defendants conceded at the motion hearing that the President's actions were not taken pursuant to any statutory authority. *See* [Doc. No. 121 at 49–50].

In *Dalton*, respondents sought to enjoin the Secretary of Defense from carrying out a decision by the President, pursuant to the Defense Base Closure and Realignment Act of 1990 (the "1990 Act") to close the Philadelphia Naval Shipyard. 511 U.S. at 464. Respondents alleged that the Secretary violated the 1990 Act in recommending closure of the Shipyard. *Id.* at 466. The Court held that the President's decision to accept a flawed recommendation "is not a 'constitutional' claim subject to judicial review under the exception recognized in *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), but simply a statutory claim." *Id.* at 462 (cleaned up). The Court rejected "the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," distinguishing "between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. However, the Court distinguished its holding in *Dalton* from its decision in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), where the Government did not rely on *any* statutory authorization for its actions.

The Court clarified that in *Youngstown*, as opposed to *Dalton*:

> The only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces. Because no statutory authority was claimed, the case necessarily turned on whether the Constitution authorized the President's actions. Youngstown thus involved the *conceded absence of any statutory authority*, not a claim that the President acted in excess of such authority. The case cannot be read for the proposition that an action

46

taken by the President in excess of his statutory authority necessarily violates the
Constitution.

*Id.* at 473 (emphasis added).

I agree with Consolidated Plaintiffs that *Dalton* does not stand for the proposition that
"action outside the scope of statutory authority can *never* give rise to a constitutional violation."
[Doc. No. 101 at 16 (emphasis in original)]. Nevertheless, Consolidated Plaintiffs' constitutional
claims are more akin to *Youngstown*, "where *no* statutory authority supported the President's
actions." [*Id.* (emphasis in original)]. Consolidated Plaintiffs assert that "[i]n hobbling the
Department, Defendants acted both without any supporting statutory authority and directly
contrary to congressional intent. Their constitutional power was thus "at its lowest ebb." [*Id.* at
16–17 (citing *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring))]. Unlike in *Dalton*,
where the 1990 Act was the ground for plaintiff's challenge, here, Consolidated Plaintiffs
challenge the Directives as outside the scope of the executive's authority entirely. They do not
allege a violation of the DEOA—rather, the Act simply evidences that the Department was
created pursuant to Congress's authority and cannot be dismantled without it. *Am. Forest Res.
Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110, 218 L.
Ed. 2d 348 (2024) ("*Dalton*'s holding merely stands for the proposition that when a statute
entrusts a discrete specific decision to the President and contains *no limitations* on the President's
exercise of that authority, judicial review of an abuse of discretion claim is not available.")
(cleaned up).

    a.  **Separation of Powers And Take Care Clause**

By "eliminating the staff required to meet Congress's requirements," Consolidated
Plaintiffs argue that the Executive Branch is unlawfully abolishing the Department and its
statutorily mandated components. [Doc. No. 70 at 38]. Amici members of Congress state that,

"Defendants' actions violate the Constitution's separation of powers under which Congress holds the sole power to make laws and the Executive faithfully executes those laws." [Doc. No. 106-1 at 8, citing U.S. Const. art. I; id. art. II, § 3). I find that Consolidated Plaintiffs are likely to succeed in showing that Defendants are effectively disabling the Department from carrying out its statutory duties by firing half of its staff, transferring key programs out of the Department, and eliminating entire offices and programs.

"All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. "To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction, the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees, and the fixing of the term for which they are to be appointed and their compensation—all except as otherwise provided by the Constitution." *Myers v. United States*, 272 U.S. 52, 129 (1926). The President "shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, but the "repeal of statutes, no less than enactment, must conform with Art. I." *INS v. Chadha,* 462 U.S. 919, 954 (1983). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("Executive must abide by statutory mandates and prohibitions").

The DEOA recognized that "the dispersion of education programs across a large number of Federal agencies has led to fragmented, duplicative, and often inconsistent Federal policies

relating to education," 20 U.S.C. § 3401, and therefore declared that "the establishment of a

Department of Education is in the public interest, will promote the general welfare of the United

States, will help ensure that education issues receive proper treatment at the Federal level, and

will enable the Federal Government to coordinate its education activities more effectively." 20

U.S.C. § 3402. The Executive Order's direction to "facilitate the closure of the Department of

Education and return authority over education to the States and location communities" goes

directly against Congress's intent in creating the Department to "supplement and complement the

efforts of States, the local school systems and other instrumentalities of the States, the private

sector, public and private educational institutions, public and private nonprofit educational

research institutions, community-based organizations, parents, and students to improve the

quality of education." *Id.* While it may be true that the President has the power to remove

executive officers, *see Myers*, 272 U.S. at 119, Defendants cite to no case that this power

includes the power to dismantle Congressionally created departments and programs through

mass terminations.[14] These actions violate the separation of powers by violating the executive's

---

[14] Defendants' cases cited in support of their argument that they were merely making permissible
enforcement decisions with respect to the changes to the Office for Civil Rights do not apply. *See, e.g.,
Heckler*, 470 U.S. at 829 (FDA agency's decision not to institute enforcement proceedings under the
Food, Drug, and Cosmetic Act with respect to drugs used for lethal injections is within agency's
discretion); *United States v. Nixon*, 418 U.S. 683, 693 (1974) (Executive Branch has absolute discretion to
decide whether to prosecute a case, and thus, "President's decision is final in determining what evidence
is to be used in a given criminal case"). Here, Consolidated Plaintiffs do not challenge a "specific
decision by Defendants regarding whether to pursue an enforcement action, or which enforcement actions
to pursue." [Doc. No. 101 at 17]. "Rather, Plaintiffs argue that Defendants' actions to reduce OCR staff
amount to an incapacitation of the Department's ability to meet its statutory obligations to begin with. The
Department cannot, on its own, decide to render OCR incapable of performing the duties Congress
established." [*Id.* (citing 20 U.S.C. § 3413)]. Defendants' cases supporting the idea that that
"implementation of such policy priorities is plainly within the purview of Defendants" also are inapposite,
as they do not speak to Defendants' power to unilaterally dismantle a Congressionally created
Department. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (refusing to find that an individual
has standing merely by asserting a take care clause claim); *Chicago & S. Air Lines v. Waterman S. S.
Corp.*, 333 U.S. 103, 111, 114 (1948) (finding that "the very nature of executive decisions as to foreign
policy is political, not judicial," and therefore holding that the matters at issue were "political matters
beyond the competence of the courts to adjudicate").

duties to take care to faithfully execute laws enacted by Congress, as well as its duties to expend

funds that Congress has authorized it to appropriate.[15] [16] *See Clinton*, 524 U.S. at 438

(President's actions in canceling provisions of certain budget and tax acts "in both legal and

practical effect . . . amended two Acts of Congress by repealing a portion of each. Statutory

repeals must conform with Art. I, but there is no constitutional authorization for the President to

amend or repeal") (citation omitted).

### b.  <u>Ultra Vires</u>[17]

"To act *ultra vires* a government official is either acting in a way that is impermissible

under the Constitution or acting outside of the confines of his statutory authority." *Mesa Hills*

*Specialty Hosp. v. Becerra*, 730 F.Supp. 3d 342, 352 (W.D. Tex. 2024). "[A] claim alleging that

the President acted in excess of his statutory authority is judicially reviewable even absent an

applicable statutory review provision." *Am. Forest Res. Council*, 77 F.4th at 796. "Even when the

Congress gives substantial discretion to the President by statute, we presume it intends that the

President heed the directives contained in other enactments." *Id.* at 797. "The Congress can and

---

[15] The Supreme Court in *Myers* recognized that "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates. This view has since been repeatedly affirmed by this court." *Myers*, 272 U.S. at 117; *Aiken Cnty.*, 725 F.3d at 259 ("[T]he Executive must abide by statutory mandates and prohibitions. Those basic constitutional principles apply to the President and subordinate executive agencies"). If Defendants were correct that the Take Care clause only applies to the President, a President could evade Article II review by simply delegating the task to subordinates.

[16] Count IV of the Somerville Plaintiffs' Complaint alleges a separate claim under the APA that Defendants' actions are contrary to a Constitutional right. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B). For the same reasons that I find a likelihood of success on the merits of Consolidated Plaintiffs' constitutional claims, I also find a likelihood of success on this count.

[17] As explained above, *Dalton* does not preclude judicial review of the constitutional claims. *See Trump*, 2025 WL 1358477, at *18 (enjoining large-scale RIF, holding that "defendants misread plaintiffs' *ultra vires* theory against President Trump. Plaintiffs' claim is not that the President exceeded his statutory authority, as the *Dalton* plaintiffs claimed. Instead, Claim One is about the President acting without *any* authority, constitutional or statutory.") (emphasis in original).

often does cabin the discretion it grants the President, and it remains the responsibility of the judiciary to ensure that the President act within those limits." *Id.* "[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). "[F]ederal courts may in some circumstances grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

Defendants argue that any analysis of an *ultra vires* claims must be "confined to 'extreme' agency error where the agency has stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]" *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up). "Only error that is patently a misconstruction of the Act, that disregard[s] a specific and unambiguous statutory directive, or that violate[s] some specific command of a statute will support relief." *Id.* (cleaned up). Even under the extreme agency error standard, Defendants have likely acted *ultra vires*. As *Amici* Members of Congress explain, "no statute grants the Executive the authority to dismantle the Department because Congress has passed no 'statute that expressly authorizes' the Executive to dissolve the Department or transfer its congressionally mandated responsibilities to other agencies." [Doc. No. 110, at 35–36 (citing *Youngstown*, 343 U.S. at 585)]. As mentioned, the Agency Defendants have the authority to reorganize the Department how they see fit, so long as it can carry out Congress's mandates. However, as has been established, the Defendants have not made it a secret that their goal is to do away with the Department entirely; they have publicly and repeatedly stated so. These actions

are plainly beyond the bounds of what Defendants can do, and Defendants do not point to any authority to the contrary. Indeed, "[t]he simple proposition that the President may not, *without Congress*, fundamentally reorganize the federal agencies is not controversial." *Trump*, 2025 WL 1358477, at *18 (granting TRO arising from large-scale RIF) (emphasis in original).

### 2.  **APA Claims**

#### a.  **Final Agency Action**

As an initial matter, I find that the Agency Defendants' actions are final such that judicial review is available. "The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,' § 704, and applies universally except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law,' § 701(a)." *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (citing 5 U.S.C. §§ 701(a), 704). "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 177 (citation omitted).

As to the first condition, Defendants argue that the RIF "marks the initiation, not the consummation, of the agency's decision-making process" and that "Plaintiffs are unable to identify any concrete, final decision by the Department of Education to shut itself down." [Doc. No. 95 at 28]. But the record is clear that Defendants have made their decision: they intend to close the Department, without Congress's approval. Defendants do not purport to reverse the mass terminations, reinstate programs or offices that it closed, or bring back programs that it transferred out of the Department. *See Trump*, 2025 WL 1358477, at *21 (granting TRO and finding that defendants' actions in implementing the RIF "are done and final" because defendants

do not assert that actions are "subject to change" or that they may be "modified or rescinded," even though the "ultimate impacts of the RIFs may yet be unknown"). Nor do Defendants argue that they are still stewing on whether the Department is a "bureaucratic bloat," or that the Department is "inefficien[t] and [a] waste." [Doc. No. 95 at 12, 33]. Defendants' goal is clear, and their actions in furtherance of that goal are not subject to change.

As to the second condition, I find that there are "legal consequences [that] will flow" from the Agency Defendants' actions. *Bennett*, 520 U.S. at 177. "[A]ny agency's decision to dismiss an employee effects self-evident legal consequences for both parties and plainly marks the end of the agency's decision-making with respect to the employee involved." *Maryland*, 2025 WL 800216, at *11; *cf. Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025) ("OPM's direction to the other agencies [to dismiss probationary employees] constituted a final agency action for the purposes of the APA."). Here, Agency Defendants have already terminated half of the Department, shut down entire programs and offices, and transferred Congressionally mandated programs out of the Department. To the extent there is any room to argue that the Department may "reverse these actions at some unidentified point in the future . . . does not change the fact that the agency has made decisions, communicated them to their employees . . . and thereby altered their rights and obligations." *Widakuswara*, 2025 WL 1166400 at *12 (finding that "*final* does not mean *permanent*") (emphasis in original).

Contrary to Defendants' assertions, Consolidated Plaintiffs are not challenging some broad, abstract policy; they challenge the mass terminations designed to get rid of the Department. This case is not like *Lujan v. Nat'l Wildlife Fed'n.*, where the Court rejected a challenge to an agency's "land withdrawal review program." 497 U.S. 871 (1990). There, the Court held that the claims did not challenge a final agency action because the program is not "a

single [Bureau of Land Management] BLM order or regulation, or even a completed universe of

particular BLM orders and regulations." *Id.* at 890. Rather, because the program "extends to . . .

1250 or so individual classification terminations and withdrawal revocations," the Court held

that respondent "cannot seek *wholesale* improvement of this program by court decree, rather than

in the offices of the Department or the halls of Congress, where programmatic improvements are

normally made." *Id.* at 890-891 (citation omitted). Here, unlike in *Lujan*, Consolidated Plaintiffs'

challenge is addressed squarely at a discrete set of final actions: the mass terminations of half the

Department of Education, and the transfer of certain programs out of the Department. Issuing an

injunction to that effect would not require this court to manage the day-to-day affairs of the

Department, it would simply restore the status quo until this court can determine whether

Defendants acted unlawfully.

### b. <u>Agency Action Committed To Discretion By Law</u>

Defendants' actions cannot be fairly categorized as mere managerial or staffing decisions

that are typically afforded discretion. The APA provides that "[a] person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute, is entitled to judicial review thereof," 5 U.S.C. § 702, "except to

the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

"The Administrative Procedure Act creates a basic presumption of judicial review for one

suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,

586 U.S. 9, 22 (2018) (cleaned up). "Congress rarely intends to prevent courts from enforcing its

directives to federal agencies. For that reason, this Court applies a 'strong presumption' favoring

judicial review of administrative action." *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486

(2015) (cleaned up).

This presumption may be rebutted if an agency action is committed to agency discretion by law. *Weyerhaeuser*, 586 U.S. at 23. "A court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Id*. "To give effect to § 706(2)(A) and to honor the presumption of review, [the Supreme Court] ha[s] read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (citing *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993)).

The Court has applied the exception in decisions involving allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 191, and reconsideration of a final action, *ICC v. Locomotive Engineers,* 482 U.S. 270, 282 (1987).[18] *Weyerhaeuser*, 586 U.S. at 23. In *Weyerhaeuser*, the Court held that an action challenging the Fish and Wildlife Service's designation of their land as a critical habitat for the dusky gopher frog under the Endangered Species Act "involves the sort of routine dispute that federal courts regularly review: An agency issues an order affecting the rights of a private party, and the private party objects that the agency did not properly justify its determination under a standard set forth in the statute." *Id.* at 23–24.

Defendants do not point to any analogous case holding that an agency's implementation of a RIF to dismantle itself falls within the narrow exception to judicial review under the APA.[19]

---

[18] *See also Lincoln*, 508 U.S. at 191 ("Over the years, we have read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion'"); *see Heckler v. Chaney,* 470 U.S. 821, 829 (1985) (FDA agency's decision not to institute enforcement proceedings under the Food, Drug, and Cosmetic Act with respect to drugs used for lethal injections was presumptively unreviewable); *Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (decision of Director of Central Intelligence to terminate an employee in the interests of national security was barred from judicial review under APA).

[19] To find that these actions fall within the narrow exception would greatly expand it—which I am unwilling to do. Further, the fact that the Department's actions prevent the effectuation of Congressionally mandated obligations itself demonstrates that these actions are not discretionary.

Defendants' cases cited in support of their arguments are inapposite, [20] especially where Courts read the "exception for action committed to agency discretion 'quite narrowly.'" *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (citing *Weyerhaeuser*, 586 U.S. at 23).

### c.  Beyond Statutory Authority

The Somerville Plaintiffs allege that the Secretary lacks the authority to abolish, reorganize, or alter offices within the Department except in narrow circumstances provided by the reorganization statute. *See* 20 U.S.C. § 3473. The Somerville Plaintiffs argue that Agency Defendants exceeded their authority by abolishing offices that the reorganization statute specifically prohibits, including: OESE, 20 U.S.C. § 3414; OSERS, 20 U.S.C. § 3417 (establishing OSERS), 20 U.S.C. § 1402 (requiring that OSEP, within OSERS, administer IDEA); OCTAE, 20 U.S.C. § 3416; OCR, 20 U.S.C. § 3413, and others.

Under the reorganization statute in the DEOA, the Secretary,

> is authorized . . . to allocate or reallocate functions among the officers of the Department, and to establish, consolidate, alter, or discontinue such organizational entities within the Department as may be necessary or appropriate, but the authority of the Secretary under this subsection does not extend to-- (1) any office, bureau, unit, or other entity transferred to the Department and established by statute or any function vested by statute in such an entity or officer of such an entity, except as provided in subsection (b); (2) the abolition of organizational entities established by this chapter; or (3) the alteration of the delegation of functions to any specific organizational entity required by this chapter.

---

[20] *See Markland v. Off. of Pers. Mgmt.*, 140 F.3d 1031 (Fed. Cir. 1998) (no APA claim, and Federal Circuit did not conclude that an agency's decision to institute an RIF was unreviewable, but rather that the RIF was implemented in accordance with its regulations); *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17-18 (1st Cir. 2020) (First Circuit reversed district court's decision that a statute did not provide meaningful standards that a reviewing court could apply because EPA "pointed [] to nary a case that would suggest" that the agency decision in that case was "traditionally left to agency discretion"); *see also Drake v. F.A.A.*, 291 F.3d 59, 70 (D.C. Cir. 2002) (FAA's decision to dismiss complaint brought by flight attendant who alleged that airline violated drug testing regulations was not reviewable because this decision "was equivalent to a decision not to commence an enforcement action"); *de Feyter v. Fed. Aviation Admin.*, No. 10-cv-358, 2011 WL 1134657, at *5 (D.N.H. Mar. 25, 2011) (finding "the decision not to impose civil penalties is generally the type of action committed to agency discretion").

20 U.S.C. § 3473(a)(1)–(3). The Secretary may alter or discontinue some entities within the

Department for other entities created by statute, including,

> (A) the Office of English Language Acquisition, Language Enhancement, and Academic Achievement for Limited English Proficient Students; (B) the Teacher Corps; (C) the Community College Unit; (D) the National Center for Education Statistics; (E) the National Institute of Education; (F) the Office of Environmental Education; (G) the Office of Consumers' Education; (H) the Office of Indian Education; (I) the Office of Career Education; (J) the Office of Non-Public Education; (K) the bureau for the education and training for the handicapped; (L) the administrative units for guidance and counseling programs, the veterans' cost of instruction program, and the program for the gifted and talented children.

20 U.S.C. § 3473(b)(1)(A)–(L). To the extent that the Secretary has discontinued offices that she

is not permitted to under the statute, such as the Office for Civil Rights, [Doc. No. 71-48 at ¶¶

22, 29], I find that the Somerville Plaintiffs are likely to prevail on this claim. To the extent that

the mass terminations are an effective dismantling of the entire Department, I also find that

Somerville Plaintiffs are likely to prevail. Defendants fail to cite to a single case that holds that

the Secretary's authority is so broad that she can unilaterally dismantle a department by firing

nearly the entire staff, or that her discretion permits her to make a "shell" department.

### d. **Arbitrary And Capricious**

The APA requires that a court "hold unlawful and set aside agency action" that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). Under the APA, the arbitrary and capricious standard "is quite narrow: a reviewing

court 'may not substitute its judgment for that of the agency, even if it disagrees with the

agency's conclusions.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citing *River St.*

*Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). An agency action is arbitrary and

capricious only if the agency has "relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In making this determination, the reviewing court considers "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (cleaned up)). At bottom, this deferential standard requires that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce*, 588 U.S. at 785.

"Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id*. (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). Here, I look to the March 11 Directive and the March 21 Directive for the Defendants' explanation. The March 11 Directive states that the 50% RIF was taken "[a]s part of the Department of Education's final mission." [Doc. No. 71-5 at 2]. The March 11 Directive also states that the RIF "reflects the Department of Education's commitment to efficiency, accountability, and ensuring that resources are directed

where they matter most: to students, parents, and teachers." [Doc. No. 71-5 at 2]. The Secretary also stated that the RIF was "a significant step toward restoring the greatness of the United States education system." [*Id.*]. As Defendants concede, the Secretary's March 14 "Dear Education Stakeholders" letter sent a few days after the announcement of the RIF also "includes only a cursory explanation." [Doc. No. 95 at 35]. The March 21 Directive was announced orally at a press conference by President Trump. There, President Trump stated that he has "decided that the SBA, the Small Business Administration, headed by Kelly Loeffler … will handle all of the student loan portfolio," that it will be "coming out of the Department of Education immediately," and that the "Health and Human Services Department, will be handling special needs and all the nutrition programs and everything else," explaining that it "will work out very well."[21]

None of these statements amount to a reasoned explanation, let alone an explanation at all. Indeed, the March 11 Directive contains two contradictory positions. It states that the goal of the RIF is to improve the Department's "efficiency" but also states that the RIF has been taken to further the Department's "final mission"—which is, incontrovertibly, its closure. Beyond that, Defendants have not shown how the RIF furthers its goals of "efficiency, accountability, and ensuring that resources are directed" to "parents, students, and teachers." *Dep't of Commerce*, 588 U.S. at 773 (a court must determine whether there is "a rational connection between the facts found and the choice made"). For instance, Defendants have not attempted to demonstrate that cutting a certain program in half has somehow made that program more efficient or returned necessary resources to the States. There is no indication that Defendants conducted any research to support why certain employees were terminated under the RIF over others, why certain offices

---

[21] Lexi Lonas Cochran, *Trump says student loans moving to SBA 'special needs to HHS*, The Hill (Mar. 21, 2025), https://thehill.com/homenews/education/5207597-trump-student-loans-sba-special-needs-disabled-students-hhs-mcmahon-kennedy.

were reduced or eliminated, or how any of those decisions further Defendants' purported goals of efficiency or effectiveness of the Department. This is especially so where Consolidated Plaintiffs have built a record demonstrating that those decisions have actually done the opposite. *See infra* Section VI.B; *See Amerijet*, 753 F.3d at 1350 ("[C]onclusory statements will not do; an agency's statement must be one of reasoning.") (cleaned up). To the extent that the Department's goals of efficiency and accountability or directing resources back to the States can amounts to an explanation, it is "incongruent with what the record reveals about the agency's priorities and decision-making process." *Dep't of Commerce*, 588 U.S. at 785. [22] Thus, I "cannot ignore the disconnect between the decision made and the explanation given." *Id.*

Additionally, Consolidated Plaintiffs have demonstrated that the Agency Defendants "failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. The Agency Defendants "entirely failed to grapple with the potential disruption to operations and interference with statutory and non-statutory functions a sudden elimination of nearly 50% of the Department's entire workforce would cause." [Doc. No. 70 at 35]. Nothing in the record indicates a consideration of the "substantial harms and reliance interests for students, educational institutions, Plaintiffs, and others." [*Id.* at 35–36]; *See Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions." (emphasis in original)). Defendants do not dispute this.

Rather, they suggest that the proper remedy is to remand the decision to the Department for additional explanation. This argument disregards a reviewing court's discretion to take any steps it deems necessary to prevent irreparable injury before a final judgment is reached. *See* 5

---

[22] The same is true as to the March 21 Directive, which provides no explanation, for example, how Congressionally mandated programs governing the facilitation of the federal student loan portfolios are made more efficient by being transferred to the Small Business Administration.

U.S.C. § 705 ("[T]o prevent irreparable injury, the reviewing court . . . may issue all necessary

and appropriate process to postpone the effective date of an agency action or to preserve status or

rights pending conclusion of the review proceedings."). As discussed below, Consolidated

Plaintiffs are likely to suffer irreparable harm should the status quo not be restored. While

remand for further explanation by the agency is the typical remedy when the agency's actions are

held arbitrary and capricious specifically because the agency fails to provide an adequate

explanation for its actions, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985),

Defendants' failure to provide a reasonable explanation is not the only ground for holding its

actions unlawful. As discussed below, it is also likely that Defendants acted contrary to law. Such

grounds for holding Defendants' actions unlawful are not necessarily contingent on a further

development of the record or a more thorough explanation of Defendants' actions, and thus,

remand for further explanation is not appropriate here. Moreover, courts have vacated and set

aside agency action upon successful APA challenges. *See Massachusetts v. Nat'l Institutes of

Health*, No. 25-cv-10338, 2025 WL 702163, at *34 (D. Mass. Mar. 5, 2025) (cleaned up),

*judgment entered*, No. 25-cv-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) ("The normal

remedy for a successful APA challenge is vacatur of the rule and its applicability to all who

would have been subject to it").

### e.  <u>Contrary To Law</u>

Under the APA, a court must "hold unlawful and set aside" agencies actions that are "not

in accordance with law." 5 U.S.C. § 706(2)(A); *see also F.C.C. v. NextWave Pers. Commc'ns

Inc.*, 537 U.S. 293, 300 (2003) (Contrary to law "means, of course, any law, and not merely those

laws that the agency itself is charged with administering"). The Agency Defendants' actions are

contrary to law because "the Mass Termination amounts to a wholesale reorganization and

reduction in the size and scope of the Department in violation of 20 U.S.C. § 3473," the DEOA's reorganization statute. [Doc. No. 70 at 36]. The Agency Defendants' actions in dismantling the Department are further contrary to the DEOA inasmuch as it creates the Department, and contrary to federal statutes that require the Department to carry out mandated functions including implementing K–12 educational programs, disbursing funds, conducting mandatory data collection and research, providing technical assistance, facilitating student loan programs, implementing vocational education and rehabilitation programs, and enforcing civil rights laws.

Consolidated Plaintiffs are likely to succeed on the merits of this claim. First, Defendants have not pointed to any case that indicates that the Secretary's effective dismantling of the Department is within her reorganization powers under § 3473. *See supra,* Section VI.A.2.c (discussing Somerville Plaintiffs' claim that Secretary's actions exceed statutory authority). Second, there are numerous federal laws that require the Department to carry out certain functions. For example, the IDEA requires Defendants to "ensure" that children with disabilities have access to educational opportunities, that their rights are protected, to "assist" states, localities and other entities in providing effective and coordinated services to those children, "support[]" coordinated research, technical assistance, technology development, and other supports, and "assess, and ensure the effectiveness of, efforts to educate children with disabilities." 20 U.S.C. § 1400(d)(1); [25-cv-10677 Doc. No. 26 at 31]. Congress also mandated that the Department operate the OCR, which is charged with "identifying significant civil rights or compliance problems," 20 U.S.C. §3143(b), employing staff "necessary to carry out the functions" of the OCR, 20 U.S.C. § 3143(c), and review complaints from students and "make a prompt investigation" of such complaints," 34 C.F.R. § 100.7; [25-cv-10677 Doc. No. 26 at 31]. Other statutes vest the Department with the responsibility to implement federal student aid, *see*

20 U.S.C. §§ 1018, 1087a(a), 1087b(a), 1087b(c), 3441(2)(C), administer mandatory formula funds for K-12 education and provide technical assistance to grantees, *see id.* §§ 6301, *et seq.*, and direct the Department to support English language learners, *see id.* § 3423d.

Finally, to the extent that the Agency Defendants' actions are an effective dismantling of the Department, I find that those actions are contrary to the DEOA's mandate that the Department itself must exist—not just in name only, but to carry out the functions outlined in the DEOA and other relevant operating federal statutes.

### B. Irreparable Harm

"'District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief.'" *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (citing *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989)). Importantly, "the measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Id.*, 587 F.3d at 485. Nonetheless, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Rather, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

An "'[i]rreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The movant has "the burden of demonstrating that a denial of interim injunctive relief would cause irreparable harm." *Ross-Simons of Warwick, Inc.*

*v. Baccarat, Inc.,* 102 F.3d 12, 18 (1st Cir. 1996). Here, the Consolidated Plaintiffs have met their burden of showing that they are likely to suffer irreparable harm in the form of: (1) financial uncertainty and delay harming student education; (2) impeded access to vital knowledge upon which students, districts; and educators rely; and (3) loss of essential services provided by the office of Federal Student Aid and the Office for Civil Rights. Defendants do not dispute the veracity of the declarations submitted by Consolidated Plaintiffs, other than to say that they are speculative in nature.

### 1. Financial Uncertainty and Delay

#### a. Plaintiff States

According to supporting declarations, Plaintiff States are experiencing financial delays and uncertainty relating to the Department's administration of funds, resulting in harm to Plaintiffs States, including its student populations. [Doc. No. 71-29; Doc. No. 71-31]. For example, the New York State Education Department ("NYSED"), which is currently administering $15.7 billion in federal funding from the Department, is experiencing drawdowns delays for Education Stabilization Fund ("ESF") reimbursements since the RIF announcement, and "are awaiting on additional guidance and instructions for the approval of drawdown requests." [Doc. No. 71-31 at ¶¶ 6, 7]. The New Jersey Department of Education ("NJDOE") "received a notice to expect 'delays in connecting to a live help desk agent' because of 'severe staffing restraints'" when attempting "to view and withdraw federal funds to use for its programs and to pay vendors." [Doc. No. 71-29 at ¶ 25]. The Illinois State Board of Education ("ISBE") has been unable to access certain categories of funding since March 1, 2025. [Doc. No. 71-22 at ¶ 12]. Regarding Title I funds, the Office of Elementary and Secondary Education "provides preliminary allocation figures to States a few weeks after a continuing resolution is passed by Congress," which is important for States and local education agencies to plan their budget for the

upcoming year. [Doc. No. 102-10 at ¶ 12]. An employee at the OESE stated "[t]his year,

however, that process has been disrupted, and we have not been able to get preliminary

allocation figures to States despite a continuing resolution passing in March 2025." [*Id*.].

Plaintiff States ensure that federal funding is allocated to educational programs and

services relating to special education, career readiness and technical education, bilingual

education, early childhood education programs, and more. [Doc. No. 71-31; Doc. No. 104].

Absent an injunction, financial delay and uncertainty will irreparably harm Plaintiff States'

SEAs, LEAs, students, and even payroll. *See* [Doc. No. 71-13 at ¶ 70 ("Untimely approvals and

drawing of funds will significantly impact the State. Not only will that harm [California's] LEAs

and students, but it will impact State payroll."); Doc. No. 104 at ¶¶ 4, 15–16 (RIDE, "a

department and the operating arm of the Rhode Island Council on Elementary and Secondary

Education", receives federal funding totaling over $60 million, which "are allocated to state

education agencies which then subgrant directly to eligible entities. Funding delays or

interruptions will compromise the ability of LEAs to ensure that their students are minimally

proficient on State academic assessments, will hobble the capacity of LEAs to support, develop,

and train qualified teachers, and will have an immediate and detrimental effect on the quality of

education in Rhode Island. Interruptions or delays in the administration of Title I funding,

specifically, will be strongly felt, as over half of Rhode Island schools currently receive this

funding.")].

Plaintiff States have a clear interest in ensuring and protecting the education of its

citizens. *See Brown*, 347 U.S. at 493 ("[E]ducation is perhaps the most important function of

state and local governments."). I am convinced that the asserted harm to Plaintiff States'

citizenry, particularly their student populations, constitutes irreparable injury to Plaintiff States

for purposes of the preliminary injunction. *See Mediplex of Massachusetts, Inc. v. Shalala*, 39 F.

Supp. 2d 88, 99 (D. Mass. 1999) (finding that owner of a nursing facility had "an interest in protecting the health of its residents and [could] assert harm to them as irreparable harm for the purpose of [the] motion [for preliminary injunction]"); *see also Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121–22 (1st Cir. 2003) (cleaned up) (finding irreparable harm where "developmentally delayed and hearing-impaired teenager" experienced gap in interpreter services because even "a few months can make a world of difference in harm to a child's development"); *see also Plyler v. Doe,* 457 U.S. 202, 221 (1982) (noting the "lasting impact of [education's] deprivation on the life of the child," that "education has a fundamental role in maintaining the fabric of our society," and "the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.").

### b.  <u>School Districts</u>

School Districts have also suffered financial uncertainty hindering long term planning and undermining their mission to provide high quality education to students. [25-cv-10677 Doc. No. 27-7; 25-cv-10677 Doc. No. 27-9]. For example, Somerville Public Schools "do not know whether [they] will be able to add staff before the 2025-26 school year, or whether [they] will be able to provide summer school, or whether [they] will be able to retain staff . . . Ultimately without timely and predictable funding, Somerville would be forced to make cuts – including possibly premature cuts – to staff and programs, disrupting services for students and families. This instability makes long-term planning nearly impossible and weakens the district's ability to provide high-quality education and support." [25-cv-10677 Doc. No. 27-7 at ¶ 48; *cf.* 25-cv-10677 Doc. No. 27-9 at ¶ 29 (Easthampton School District facing similar challenges as Somerville Public Schools)].

As here, "[a]ctions by a defendant that 'make it more difficult' for' an organization 'to accomplish [its] primary mission . . . provide injury for purposes . . . irreparable harm.'" *Nat'l Treasury Emps. Union v. Vought*, No. 25-cv-0381, 2025 WL 942772, at *15 (D.D.C. Mar. 28, 2025) (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)); *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1126 (N.D. Cal. 2019), aff'd sub nom. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742 (9th Cir. 2020) (finding irreparable injury where the goals of providing healthcare and legal services were frustrated and that plaintiffs' changes to their programs and other diversions of resources constituted irreparable harm).

Furthermore, the detriment to Plaintiffs' organizational missions and to student education cannot be remedied through retroactive relief. [25-cv-10677 Doc. No. 27-7 at ¶ 46]. "[A]s students fall behind, it becomes harder to bring them back up." [*Id.*]; *see John T. v. Delaware County Intermediate Unit*, No. 98-cv-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time."). In Easthampton, without certainty regarding funds for IDEA and Title I, "the District would need to make several detrimental changes to programming[,]" including "cutting personnel and increasing class sizes," "instituting cuts in the District's discretionary spending, particularly arts, music, extracurricular activities, athletics, and other programs" and "cutting transportation funding, most notably high school busing." [25-cv-10677 Doc. No. 27-9 at ¶ 23]. Furthermore, "[t]here would additionally need to be cuts to professional development programming for staff, hindering the District's ability to support new teachers. If the funding situation got dire enough, the District would also need to close its preschool programming. All of these cuts would have profoundly negative effects on students, staff, and the teaching culture (i.e., pedagogical methods) of the District." [*Id.*].

Significantly, the School Districts have demonstrated that they lack sufficient financial resources to weather delays in funding. *See* [25-cv-10677 Doc. No. 27-7 at ¶ 42 (Somerville Public Schools "do not have sufficient financial resources to endure long periods of time without reimbursement, nor do [they] have the funds that would be required for us to spend money in [their] budget without knowing when or if [they] will receive reimbursement for those expenditures."); 25-cv-10677 Doc. No. 27-10 at ¶ 20 ("If the reimbursement were interrupted, it would be very difficult to fund [classroom aide] positions as the [Worcester Public School] District would not have other abilities to provide funding."); 25-cv-10677 Doc. No. 27-9 at ¶ 20 ("[The Easthampton School District"] do[es] not have sufficient financial resources to endure long periods of time without reimbursement, nor do[es] [it] have the funds that would be required [it] to spend money in [its] budget without knowing when or if [it] will receive reimbursement for those expenditures.")].

### c.  <u>Union Plaintiffs</u>

Union Plaintiffs' members, who serve as educators or education workers, are experiencing funding uncertainty, which will likely result in job loss and loss of employment benefits. [25-cv-10677 Doc. No. 27-11 at ¶¶ 10, 28 ("AFT members occupy a broad range of positions in education, including but not limited to: pre-K through 12th-grade teachers, early childhood educators, classroom aides, counselors, school nurses, paraprofessionals, and other school-related personnel; higher education faculty and professional staff at community colleges, colleges, and universities" and "delays or problems disbursing IDEA funds will harm AFT members through exacerbated workforce shortages, increased workloads, and job losses. [W]ithout reliable IDEA funds…money would either have to be reallocated away from other areas to maintain services, services would be reduced, and/or expectations would be placed upon fewer educators."); 25-cv-10677 Doc. No. 27-13 at ¶ 16 (Many SEIU members "whose salaries

are subsidized by the Department of Education's funding streams will be at risk of losing their

jobs (and, accordingly, the salaries and health benefits they rely on to support themselves and

their families)" if federal funding is delayed or cut); 25-cv-10677 Doc. No. 27-12 at ¶¶ 11, 14, 18

("Title I funds the salaries" of teachers in "26 Massachusetts school districts that AFT

Massachusetts members work in." If funding were cut or redirected, "[i]n Lynn, for example, it

could mean the termination of approximately 84 teachers and 74 paraprofessionals.")

Here, "[w]hile [the Union] Plaintiffs' [are likely to] suffer the harm of losing

employment, it is well settled that the loss of employment is not considered irreparable for the

purposes of an injunction." *Massachusetts Correction Officers Federated Union v. Baker*, 567 F.

Supp. 3d 315, 327 (D. Mass. 2021). I am also not convinced that the Union Plaintiffs' loss of

associated employment benefits is enough to demonstrate irreparable harm for purposes of a

preliminary injunction. Union Plaintiffs' cited cases, *United Steelworkers of Am. v. Textron, Inc.*,

836 F.2d 6, 8 (1st Cir. 1987), which specifically pertained to the benefit needs of 200 retired

workers and a dispute regarding contracts outlining medical and life insurance benefits, and

*Risteen v. Youth for Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002), which specifically

involved a plaintiff who delayed "critical medical attention because he lost his health insurance,"

are distinguishable from the facts of this case, where Union Plaintiffs allege loss of benefits more

generally.

**2.  Cuts To Vital Research, Data, Accreditation, And Compliance Services**

**a.  Impact To The Institute Of Education Studies At The Department**

To understand the harms to Consolidated Plaintiffs, I first outline the lay of the land

within the Institute of Education Studies at the Department. As a result of the RIF, three arms of

the Institute of Education Studies at the Department, including the National Center for Education

and Statistics ("NCES"), the National Center for Education Research ("NCER"), and the

National Center for Education and Evaluation ("NCEE"), which includes programs like What

Works Clearinghouse and the Education Resources Information Center ("ERIC"), are unable to

fulfill their mandates. [Doc. No. 71-64 at ¶¶ 5, 6, 8, 12]. Already, "cuts at NCES have had a

major impact on the Department's collection and analysis of data." [Doc. No. 102-10 at ¶ 10].

With only three employees remaining, the NCES almost surely not be able to complete the

National Assessment of Education Progress, "the largest continuing and nationally representative

assessment of what the nation's students know and can do in subjects such as mathematics,

reading, science, and writing," and "a congressionally mandated project administered by NCES,"

which previously thirty people used to work on alone. [Doc. No. 102-9 at ¶ 7a].

At NCER and NCEE, the only remaining employees are the two Commissioners. [Doc.

No. 71-64 at ¶ 12]. The reduction also impacts other offices who rely on data provided by IES.

For example, the Office of Elementary and Secondary Education ("OESE") within the

Department relies on [NCES] data for their work," which cannot be ameliorated because "staff

within OESE lack the subject matter expertise of many of the RIF'ed employees." [Doc. No.

102-10 at ¶ 10]. With regard to compliance services, a majority of employees at the Office of

General Counsel were terminated and the Department is "[w]ithout legal advice from specialized

OGC attorneys." [25-cv-10677 Doc. No. 27-6 at ¶¶ 10, 12].

### b. Impact To Plaintiff States

Plaintiff States have demonstrated they are likely to suffer irreparable harm to their

educational systems because of cuts to research, data, accreditation, and compliance services at

the Department. [Doc. No. 71-19; Doc. No. 71-36; Doc. No. 71-15]. More specifically, *see* [Doc.

No. 71-19 at ¶¶ 17–18 ("The University of Hawai'i (UH) depends on IES data and analyses for

strategic planning, policy development, program evaluation, and accreditation processes," which

"directly informs UH's initiatives to improve student retention, graduation rates, learning outcomes, and workforce readiness. Any reduction in IES support would not only compromise UH's institutional research and planning effectiveness but also undermine the State of Hawai'i's capacity to develop the competitive, skilled workforce needed for economic success."); Doc. No. 71-32 at ¶ 31 (SUNY relies on NCES and Integrated Postsecondary Education Data System data for benchmarking, which provides "critical context in regard to how SUNY is performing," and without it SUNY "will be less able…to provide its students with the best education possible."); Doc. No. 71-36 at ¶ 49 ("The elimination of all or most of the staff at IES/NCES and any associated delays, interruptions, or reductions in funding will likely have a debilitating effect on RIDE's [Rhode Island Department of Elementary and Secondary Education] ability to comply with the terms of this [statewide longitudinal data system] grant and carry out critical functions of this program."); Doc. No. 71-15 at ¶ 16 (Higher education institutions must report data to NCES by statute, and "with almost every employee working for NCES and IPED having been cut…this will likely lead to delays and issues with the data collection, which could be used to withhold or eliminate federal funding in Colorado institutions.")].

Plaintiff States have also shown that the pace of approval for critical recertification and change requests for Program Participation Agreements has slowed for colleges and universities, resulting in at least one close call shutdown of a campus. *See* [Doc. No. 71-43 at ¶¶ 7-12; Doc. No. 101 at 10 n.9]. After 18.5 weeks of uncertainty, a Washington technical college finally learned that its application had been approved, narrowly avoiding termination of their Tacoma campus lease, associated staffing positions, and program offerings. [Doc. No. 101 at 10 n.9]. Regarding accreditation, Plaintiff States have shown the RIF "jeopardizes the structure and

integrity of institutional accreditation, inflicting a loss of quality control to the detriment of students." [Doc. No. 71-19 at ¶ 18; *see also* Doc. No. 71-15 at ¶ 17].

### c. Impact To School Districts

Like Plaintiff States, the School Districts have demonstrated they are likely to suffer irreparable harm because cuts to vital resources and expertise will undermine the School Districts' ability to educate their students. *See* [25-cv-10677 Doc. No. 27-10 at ¶¶ 26–31 (Worcester regularly uses reports from IES to help it understand what types of innovation are effective and relies on technical assistance from the Department "continuously" to design its CTE curricula and to ensure compliance with Titles I through IV. If IES or the What Works Clearinghouse "were no longer available or were not kept current, the loss to school districts like Worcester would be irreparable" because of the constant need to innovate and because of the limited time to achieve results with each student and class year); *see also* 25-cv-10677 Doc. No. 27-7 at ¶¶ 28–31 (Somerville often relies on technical assistance from the Department, particularly through IES, and compromised access to such resources would impede Somerville's ability to provide its students with the "best possible education")]. Importantly, at least one school district has stated that they could not replace the Department's research. [25-cv-10677 Doc. No. 27-10 at ¶ 28 (Worcester "could never replicate the breadth and depth of [IES's] work")].

In particular, students with disabilities will be negatively impacted absent up-to-date data and technical assistance provided by the Department; without the Department's help, these students will be deprived of guidance and expertise essential to offering a quality education. *See* [25-cv-10677 Doc. No. 27-8 at ¶¶ 13–21 (For formula grants under IDEA which are subject to tight deadlines, states have historically worked closely with OSERS staff and relied on their

expertise to submit an application every year that includes assurances of how the state will ensure that schools will provide statutorily required free and appropriate public education, complaint resolution procedures for parent involvement, services for students in private schools, and more. OSERS staff work to correct application errors with states, which "if uncorrected could result in a student not receiving the services which they are entitled"); *see also* 25-cv-10677 Doc. No. 27-7 at ¶ 31 (Resources from the Department help Somerville in a variety of ways like providing "templates to IEP forms, suggestions for high-quality assistive technology; guidance on bullying prevention for students with disabilities; and webinars for helping educators communicate effectively with families through the IEP process")].

Furthermore, the closure of Office of English Language Acquisition will likewise irreparably harm Plaintiffs' ability to serve their English language learners. *See* [Doc. No. 102-12 at ¶ 13 (OELA was completely abolished and staff from the OESE are absorbing statutorily required work); Doc. No. 102-10 at ¶ 10–12 (outlining how the RIF is likely to have significant impacts on OESE's abilities to perform its core functions); 25-cv-10677 Doc. No. 27-7 at ¶ 20 (Title III funding helps pay for Somerville's English Language Learner program, and without access to the program, English learning students "would go without continuity in their language learning for about 10 weeks during the summer, which would cause a huge backslide in their learning."); 25-cv-10677 Doc. No. 27-10 at ¶ 16 (Worcester's Title III funding, amounting to $1.3 million, supports English learners through classroom instruction, programming tailored to English learners, professional development, and instructional coaches and supplemental programs, "both after school and during the summer to extend learning and prevent learning loss")].

Finally, "[w]ithout technical assistance provided by OGC lawyers, [] state agencies will be impeded in their ability to deliver federal funds, including funds appropriated in accordance with IDEA and ESEA, to local schools efficiently and on correct bases," further demonstrating irreparable harm. [25-cv-10677 Doc. No. 27-6 at ¶ 9].

### d.  Impact To Union Plaintiffs

Union Members also rely on data maintained by the Department for research for teaching in education programs, and to hold institutions and states accountable for meeting the needs of their communities. [25-cv-10677 Doc. No. 27-14 at ¶ 11 (Member of the American Association of University Professors who produces research that helps improve higher education uses data from IES when studying state policy and institutional productivity); 25-cv-10677 Doc. No. 71-64 at ¶ 15 ("Peer-reviewed educational research will no longer be available to everyone, but instead it will only be available to the elite who can pay to access it.")]. However, while I acknowledge that Union Plaintiffs engage in important work, I am not convinced the Union Plaintiffs have shown, at least at this stage, that they are likely to be irreparably harmed by the RIF's impacts to research.

### 3.  Essential Services Provided By FSA

### a.  The RIF's Impact To FSA

Again, to understand the harms to Consolidated Plaintiffs, I first outline the lay of the land within FSA itself. The RIF has resulted in the practical elimination of most, if not all, essential offices within the FSA. [Doc. No. 102-8]. For example, the Vendor Oversight Group ("VOG") was hit hard by layoffs, with almost all staff fired. [*Id.* at ¶¶ 37–38, 45]. For context, VOG previously enforced contractually required service level agreements ("SLA") to fulfill statutorily mandated oversight and compliance work – i.e. to ensure loan servicers issued proper

billing to the FSA and proper servicing to borrowers. [*Id.* at ¶¶ 18–20]. "Depending on the size of the loan servicer, failing a single SLA could cost a servicer and save taxpayers" amounts ranging from $150,000 to $2.5 million per SLA quarter; "VOG reduced the costs of administering student loan programs by tens of millions of dollars each year." [*Id.* at ¶¶ 23, 28].

As a result of the RIF, "all VOG's SLA work for the last quarter was immediately halted, and all of their work to date has been effectively lost." [*Id.* at ¶¶ 49–50]. "FSA's contracting officer will be forced to waive the SLA's requirements for 'interaction quality' and 'processing accuracy' for the previous quarter immediately costing taxpayers millions of dollars." [*Id.* at ¶ 50]. Significantly, "FSA will no longer have the capacity to measure interaction quality and processing accuracy, which inevitably results in a decline of customer service to borrowers and a cost increase to administer the student loan program." [*Id.* at ¶ 51].

In the medium term, the dramatic cuts to FSA will undermine FSA's ability to monitor and fix existing and new servicing issues. [*Id.* at ¶ 52]. For example, "VOG was tracking 183 open servicing issues that are no longer being effectively monitored and tracked to resolution." [*Id.*]. And in the longer term, "FSA is now like a house of cards" incapable of withstanding "any coming shocks to the federal student loan system." [*Id*. at ¶ 53]. This will likely materialize by October 2025, when approximately 9.5 million borrowers will be deemed to have defaulted on their student loans. [*Id*. at ¶ 54].

Additionally, six of eight School Participation Sections ("SPS") within the Office of Institutions of Higher Education ("IHE") Oversight & Enforcement have been eliminated. [Doc. No. 71-63 at ¶ 13; Doc. No. 71-52 at ¶ 12]. "IHE Oversight & Enforcement is responsible for administering eligibility, certification, financial analysis, and oversight of over 5,500 schools that participate in loan programs under Title IV," including for example Pell Grants and Federal Work

Study. [Doc. No. 71-63 at ¶ 5; *see also* Doc. No. 71-51 at ¶ 4; Doc. No. 71-52 at ¶¶ 4–6]. "Without staff adept at rooting out fraud, students will be taken advantage of, and taxpayer money will be wasted." [Doc. No. 71-63 at ¶ 16]. These functions are critical for the success of schools, the protection of students, and the safeguarding of taxpayer funds—and they are required by statute and regulation. *See* 20 U.S.C. § 1018(c)(4); 34 C.F.R. § 668.171–77 (2025); *see also* [Doc. No. 71-52 at ¶¶ 6–10]. FSA's Vendor Performance Division and Human Capital Management Division was also eliminated by the RIF. [Doc. No. 71-68 at ¶¶ 7–9; Doc. No. 71-69 at ¶¶ 6, 9–10, 13–16; Doc. No. 71-67 at ¶ 5]. The Office of the Ombudsman Federal Student Aid was also heavily impacted by the Mass Termination. [Doc. No. 71-58 at ¶¶ 19, 20].

Regarding the Product Management Division within the Department, whose flagship product is FAFSA, "the vast majority" of employees are subject to the RIF. [Doc. No. 71-61 at ¶¶ 4, 7, 12]. "[I]t is not possible for the Product Management Division to fulfill its duties following such vast cuts" and as a result "there will be regular technological problems and inaccurate information that will impact schools and borrowers." [*Id.* at ¶¶ 13–14].

Importantly, former employees have stated given the quick termination and immediate disabled access to work files and emails, they have not been able to transition work to others. [Doc. No. 102-8 at ¶ 49; Doc. No. 71-63 at ¶ 11]. Finally, cuts to other offices, like the OGC, impede the FSA's "ability to effectively manage the contracts for the FAFSA and loan servicers, which must operate in accordance with highly specific federal authorities." [25-cv-10677 Doc. No. 27-6 at ¶ 10].

### b.  Impact To Plaintiff States

As already mentioned, Plaintiff States have also shown that the pace of approval for critical recertification and change requests for Program Participation Agreements has slowed for

colleges and universities, resulting in at least one close call shutdown of a campus. [Doc. No. 71-43; Doc. No. 101 at 10 n.9; Doc. No. 71-16 at ¶ 7, 10 (In Fiscal Year 2024, FSA handled loan disbursement, servicing, and borrower assistance for 14,840 University of Connecticut students. Cuts would cause "substantial financial hardship for students impacted, causing them to discontinue their education…would result in fewer tuition and fee paying students, aided by the support of the FSA programs [], subsequently causing budget shortfalls…impacting potential employment opportunities for tax paying citizens in Connecticut and the United States."); Doc. No. 71-19 at ¶¶ 6–8 (University of Hawai'i "heavily depends on multiple FSA-administered programs," which "provide critical financial support to thousands of UH students annually." Loss of funding "would likely lead to higher student loan debt burdens, increased dropout rates, and potentially force students to work more hours, reducing their academic engagement and extending time to graduation . . . Any threat to [the Pell Grant Program] would have immediate, measurable impacts on enrollment, student success metrics, and economic mobility."); Doc. No. 71-25 at ¶¶ 9–10 ("Thirty-three percent of the Commonwealth [of Massachusetts'] public higher education students receive Pell Grants." Without these federally funded student aid programs, which currently amount to $251 million, the aid-cost gap would further widen and "likely make the Commonwealth's last dollar program in their current form cost prohibitive."); Doc. No. 71-30 at ¶¶ 8, 11 ("In the 2023-24 aid year, Rutgers students received over $491 million in federal aid through Pell Grants, Supplemental Educational Opportunity Grants, Federal Work-Study, and Direct Loans," and "for the current aid year, 2024-25, which is in progress, over $626 million in federal aid has been awarded-to-date to Rutgers students." The RIF "will likely delay the availability of federal financial aid if the [FAFSA] forms are not processed on time, creating cash flow challenges for Rutgers.")].

Additionally, the Department's actions risk the FAFSA system, on which federal student aid and Plaintiffs' public universities rely. [Doc. No. 71-32 at ¶¶ 18–19 (Completing the FAFSA is essential for Pell Grant eligibility and New York State-based financial aid programs, of which more than 100,000 SUNY students rely on and which provide approximately $340 million in financial aid to SUNY students. "Current high school seniors are in the midst of the FAFSA submission process right now, and a fully functioning FAFSA is essential to their families' ability to make college acceptance decisions for the fall."); Doc. No. 71-16 at ¶ 9 (RIF "is especially concerning in light of recent complications associated with accurate and timely transmission of FAFSA results to higher education institutions in 2024 via the FAFSA Simplification initiative, and even though some staff were reinstated "it is especially troubling that [RIF] included some of the staff who were instrumental in improving upon this critical step and may hold unique knowledge on how to avoid a repeat of the 2024 FAFSA simplification errors.")].

### c. <u>Impact To School Districts</u>

Like Plaintiff States, School District Plaintiffs have shown cuts at the FSA are likely to irreparably harm their core mission: providing quality student education. [25-cv-10677 Doc. No. 27-7; 25-cv-10677 Doc No. 27-10]. "Without Federal Student Aid Services, including the FAFSA and student loan and grant programs, college would be out of reach for the vast majority of Somerville's students." [25-cv-10677 Doc. No. 27-7 at ¶ 32]. Furthermore, Somerville college counselors and other staff "rely heavily on materials produced by FSA" to help guide and support their students as they apply for federal student aid, including "guides, videos, checklists, and forms." [25-cv-10677 Doc. No. 27-7 at ¶ 33; *see also* 25-cv-10677 Doc No. 27-10 at ¶¶ 32–33 (Worcester's "work preparing students for college relies heavily on resources from the Department, such as how-to guides on assisting students filling out the FAFSA.")].

### d. Impact To Union Plaintiffs

Similarly, regarding the Union Plaintiffs and their members, cuts to FSA will likely result in loss of access to materials that help their members understand loan repayment options. *See* [25-cv-10677 Doc. No. 27-12; 25-cv-10677 Doc. No. 27-13]. For example, AFT Massachusetts has assisted members that rely on the Public Service Loan Forgiveness program through student debt clinics and relies on the Department for technical assistance such as guidance documents, loan repayment calculator, and more. [25-cv-10677 Doc. No. 27-12 at ¶ 27]. Furthermore, Union Plaintiffs and its members rely on federal student aid to afford their education and on positions created through federal work study, without which Union Plaintiffs' members would be forced to forgo higher education, default on existing loans, or potentially opt out of careers in public service. [25-cv-10677 Doc. No. 27-13 at ¶¶ 18–23 ("CSUEU represents a bargaining unit of student assistants at California State University," and "[t]housands of these student assistants rely on aid via federal work study positions" as well as "to afford tuition, food, rent, other living expenses, and transportation off-campus internships.")]. In this instance, where they have shown reliance on federal work study positions and public service loan forgiveness programs, Union Plaintiffs' have demonstrated their members are likely to be directly and irreparably harmed due to cuts at the FSA.

### 4. Essential Services Provided By OCR

### a. RIF Impact To OCR

Again, to understand the harms to Consolidated Plaintiffs, I first outline the lay of the land within OCR. As part of the RIF, OCR staff has been cut by approximately fifty percent. [Doc. No. 71-48 at ¶ 22]. By June 2025, seven of the twelve regional offices—Boston, Dallas, New York, Chicago, Cleveland, San Francisco, and Philadelphia—will be closed. [*Id.* at ¶ 23]. As of March 21, 2025, staff in these offices were put on administrative leave. [*Id.*]. "To remove

seven of the twelve regional offices and approximately half of OCR's enforcement personnel means the office will exist in name but not in actual function." [*Id*. at ¶ 30]. Caseloads, which were already high, will only increase—already the average case load increased from 50 cases per investigator to 80 cases per investigator, and will likely jump as much as 120 cases per investigator. [*Id.* at ¶¶ 25–26].

### b. Impact To Plaintiff States

Absent an injunction, Plaintiff States will no longer be able to rely on OCR to investigate civil rights complaints about educational institutions within their jurisdictions. *See* [Doc. No. 71-29 at ¶ 20–23 ("Staff [at the New Jersey Department of Education] tried multiple times to get in touch with the New York Regional Office, but all telephone calls went to voicemail and no response has been received to date.")]. The result will be "an increase in the need for state enforcement of civil rights protections," but already overburdened states will struggle fill the gap. [Doc. No. 71-31 at ¶ 9; *see also* Doc. No. 71-42 at ¶ 20 (In Washington, "the responsibility for ensuring compliance with civil rights laws, disability rights laws, and appropriate accommodations for students with special needs will fall on already overburdened state resources" risking the safety of Washington's students); *see also* Doc. No. 71-22 at ¶ 15 ("ISBE does not have the capacity to also investigate, mediate, or adjudicate claims of discrimination under Section 504 or other claims of educational discrimination that are currently handled by OCR. Already . . . ISBE is experiencing an increase in technical assistance calls from parents and districts seeking help with Section 504 plans.")].

This is not a situation where Plaintiff States are merely being delegated tasks previously handled by the OCR. Rather, this is a case where the Department can no longer effectuate vital statutory functions specifically tasked to it, and which Plaintiff States are scrambling to fill. [Doc. No. 71-48 at ¶ 30 ("Given my experience," [as twice served Assistance Secretary for

Office for Civil Rights], I believe the Department's RIF will render the Department unable to

fulfill its statutory functions."); Doc. No. 102-12 ("OCR-Dallas' work is mandated by statutes

like the Civil Rights Act of 1964 and the American with Disabilities Act…I, [as a former Civil

Rights Attorney at the OCR], do not believe OCR's statutorily mandated work can [be]

completed by the few staff remaining in OCR, especially with impossibly heavy caseloads.")].

      Cuts to OCR have already resulted in stalled or dropped investigations, further burdening

Plaintiff States and its students. [Doc. No. 102-7 at ¶ 7; Doc. No. 110 at 20–21]. For example, in

California, a parent of a student with a disability reached out to the California Department of

Education's ("CDE") Special Education division about concerns that an OCR decision

identifying violations of a LEA would not be enforced due to the RIF. [Doc. No. 110 at 20–21].

Such complaints, historically handled by OCR, "will place an extraordinary additional burden on

the CDE" that does not have the requisite staff or budget capacity. [Doc. No. 102-7 at ¶ 8; *see

also* Doc. No. 110 at 20 (After recent staff terminations, many parents have not received updates

or responses to their inquiries about their children's pending cases); 25-cv-11042 Doc. No. 20-16

at ¶¶ 18–24 (A Michigan student who withdrew from public school due to harassment was

informed on February 5, 2025 that OCR had paused its investigation into his complaint. "OCR

has not contacted [the student's] family to schedule the mediation since then, nor has it indicated

that any progress has been made . . . [The family] has no reason to believe the school will take

steps to keep A.J. safe in public school without OCR's intervention. As a result, [the family]

cannot send A.J. back to public school this coming fall.").].

      Finally, without direct and ongoing guidance about anti-discrimination laws provided by

OCR, Plaintiff States will struggle to proactively combat discrimination and harassment. *See*

[Doc. No. 71-32]. "For example, to combat antisemitism and other forms of discrimination and

harassment, SUNY has taken extensive steps to fulfill its responsibilities under Title VI of the

Civil Rights Act of 1964 . . . These efforts by SUNY which "would not have been possible without the direct and ongoing guidance from OCR." [*Id*. at ¶ 23]. These steps include "mandatory Title VI training for all SUNY faculty and staff; requiring that campuses complete Title VI checklists before relevant events; and promulgating guidance with expectations for how students can submit and campuses will receive Title VI complaints." [*Id.*]; *see also* [Doc. No. 71-48 at ¶ 14 (OCR "provides trainings and technical assistance to state and local educational agencies nationwide" by "answer[ing] questions from schools, community organizations, and parent associations on topics including the laws in OCR's jurisdiction, OCR process, and types of civil rights harms.")]. Such examples further demonstrate that absent an injunction, Plaintiff States will suffer irreparable harm.

Taken together, Plaintiff States have shown that such cuts to the OCR will likely irreparably harm Plaintiff States, absent an injunction. Through supporting declarations, Plaintiff States have shown that their ability to investigate civil rights complaints and adjudicate claims of discrimination are likely to be impeded as a result the RIF. Thus, given the impact to its citizenry, Plaintiff States have demonstrated a sufficient risk of irremediable harm for purposes of the preliminary injunction. *See E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738, 745 (1st Cir. 1996) (finding irreparable harm "because the Commission's ability to investigate charges of discrimination and to enforce anti-discrimination laws has been and continues to be impeded").

### c.  **Impact To School Districts**

Similarly, the School Districts and its students will no longer be able to rely on the OCR, in its current state, for civil rights enforcement, training, and investigation, demonstrating irreparable harm. For example, "the training and information" that Easthampton has "gained from OCR has enabled the District to respond to issues with compassion and empathy, rather than punitive measures…creating a healthier school environment." [25-cv-10677 Doc. No. 27-9

at ¶ 33]. When Easthampton encountered an issue "related to racial bias and discrimination[,]" OCR's assistance "investigating and rectifying the issue was invaluable." [*Id.* at ¶ 31; *see also* 25-cv-10677 Doc. No. 27-8 at ¶¶ 41-43 (describing the benefits of the OCR complaint resolution process)].

Without an injunction, Easthampton will no longer be able to "rely on the guidance put out by the Department of Education to know how to respond legally and adequately." [25-cv-10677 Doc. No. 27-9 at ¶ 34; *see also id.* at ¶¶ 38–39 (describing reliance on OCR's "technical support," "technical assistance" and "guidance, funding, and training"); 25-cv-10677 Doc. No. 27-11 at ¶ 62 (describing the "significant technical assistance to support school districts" that is provided by OCR); 25-cv-10677 Doc. No. 27-8 at ¶ 41 (OCR provides a "critical enforcement mechanism" for students and their families "to vindicate their rights"); *id.* at ¶ 42 ("OCR offers critical resolution processes" that "allow issues to be resolved in a timely manner" and "frequently help[] restore the working relationship between the family and the school and school district.")].

### d.  Impact To Union Plaintiffs

Union Plaintiffs' members rely on OCR's investigation and resolution processes, without which they will be irreparably harmed. [25-cv-10677 Doc. No. 27-11 at ¶ 61; 25-cv-10677 Doc. No. 27-12 at ¶ 28 ("Shutting down OCR would reduce teacher efficacy to address systemically hostile school environments, harming the workplace and students.")]. For example, AFT members file complaints with OCR on behalf of themselves, in instances of retaliation, or students, in instances of harassment. [25-cv-10677 Doc. No. 27-11 at ¶ 60]. Likewise, Union Plaintiffs' members who are students rely on the investigation and complaint procedures provided by OCR and "will be harmed if these complaint and investigation processes are less effective or less timely." [25-cv-10677 Doc. No. 27-13 at ¶ 20].

5. **Irreparable Harm Summary**

Here, "[e]ven though, as established above, the likelihood of success on the merits is great, which would allow a movant [to] show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief, the allowance is unnecessary." *Nat'l Institutes of Health*, No. 25-cv-10338, 2025 WL 702163, at *31. Through supporting declarations of former Department employees, universities and colleges, local and state education agencies, union members, and educators, Consolidated Plaintiffs have shown that they are likely to suffer irreparable harm in the form of financial uncertainty and delay damaging student education, (2) impeded access to vital knowledge upon which students, districts, and educators rely, and (3) loss of essential services provided by the office of Federal Student Aid and the Office for Civil Rights.

More specifically, Plaintiff States and Schools Districts are experiencing delays and uncertainty in their receipt of federal educational funding, amounting in the millions, which jeopardize their missions of ensuring an educated citizenry and providing quality education. Such delays and uncertainty raise immediate predicaments about whether there will be sufficient staff and student programming for the 2025-2026 school year and hinder long term planning. Students will feel these effects in the form of lower quality of education, further demonstrating irreparable harm. Regarding cuts to IES, two of the country's most vulnerable student populations, English language learners and students with special needs, will be particularly harmed. Absent an injunction, Plaintiff States and School Districts will no longer have access to data and research that guide student education and educational programming, which can range from bullying prevention for students with disabilities to technical assistance for how to implement IDEA and Title III funding appropriately.

There is more. Consolidated Plaintiffs have overwhelmingly shown that the RIF has resulted in the practical elimination of most, if not all, essential offices within the FSA. The Department's actions have directly impacted the FAFSA system and risk its functionality. It is undisputed that current high school students are applying to and rely on FAFSA to make decisions about their higher education as soon as Fall 2025. Where the majority of employees have been eliminated in the Department division whose flagship product is FAFSA, Consolidated Plaintiffs face imminent harm. Similarly, students and former students, including Union Plaintiffs, and universities alike rely on federal funding through programs like Federal Work Study, Pell Grants, Direct Loans, and Public Service Loan Forgiveness, which are at risk. Finally, Consolidated Plaintiffs will no longer be able to rely on the OCR, in its current state, for civil rights enforcement, training, and investigation, demonstrating irreparable harm. Cuts to OCR have already resulted in stalled or dropped investigations, further burdening Consolidated Plaintiffs.

Taken together, the detriment to state and local educational institutions and to both former and current students cannot be remedied through retroactive relief or money damages. Thus, I am convinced that, absent an injunction, the risk of harm to Consolidated Plaintiffs is immediate and irreparable.

## C. <u>Balance Of The Equities And The Public Interest</u>

"A plaintiff seeking a preliminary injunction must establish…that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. When the Government is the opposing party, as here, the balance of the equities and public interest analyses merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The balance of the equities tips in favor of Consolidated Plaintiffs because "there is a substantial public interest in having governmental agencies abide by the federal laws that govern

their existence and operations." *Newby*, 838 F.3d at 12. Further, Consolidated Plaintiffs have demonstrated a "high likelihood of success on the merits," which "is a strong indicator that a preliminary injunction would serve the public interest." *Id.* On the other hand, Defendants argue that the public is suffering irremediable harm because a preliminary injunction would "displace and frustrate the President's decision" as to how to "set[] his policy priorities for the Department of Education" and that the Government will be harmed if it is "forced to compensate employees for unneeded and unnecessary services." [Doc. No. 95 at 36]. However, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12.

Furthermore, a preliminary injunction would serve the public interest because there is a substantial risk that, without it, there will be significant harm to the functioning of public and higher education, particular in Plaintiff States. It is well established that an educated citizenry provides the foundation for our democracy. As the Supreme Court has articulated:

> [E]ducation is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society . . .  It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

*Brown*, 347 U.S. at 493. There exists a reciprocal relationship: the citizens of the Plaintiff States have a right to education under their respective constitutions and the Plaintiff States have an interest in an educated citizenry as evidenced by their compulsory education laws. As stated in Members of Congress's amicus brief, "Congress created the Department in the wake of the Supreme Court's decision in *Brown v. Board of Education,* a time when Congress recognized, from past experience, that 'the enforcement of the civil rights laws' could face 'an inhospitable climate' depending on the executive in power and the politics of the era." [Doc. No. 110 at 17

(citing Legislative History, Pub. L. No. 96-88, 125 Cong. Rec. H14487 (June 12, 1979) (Remarks of Rep. Rosenthal))]. "But now, the Trump administration is engaging in precisely the 'short-circuit[ing] Congress worked to prevent." [*Id.*]. Here, Consolidated Plaintiffs have detailed the consequences that Defendants' actions will have on students, parents, teachers, and core education programs. *See supra* Section VI.B. Thus, the balance of the equities and the public interest strongly favor Plaintiffs. *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006) ("[T]he public has an important interest in making sure government agencies follow the law").

## VII.   BOND

Pursuant to Federal Rules of Civil Procedure 65(c), a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "[t]he First Circuit has recognized an exception to the bond requirement in suits to enforce important federal rights or public interests," as is precisely the case here. *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 129 (D. Mass. 2003) (cleaned up). Accordingly, I find that no security is necessary under Rule 65(c). *See also, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-00333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (cleaned up) (imposing nominal bond of zero dollars where bond would "essentially forestall Plaintiffs' access to judicial review")

\* \* \*

## VIII.  CONCLUSION

For the reasons stated above, Consolidated Plaintiffs' Motion for Preliminary Injunction, [Doc. No. 69; 25-cv-10677 Doc. No. 25], is <u>GRANTED</u>.  The Department must be able to carry out its functions and its obligations under the DEOA and other relevant statutes as mandated by Congress.

It is therefore ORDERED, until further order of this Court, that:

1. The Agency Defendants are enjoined from carrying out the reduction-in-force announced on March 11, 2025; from implementing President Trump's March 20, 2025 Executive Order; and from carrying out the President's March 21, 2025 Directive to transfer management of federal student loans and special education functions out of the Department;

2. The Agency Defendants are enjoined from implementing, giving effect to, or reinstating the March 11, 2025, the President's March 20, 2025 Executive Order, or the President's March 21, 2025 Directive under a different name;

3. The Agency Defendants shall reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the reduction-in-force announced on March 11, 2025 to restore the Department to the status quo such that it is able to carry out its statutory functions;

4. The Agency Defendants shall provide notice of this Order of Preliminary Injunction within 24 hours of entry to all their officers, agents, servants, employees, attorneys, and anyone acting in concert with them;

5. The Agency Defendants shall file a status report with this Court within 72 hours of the entry of this Order, describing all steps the Agency Defendants have taken to comply with this Order, and every week thereafter until the Department is restored to the status quo prior to January 20, 2025; and

6. This Preliminary Injunction shall become effective immediately upon entry by this Court. The Preliminary Injunction Order shall remain in effect for the duration of this litigation and until a merits decision has been issued.

SO ORDERED, this 22nd day of May 2025 at 10:30 A.M.

/s/ Myong J. Joun
United States District Judge

1      UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
2

3    _____

4    STATE OF NEW YORK, ET AL,

5                 Plaintiffs,        Civil Action
                                     No. 25-CV-10601-MJJ
6    V.
                                     April 25, 2025
7    LINDA MCMAHON, ET AL,

8                 Defendants.
     _____
9

10

11

12         BEFORE THE HONORABLE MYONG J. JOUN

13            UNITED STATES DISTRICT COURT

14         JOHN J. MOAKLEY U.S. COURTHOUSE

15               1 COURTHOUSE WAY

16              BOSTON, MA  02210

17

18

19

20

21        JAMIE K. HALPIN, CRR, RMR, RPR
              Official Court Reporter
22        John J. Moakley U.S. Courthouse
          1 Courthouse Way, Room 7-204
              Boston, MA  02210
23            jkhhalpin@gmail.com

24

25

```
 1    APPEARANCES:

 2
      FOR THE PLAINTIFFS:
 3
      Nathaniel J. Hyman
 4    Massachusetts Attorney General's Office
      1 Ashburton Place
 5    18th Floor
      Boston, MA 02108
 6    617-963-2514
      Email: Nathaniel.j.hyman@mass.gov
 7
      Rabia Muqaddam
 8    NYS Office of The Attorney General
      28 Liberty St.
 9    New York, NY 10005
      917-715-4172
10    Email: Rabia.muqaddam@ag.ny.gov

11    Yael Shavit
      Office of the Attorney General
12    One Ashburton Place
      Boston, MA 02108
13    617-963-2197
      Email: Yael.shavit@mass.gov

14

15    For Somerville Public Schools, et al

16    Rachel F. Homer
      Democracy Forward Foundation
17    P.O. Box 34553
      Washington, DC 20043
18    202-448-9090
      Email: Rhomer@democracyforward.org
19
      Elena Goldstein
20    Democracy Forward Foundation
      PO Box 34553
21    Washington, DC 20043
      202-448-9090
22    Email: Egoldstein@democracyforward.org

23    Victoria S. Nugent
      Democracy Forward
24    P.O. Box 34553
      Washington, DC 20043
25    202-862-1393
      Email: Vnugent@democracyforward.org
```

```
 1

 2    FOR THE DEFENDANTS:

 3
      Eric J. Hamilton
 4    Department of Justice
      950 Pennsylvania Avenue, NW
 5    Washington, DC 20530-0001

 6

 7    Michael Benjamin Bruns
      DOJ-Civ
 8    6705 13th Pl NW
      Washington, DC 20012
 9    202-758-8520
      Email: Michael.bruns@usdoj.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **P-R-O-C-E-E-D-I-N-G-S**

2          THE CLERK:  All rise.

3          (The Honorable Court Entered)

4          THE CLERK:  The court is now on the record in the

5   matter of *State of New York, et al v. Linda McMahon, Civil*

6   *Action 25-10601.*  Counsel, please identify yourselves for the

7   record.

8          MR. HYMAN:  Good afternoon, your Honor.  Nathaniel

9   Hyman of behalf of the Commonwealth of Massachusetts Attorney

10  General's office.

11         THE COURT:  Good afternoon.

12         MS. MUQADDAM:  Good afternoon.  Rabia Muqaddam for the

13  Office of the Attorney General.

14         THE COURT:  How do you say your last name?

15         MS. MUQADDAM:  Muqaddam, like a hard K sound.

16         THE COURT:  Okay, thank you.

17         MS. SHAVIT:  Good afternoon, your Honor.  Yael Shavit

18  for the Commonwealth of Massachusetts.

19         THE COURT:  Very nice to meet all of you.

20         MR. HAMILTON:  Good afternoon, your Honor.  Eric

21  Hamilton, Deputy Assistant Attorney General for the Federal

22  Programs Branch U.S. DOJ for defendants.

23         THE COURT:  Good afternoon.

24         MR. BRUNS:  Afternoon, your Honor.  Michael Bruns for

25  the United States for the Department of Justice.

 1          THE COURT:  Nice to meet you as well.  We've got some

 2     more.

 3          MS. HOMER:  Good afternoon, your Honor.  Rachel Homer

 4     on behalf of the Somerville Plaintiffs.

 5          MS. GOLDSTEIN:  Elena Goldstein also on behalf of the

 6     Somerville Plaintiffs.

 7          MS. NUGENT:  Good afternoon, your Honor.  Victoria

 8     Nugent for the Somerville Plaintiffs.

 9          THE COURT:  Excellent.  Also nice to meet you.  All

10     right, so who wants to start?  Great.

11          MS. MUQADDAM:  Good afternoon.  Rabia Muqaddam for the

12     plaintiffs.  I will be covering jurisdiction and likelihood of

13     success on the merits.  My colleague, Nate Hyman from the

14     Massachusetts Attorney General's office, will cover irreparable

15     harm and the equities, and then counsel for the Somerville

16     Plaintiffs will take over, and we have predecided how we're

17     going to split it up.

18          So I'd like to take the issues in this order:

19     Standing and ripeness, the APA claims, the constitutional

20     claims, the savings clause arguments and CSRA, C-S-R-A,

21     channeling.

22          At the outset, I'd like to emphasize the state of the

23     record here which I think underlies a lot of questions before

24     this Court.

25          A fundamental flaw throughout the Defendants'

1 arguments is an attempt to characterize the Department's

2 actions here as minor changes that will not affect statutory

3 functions, but this is completely belied by the extensive

4 factual record which is entirely unrebutted.

5 Declarations from a host of current and former Ed.

6 Employees attest that the actions have stripped the Department

7 of the resources necessary for it to carry out important

8 statutory mandates, and also represented here before you across

9 both sets of Plaintiffs are nearly every actor across the

10 educational systems of the states. So we have frontline

11 educators represented to the state agency education heads, the

12 chancellors of state universities, and they all agree with the

13 current and former Ed. Employees that the Department is no

14 longer functioning and it is getting worse every day.

15 So turning to standing and ripeness, again, the

16 arguments the defendants have put forth are based on these

17 conclusory mischaracterizations of the record. So they have

18 argued that the chain of harms is too attenuated, that there

19 are not current harms, but this is again belied by the

20 extensive record, and I think that a case that's actually cited

21 by the Defendants, which I think is instructive, is *Roman*

22 *Catholic Bishop of Springfield.* So, in that case, the court

23 looked at some of the actions and determined they were ripe and

24 some of the actions and determined that they were not ripe, and

25 in the instance of those that were ripe, the court looked at a

1　particular action that if this is causing sufficient harm, it

2　is actually ripe right now.　So I think the action that we're

3　looking at here is much more in that category; whereas the

4　second category that the court looked at were things based on

5　an application that had not yet been filed, events that had not

6　yet occurred.

7　　So all of the facts here go in support of the

8　Plaintiffs' request to enjoin two discrete separate things, and

9　one is the Mass Termination that was effectuated through the

10　RIF and then the second one is this Presidential or the

11　implementation of the Presidential directive on March 21 to

12　transfer functions outside of the Department.

13　　So just speaking a little bit to that factual record,

14　my colleague will get into the harms to the states in

15　particular, but the record reflects a lot of different types of

16　functions that the Department is no longer able to accommodate

17　that are statutorily mandated.

18　　So I point your Honor in particular to Exhibit 2 to

19　the Smith declaration which gets up as the Arne Duncan

20　declaration.　Arne Duncan was a very long-serving Secretary of

21　Education, and in his own words, "there is no way that the

22　Department can continue to meet its statutory mandates."　So

23　ECF 71-54, the loss of the ability to ensure compliance with

24　Title II.　ECF 71-60, the loss of Title III functions that are

25　statutorily mandated.　71-64, ESRA cannot be complied with.

 1  71-66, the OGC is no longer able to satisfactorily articulate

 2  to the Department what is legal and what is not.  ECF 71-61

 3  through 63, all describing the way that Federal Student Aid

 4  cannot accomplish its goals and its statutory mandates, and so

 5  on and so on.  I won't continue, but I think the record is

 6  extremely clear about that and again is totally unrebutted.

 7       So turning to the APA claims, the Defendants have not

 8  launched a particularly significant challenge to the merits

 9  here.  Very little of their opposition addresses it, but I will

10  briefly touch on the arguments that Plaintiffs have raised

11  under the APA.

12       So first is that these actions are arbitrary and

13  capricious and there are three ways in which they are.  The

14  first one is that the reasoning is the Defendants have not

15  offered sufficiently rational explanation as to these actions,

16  and actually they have offered really no explanation.  The

17  proposal is that the Department is merely being pared back of

18  unnecessary bureaucracy but there is no explanation as to how

19  that is the case, and I think one of the interesting things

20  that has come out on the record is the testimony of in

21  particular the Tessitore declaration.

22       So there were members of the Department working on

23  developing this list to put forth to higher management about

24  which functions were in fact statutorily mandated, and that

25  list was not even due to upper management until two days after

1    the RIF and it's in all the documents associated with the RIF,

2    including the Dear Educator letter that was submitted to

3    attempt to explain it.  In no way has the Department

4    articulated why the functions were targeted, how the targeted

5    functions that accomplished Ashford mandates were going to be

6    transferred to others who could accomplish them and so these

7    are arbitrary and capricious actions without reasoning.

8           And the second reason is the basis for these actions

9    while not rational or reasonable is actually clear and that is

10   that the President and Secretary McMahon do not wish the

11   Department to exist, and there are statements cited throughout

12   our papers that explain the real basis for this is a desire to

13   eliminate it as much as possible, and despite the many

14   conclusory statements across Defendants' opposition, none of

15   the facts explain how this isn't a mere reorganization, these

16   aren't minor changes.  The RIF stripped the Department of key

17   functions that allow it to meet its mandates.  None of that is

18   rebutted and that also demonstrates arbitrary and capricious

19   action.

20          And then finally, a failure to consider the impact in

21   full.  No consideration of reliance interests, no consideration

22   of how the Department was going to meet its obligations, no

23   consideration about the impact on Plaintiffs or the many people

24   who rely on the Department.

25          And then finally on the APA, we've also challenged the

```
 1   actions as contrary to law and that's because they're contrary
 2   to the very limited authority of the Secretary of Education
 3   articulated in Section 3473 and also contrary to the many,
 4   many, many statutes that the Department administers.
 5          So Defendants have raised two APA arguments that go to
 6   whether these actions can be adjudicated under the APA.
 7          So the first one of those is that these actions are
 8   not final or discrete, and we think that is clearly not the
 9   case.  So final agency action under the Bennett test, the first
10   part is does it mark the confirmation of agency
11   decision-making, and the second is whether it determines rights
12   or obligations from which legal consequences will flow, and
13   Defendants have argued essentially there are too main links
14   between what the challenged actions are and then the
15   consequences, and we think that's just simply not the case.
16          So here, the massive RIF and the direction and the
17   implementation of the March 21 directive clearly are not
18   interlocutory even if there may be more actions to further
19   destroy the Department, and so we think that for the same
20   reason as actually recently determined in Boy Scouts of America
21   had been dismantled by a final agency action, the same is true
22   here.
23          The other argument they've raised is that these
24   actions are simply unreviewable under the APA because they are
25   committed to agency discretion by law, and I just want to
```

1  emphasize how narrow that exception is to the presumption of

2  reviewability under the APA.  So in *Lincoln v. Vigil*, which is

3  the main case on this, the court said that basically there was

4  no statutory way by which to judge the agency action.  That

5  program had been created entirely by the agency.  There was no

6  specific statutory or other legal standard by which one might

7  judge it.  Whereas here, there are many very clear

8  administrative and constitutional standards by which to judge

9  the Defendants' conduct.

10         So on the constitutional claims, we've raised

11  separation of powers and the Take Care Clause claim.  The

12  Defendants have not pushed back much on that except with

13  respect to arguments in *Dalton* and *Heckler*.  In *Dalton*, the

14  court is very clear that a statutory claim may not be

15  constitutional but it also may, and here, clearly, the

16  Defendants have chosen to take actions that are contrary to

17  many, many federal statutes and the constitution.

18         And *Heckler* is a case that really relates only to the

19  ability of an agency to make enforcement decisions,

20  determinations, prioritization.  Here, we're talking about the

21  ability of OCR to actually do its job to begin with.  We're not

22  talking about discretion to bring a particular action or not.

23         And finally on the savings clause piece, so Defendants

24  have only raised that "insofar" as we are challenging the

25  executive order.  This motion does not seek an injunction

1    against the executive order.

2           And then finally on the CSRA channeling, C-S-R-A, so

3    that provides an administrative procedure solely for employees

4    and employee unions.  The Plaintiffs are sovereign states, and

5    this channeling does not apply here, and to hold otherwise

6    would actually deny the Plaintiff States a forum entirely.

7    There is no case that says that sovereign states have access to

8    CSRA procedures, and although the Defendants cite a particular

9    section that says an interested party may intervene, there is

10   no basis to think that sovereign states would be such

11   interested parties as might other actors in the employment

12   context, and it's worth raising that even in *National Treasury*

13   *Employees Union v. Vought*, which is a case that actually did

14   involve employees and unions, the court there also wasn't

15   convinced that CSRA channeling would be appropriate and applied

16   the *Bennett* test.

17          So I will conclude there unless the Court has

18   questions.

19          THE COURT:  So I just want to be clear that when you

20   say seeking injunctive relief as to two reasons, one of those

21   reasons you mentioned was the mass firings.  You're not

22   challenging the Department's discretion to terminate employees.

23   You're not interested in an order, for example, that they

24   reinstate these fired employees.  You're just interested in

25   whoever it is that there is enough bodies in the Department to

1  actually carry out its functions.

2       MS. MUQADDAM:  So the injunction we've sought is just

3  targeted at the March 11 RIF, but we have asked for the

4  employees that were terminated through that RIF to be

5  reinstated such that the Department can meet its mandates, but

6  we are in no way asking the Court to prevent the agency from

7  terminating employees lawfully in the future, solely with

8  respect to this Mass Termination.  It may be that the

9  Department can decide to engage in a RIF and do it in a way in

10 which the Department can continue to meet its mandates, but

11 that's not what happened here, and then we're also seeking to

12 enjoin an agency implementation of the transfer directive.

13      THE COURT:  And how do you respond to Defendants'

14 argument that basically this is just a reorganization?

15      MS. MUQADDAM:  I think the answer to that lies in the

16 factual record.  So if there was evidence that the Department

17 could meet the statutory mandates that the declarations

18 extensively document are being unmet, they were free to and

19 they have not, and so the only evidence in the record, which is

20 voluminous, explains the Department is unable to meet those

21 mandates.

22      THE COURT:  So to the extent that they have authority

23 to reorganize their Department, they're free to do it as long

24 as it doesn't compromise their ability to carry out its

25 functions?

1       MS. MUQADDAM:  Exactly, and I think it's worth looking

2    at the very, very limited discretion that the Secretary of

3    Education does have under statute.  So she can, for example,

4    make changes that are necessary and proper.  That's the quote

5    from the statute, and there are also a few functions that she

6    is permitted to even discontinue, but even there she has to

7    provide some notice to Congress.  So neither of those attempts

8    -- neither of those forms of discretion were exercised here.

9       THE COURT:  Thank you.

10      MS. MUQADDAM:  Thank you.

11      MR. HYMAN:  Good afternoon, your Honor.  Nate Hyman

12   again on behalf of the Commonwealth and on behalf of the

13   Plaintiff States.

14      My goal today is to discuss irreparable harm to the

15   Plaintiff States at this juncture.  As my colleague alluded to

16   a moment ago, we've got 1,100 pages of unrebutted evidence in

17   the record.  I am not going to be able to get through all of

18   it, and so my goal today is to put these categories of harm

19   into four broad buckets which I hope are useful for the Court

20   weighting through this material.

21      The first is knowledge transfer.  Broadly speaking,

22   this is technical assistance, training, guidance, knowledge,

23   management and hard data, things that the states rely on every

24   single day to be able to continue to comply with their grant

25   obligations and fulfill their missions as state education

1  agencies and institutions of higher education; the second is

2  civil rights enforcement, something that the states and the

3  Federal Government have co-jurisdiction over in educational

4  settings; the third is FSA or Federal Student Aid, the

5  important role that that plays, and the fourth are impacts to

6  funding.

7       So, your Honor, I will start briefly by addressing one

8  item within that knowledge transfer section, knowledge

9  management.  One of the less talked about that I think is the

10  fascinating parts of the Education Department is that they've

11  got this group called the IES or Institute For Education

12  Statistics -- Sciences rather, I'm sorry, and what this group

13  does is it promulgates and allows folks to access a wide array

14  of data sets, best practices data.  They've got these regional

15  knowledge educational laboratories, and I think the record is

16  replete of state officials testifying about how much they rely

17  on this stuff, all impacted by the RIF, your Honor.  These

18  folks are no longer working.  They're no longer providing the

19  services to the states.  The states can't use this information

20  moving forward, and that is irreparable harm to the states

21  today.

22       Moving on to civil rights enforcement, your Honor.  As

23  your Honor likely knows, the Office for Civil Rights is the

24  preeminent organization within the Federal Government entrusted

25  with enforcing civil rights laws in educational institutions.

1    The way they've organized this RIF of the twelve regional

2    offices that did this throughout the country, seven of them are

3    gone.  So it's not as though they went to each office and said

4    we're going to take 25 percent of this head count and remove

5    these people.  They just abdicated responsibility for enforcing

6    civil rights laws in educational institutions in like 27 states

7    across the country, and what you see in the declarations, your

8    Honor, is that the practical impact of that is that our states

9    have to put additional resources, divert resources from other

10   things, and put them towards ensuring a fair and equal

11   experience for students in our school systems.  So you've got

12   declarations from California, from Illinois, from Rhode Island

13   testifying to this exact issue, that in light of the fact that

14   OCR San Francisco and OCR Chicago and OCR Boston are closed and

15   there aren't attorneys in those offices investigating and

16   attempting to remediate discrimination, the states are going to

17   have to fill that gap and indeed have begun to do so.

18          Moving on to FSA, we could spend four hours talking

19   about FSA.  I think the analogy that I find most useful in

20   thinking about FSA is that of a bank.  So what the Federal

21   Student Aid group does is it allows students to originate

22   funding to go purchase education.  It then services that debt

23   at about $1.6 trillion, about the same size as Wells Fargo.

24   The President makes that point in the EO.  And then finally, it

25   collects in the event that student borrowers go into default.

1 Wells Fargo has 250,000 employees.  FSA before the RIFs had

2 1,400.  My understanding is that number is now down to 700.

3 I want to focus on this origination step first because

4 I think it's the place that directly impacts the states the

5 most.  In particular, I want to talk about state universities.

6 So in order to qualify for Title IV funding under the FSA, this

7 is things like Pell Grants, direct loans, basically how most

8 people pay for college, you have to go through something called

9 the certification process and that's basically the government

10 kicking the tires on a university and ensuring that it's

11 actually going to provide meaningful education for the students

12 who attend there.

13 Failure to get certification is the kiss of death for

14 an institution.  I think you've got voluminous records before

15 you, your Honor.  Denise Barton for the UMass system, for

16 instance, provides this information, Exhibit 26.

17 So without this information -- without this

18 certification rather, your Honor, universities are not going to

19 be able to provide services.

20 The group that does certification within FSA has been

21 RIF'ed.  So for practical purposes, if you're a state

22 university and you want to open a new program or a new campus,

23 you can't do that because there is not somebody within FSA who

24 can take your certification application, look it over, and

25 allow you to proceed by receiving Title IV funding.

1    In particular, your Honor, for the Court just to have

2    an example, Evergreen State College in Washington State has a

3    declaration in there, your Honor, and there they remark that

4    they've had this certification for this new program pending for

5    some time, have no idea when it's going to go through but are

6    concerned it's not.  They've also got a recertification.

7    Recertification is a process that universities have to go

8    through every one to six years.  Again, heavily impacted by

9    this function.

10    One more data point in the FSA before I will move on,

11    you have before you the declaration of Chris Miller.  He's

12    somebody who worked in the Atlanta office before the RIF.  Now,

13    Miller ran a team of financial analysts.  This was an

14    important, perhaps not particularly outward facing, but an

15    important part of the certification process.  These were people

16    who had specialized technical experience looking at financial

17    statements from institutions and determining whether or not

18    they were viable universities moving forward.  There were 16

19    people who worked for this group before the RIF.  There is one

20    now.  There is something like 5,600 universities in the United

21    States of America.  So this one person is going to be

22    responsible for every certification and recertification process

23    that has to go through this financial analysis segment.

24    And for those reasons, your Honor, the impacts to the

25    FSA directly impact the states that is causing harm today and

1  it will continue to cause harm moving forward.

2        Finally, your Honor, I will touch briefly on impacts

3  to funding.  Three things I'd like to cover here.  The first

4  are conditions precedent, the second is threats to compliance

5  and the third is inherent uncertainty caused by the RIFs so I

6  will take each of those in turn, and just to provide the Court

7  with a concrete example, your Honor is likely familiar with

8  Title I funding.  So Title I funding, by dollar amount, one of

9  the largest sources of federal funding.  Oregon, for instance,

10 gets $150 million each year in Title I funding, and Title I

11 funding is a formula grant which means that Congress sets out

12 some formula that determines how much each state is going to

13 receive, and then the Department of Education's job is to just

14 allocate the funding that it gets from Congress according to

15 that formula.

16        In order to allocate those funds though, the group

17 that does Title I grant funding has to go to a group within IES

18 and use a data set that they maintain in order to allocate

19 these funds accordingly, and the problem is that the group that

20 maintains that data set just got RIF'ed.  So the next year when

21 it comes time to calculate Title I allocation, the Department

22 of Education is not going to have the underlying data set

23 necessary in order to ensure that the amount that each is

24 receiving is in fact in accordance with Congress' allocation

25 mechanism.

1      The next category is threats to compliance, your

2  Honor.  Every single day state education agencies, local

3  education agencies, state universities pick up the phone and

4  they call people in the Department of Education.  They ask them

5  questions.  They ask whether they can use their funding for a

6  particular purpose and be consistent with the federal law and

7  regulatory regime.  They ask about grant programs, they ask

8  about applications, and more often than not, when that request

9  comes, the program manager might not know the answer right away

10  and so they pick up the phone and they call OGC, Office of

11  General Counsel.

12      As a result of this RIF, 83 percent of OGC attorneys

13  are gone.  They are no longer working in this office, and what

14  this means for practical purposes, and you have record evidence

15  in front of you, this is happening as we speak, the program

16  officers aren't -- they're able to give the advice that they're

17  capable of giving but they're not able to give the fill panoply

18  of advice that they have historically given which dramatically

19  increases the odds that the states inadvertently run afoul of a

20  grant term that might result in termination of funding.  That's

21  a real harm that's happening right now.

22      The final point I'd like to make in terms of

23  irreparable harm, your Honor, and that is uncertainty.  Your

24  Honor may have noticed in the declarations there is a couple of

25  references to a funding program that arose out of the COVID-19

1 crisis, that there were these emergency funds that had been

2 given over to the states as part of a congressionally mandated

3 program, and several of the states were concerned because

4 they'd stopped receiving communications from the Federal

5 Government on these funds.  At the time, they believed that

6 that might be caused by the RIF, that Billy or Joe or whoever

7 it was that was supposed to be responding had been RIF'ed and,

8 therefore, wasn't responding.  We subsequently learned that

9 that is in fact an effort by the Federal Government to, in our

10 view, unlawfully impound those funds and this seems to be

11 happening over and over again.

12       What the RIF has done is made it impossible for the

13 states to know whether this is an intentional effort by the

14 Department of Education to impound funds in which case we need

15 to get this team together and file a lawsuit or if it's just

16 that Billy was laid off and his replacement hasn't taken over

17 yet, and so we just need to wait a couple of weeks to get

18 somebody on the line.  That is irreparable harm, your Honor.

19 It's happening right now.  It will continue to happen moving

20 forward.

21       With my remaining time, your Honor, I will just

22 briefly speak on the equities.  Your Honor, unequivocally in

23 this case the equities favor the Plaintiff States.  What we are

24 asking to do is the Department of Education simply has to

25 continue functioning in the way that Congress has dictated that

1   it should.  So Congress has said there shall be a Department of

2   Education; they'd like to dismantle it.  Congress has said that

3   Federal Student Aid will be managed by Education; they'd like

4   to move it to SBA.  Congress has said that IDEA, you know,

5   programming and funding, should rest in the Department of

6   Education; they are asking that it move to HHS.

7         We rely on these services every single day.  The lack

8   of those services damages us, and so we would respectfully

9   submit, your Honor, that the equities favor us.

10         With that, your Honor, I will reserve for rebuttal and

11   pass the baton to Democracy Forward.

12         THE COURT:  Thank you.

13         MS. HOMER:  Good afternoon, your Honor.  Rachel Homer

14   on behalf of the Somerville Plaintiffs.  I have four points to

15   focus on this afternoon briefly:  First, the harm to the

16   Plaintiffs; second, the relief that the Somerville Plaintiffs

17   are speaking; third, why these claims are not channelled; and

18   fourth, why the Mass Termination order is arbitrary and

19   capricious.

20         First, we have provided an extensive record of

21   irreparable harm to our Plaintiffs that is already occurring

22   due to Defendants' illegal Mass Termination order.  This

23   evidence is entirely unrebutted in the record.  The Defendants

24   have not rebutted that the Mass Termination order is already

25   causing and will continue to cause disruption and delays in the

1    funds from the Department and a degradation of the support and

2    resources that my colleagues and the states were just talking

3    about that the Department provides.

4         We have provided an unrebutted expert report by Dr.

5    Linos explaining that the delays and disruption are inevitable

6    in any public agency or even in private corporations when this

7    many staff are fired and that is especially true when there is

8    no time or plan to effectively transition work from the

9    employees who are fired to the remaining employees.  That's at

10   Exhibit 5, Pages 10 to 12.  And you've just heard from the

11   State Plaintiffs about the difficulty that states are already

12   having in accessing their funds.  That's at Exhibits 13, 22 and

13   31, for example.

14        This is further supported by the evidence in our case.

15   I would point your Honor to the Leheny declaration at Exhibit 6

16   which talks about the Office of General Counsel and explains

17   that every single attorney who reviews and advises on all K-12

18   grants, so that's all Title I grants and the other title

19   grants, and all IDEA grants, that's all grants under the

20   Individuals with Disabilities Education Act, every single one

21   of those attorneys have been fired.  Of course that will cause

22   and is already causing delays and disruptions and the

23   degradation of the resources and support that the Department

24   provides, exactly as our expert report describes.

25        This is also further supported by the declaration from

1    Katherine Neas which explains that IDEA applications must be

2    reviewed now in the spring for funding to get out in time, and

3    the key staff in the office that administers IDEA, the Office

4    of Special Education Programming and all of the relevant staff

5    in the Office of the General Counsel have been fired.  So,

6    again, delays are not only already occurring but they're, of

7    course, inevitable, and that's at Exhibit 8 in our case.

8          Let me tell the Court about how this is affecting our

9    Plaintiffs who are already right now experiencing irreparable

10    harm.  We represent school districts and unions of educators

11    and other school support staff.  These schools, Somerville,

12    Easthampton and Worcester, together represent a cross-section

13    of schools in this state.  They represent small communities and

14    urban communities, students of all racial backgrounds and

15    income levels, native English speakers as well as English

16    language learners.  The School Districts Plaintiffs' mission is

17    to educate students with the best education possible.  The

18    harms the school districts are experiencing are happening right

19    now and are already harming students and will continue to harm

20    students.

21          All three schools have described how right now, in the

22    spring, they need to be making staffing decisions and

23    programatic decisions for the next school year.  They can't

24    wait until the fall.  If they need to lay off teachers and

25    other staff, that will harm their mission of educating

1  students.  It will lead to larger class sizes, cuts to programs

2  such as summer school, arts education, athletic education,

3  preschool programming.  It will also lead to less support for

4  students who need additional supports, especially students with

5  disabilities, and it will lead to cuts for training for

6  teachers.

7       THE COURT:  For these three municipalities, what are

8  the perspective percentage of their funding that comes from the

9  Federal Government?

10      MS. HOMER:  Your Honor, those numbers are in our

11  brief, I don't have them in front of me, but it's approximately

12  10 percent for each, and without that certainty of federal

13  funding, they can't maintain their current staffing levels and

14  their current programming levels.  They will need to make those

15  cuts and once those cuts happen, they can't be easily reversed.

16  Teachers aren't widgets.  They can't simply be let go and then

17  re-hired.  There is a cycle to teacher hiring.  There is a

18  cycle to the school year.  And once experienced teachers are

19  lost, the new teachers who replace them typically won't have

20  that same level of expertise.

21      As the Superintendent of Somerville schools said in

22  his declaration at Exhibit 7, these harms "they are real and

23  they are already happening."  Easthampton and Worcester have

24  said the same in Exhibits 9 and 10.

25      The school districts are also right now and

1  continuously making curriculum decisions that rely on the

2  Institute of Education Sciences' data that my colleagues and

3  the states were just talking about.  For example, the

4  Superintendent of Worcester, Dr. Monarrez, explains that their

5  school relies on data from IES on an ongoing basis as they

6  evaluate curriculum, instructional methods, how to best support

7  and educate students, especially students with disabilities,

8  and in a rapidly changing world, they rely on constantly

9  updated resources from this Institute of Education Sciences,

10  and even any short-term degradation in those resources harms

11  their students at least to learning loss, and once students

12  fall behind, it becomes harder and harder for them to catch up.

13      Second, your Honor, I'd like to just briefly describe

14  the relief that the Somerville Plaintiffs are seeking.  We are

15  only challenging the Mass Termination order of March 11 and we

16  are seeking straightforward relief here.  We are seeking a

17  preliminary injunction, a restoring of the status quo to prior

18  to the illegal March 11 Mass Termination order, reinstating the

19  employees that were fired through that Mass Termination order.

20  We are not seeking any kind of order requiring the Department

21  to hire different or new employees and we're not precluding any

22  further RIFs that happen pursuant to the law.

23      Third, your Honor, I'd like to just very briefly talk

24  about channeling, which, again, my colleagues and the states

25  spoke about as well.  The key inquiry for channeling is whether

1    Congress impliedly intended this type of claim to be channeled.

2    Congress created and administrative review scheme where the

3    MSPB can hear claims brought by federal employees about

4    personnel actions, and the FLRA can hear claims about labor

5    management issues brought by employees, agencies and the

6    federal sector unions representing those employees.

7          This case does not involve any of those types of

8    claims or those types of plaintiffs.  We represent school

9    districts, and we represent unions of teachers and support

10   staff in schools.  We do not represent any federal employees or

11   any unions representing any federal employees at the

12   Department.  Our claims are simply not about any of those

13   issues whatsoever.  In contrast, the Administrative Procedure

14   Act explicitly makes this type of final agency actions

15   reviewable by a federal court.

16         Finally, your Honor, I would just briefly like to talk

17   about the Administrative Procedure Act and the arbitrary and

18   capricious standard.  Your Honor asked about whether -- asked

19   my colleagues and the states about whether a reorganization is

20   authorized and my colleagues and the states explain the

21   statutory limitations on the Secretary's reorganization

22   authority.  We, of course, agree with that, and in addition

23   would add the Secretary's decision-making, like all government

24   decision-making, is always constrained by the Administrative

25   Procedure Act requirement that it not be arbitrary and

1  capricious.  Any final agency action needs to be reasoned

2  decision-making.  This is simply a core requirement of a

3  functional government in compliance with the law.

4       Here, the record is unrebutted that they did not

5  engage in the kind of reasoned decision-making when they

6  undertook the Mass Termination order that they are required to

7  do by law.  There is no analysis of what work needs to continue

8  to meet the Department statutory obligations.  There was no

9  consideration about how to transfer work from the staff who

10  were fired to the remaining staff.  There was no consideration

11  of the reliance interests of all of the many people across the

12  country that rely on the Department including the states,

13  including schools, including teachers, including parents,

14  including students.

15       And importantly, the reason for the Mass Termination

16  that they present in litigation of streamlining is not the real

17  reason because it's not the reason that the Secretary presented

18  in her order announcing the Mass Termination order where she

19  described the reason as the first step towards closing the

20  Department.  A government agency is obligated to provide the

21  genuine justification for its action.  When it fails to do so,

22  it fails to meet the reasoned decision-making requirement.

23       With that, your Honor, I will reserve the remainder of

24  my time unless you have any questions.

25       THE COURT:  So with regard to the Union Plaintiffs, if

1   you could make your best case for your irreparable harm.  It

2   seems to me the municipalities have a stronger argument here.

3   There is a more direct line between the reduction in force and

4   harm.  If you can make your best case on behalf of the unions.

5          MS. HOMER:  There is -- of course, your Honor.  There

6   is two types of irreparable harm that the Union Plaintiffs are

7   experiencing and that their members are experiencing.  The

8   first is that the Union Plaintiffs, their jobs, are dependent

9   on the funding that the Department of Education provides.  As

10  we have noted in our declarations, and I would be happy to

11  provide you with the citations later, the Union Plaintiffs

12  depend -- their jobs are dependent on Title I funding and IDEA

13  funding, and for Title I in particular, schools need to

14  identify how many jobs, how many educator jobs are dependent on

15  that funding.  So we have in the record the exact number of

16  jobs, of educator jobs, that are dependent on that funding.  So

17  any delays or disruptions in those funding streams directly

18  affect job loss, and there is case law that we have cited in

19  our brief that job loss and the attended loss of health

20  insurance that comes with job loss is irreparable harm.

21         In addition, the unions themselves, not just on behalf

22  of their members, they rely on the resources provided by the

23  Department of Education for things like teacher training and

24  for things like advising their members on options for student

25  loans and for grants to attend higher education and for

1  repayment for student loans.

2      So the degradation in the resources that Federal

3  Student Aid is able to provide harms union members as well as

4  the unions themselves.

5      THE COURT:  Thank you.

6      MS. HOMER:  Thank you, your Honor.

7      MR. HAMILTON:  Good afternoon, your Honor.  This Court

8  should deny Plaintiffs' motion for a preliminary injunction.

9  President Trump campaigned and was elected on a promise to

10 improve education in the United States by returning control of

11 our schools to state and local decision-makers, those who are

12 closest to the children in the United States.  His

13 administration has made it a legislative priority to close the

14 Department of Education, but that's distinct from his

15 administrative agenda to cut bureaucratic bloat wherever it

16 exists.  That's a mandate that applies equally to the

17 Department of Education and other agencies in the Federal

18 Government.

19     The Department of Education is one of the newest

20 agencies in the Federal Government established in 1979.  Over

21 the years, previous administrations under previous Presidents

22 have expanded the Department of Education beyond its statutory

23 minimum.  The trump Administration is going in a different

24 direction, and last month the Department issued a press release

25 announcing progress on its goals of streamlining the Department

1   of Education.  That press release is addressed to no one.  It's

2   signed by no one.  It is not a Mass Termination order as the

3   Plaintiffs allege.  Instead, it announces that some employees

4   in the Department of Education chose to accept early retirement

5   offers, other employees chose to participate in a voluntary

6   resignation program, and other employees had their positions

7   eliminated in a reduction in force.

8           Plaintiffs want to reverse all of that and take the

9   Department of Education back to what it looked like under our

10  previous President.  Their claims are fundamentally flawed, and

11  their motions for a preliminary injunction satisfy none of the

12  four *Winter* factors for that remedy.

13          I will start with likelihood of success on the merits.

14          THE COURT:  So before you get there, I just want some

15  clarification on what you meant by or I should say what

16  President Trump meant by when he said he is going to return

17  education to the states?  What does that mean in terms of what

18  he is doing now with the Department?

19          MR. HAMILTON:  Well, it means -- I think it's focusing

20  on the legislative agenda of closing the Department of

21  Education and giving states and local authorities more control

22  over decision-making and so that there is less interference

23  from Washington bureaucrats in the Department of Education, but

24  again that's distinct from the administrative agenda of making

25  the Department of Education as efficient as it can be, but we

1   don't even get to issues with what is going on in the

2   Department of Education because, you know, the questions about

3   that, because the Plaintiffs can't even satisfy the state

4   standing or standing for the Somerville Plaintiffs.

5         I want to start by --

6         THE COURT:  Sorry to interrupt again.  When you say

7   legislative agenda, where in the record can I find support that

8   the administration is working on a legislative agenda?

9         MR. HAMILTON:  I think the State Plaintiffs have

10   attached a number of statements by the President and Secretary

11   McMahon that talk about the goal of closing the Department of

12   Education.  Defendants acknowledge that that requires an act of

13   Congress, our brief says that, and the work that the Defendants

14   are doing to make the Department of Education more efficient

15   today is separate from that legislative goal.

16         THE COURT:  So when you say there is no agenda, you're

17   basically saying we acknowledge that it has to be an act of

18   Congress to abolish the Department, that's what you're saying,

19   it's not an agenda?

20         MR. HAMILTON:  Exactly.  It's a legislative proposal.

21         Returning to standing, I will start with a case that

22   was decided right about the same time we filed our brief.

23   That's the U.S. Supreme Court's decision in *OPM v. AFGE*.  This

24   was on the U.S. Supreme Court's emergency docket.  It was

25   decided on April 8, and the theory of the case that the

1  Plaintiffs proceeded on there is quite similar to the case

2  here.  There, a group of entities and organizations that had

3  relationships with different federal agencies sought the

4  reversal of the termination of probationary employees in

5  various agencies, and their theory for relief was downstream

6  injuries.  For example, they alleged that the termination of

7  probationary employees in the Department of Veterans Affairs

8  would delay mental health services, they alleged that the

9  termination of probationary employees in the Bureau of Land

10  Management would affect their access to outdoor spaces, and the

11  U.S. Supreme Court in an order on its emergency docket held

12  that the Plaintiffs had not made the requisite showing for

13  standing.  The same problem applies to the Plaintiffs' lawsuit

14  here which hang on these downstream injuries that they are

15  speculating could occur in the future.

16      THE COURT:  All of the Plaintiffs or some of the

17  Plaintiffs?

18      MR. HAMILTON:  All of the Plaintiffs, your Honor.  All

19  of the Plaintiffs are alleging that the termination of certain

20  employees, certain employees' acceptance of the voluntary

21  resignation programs is going to have -- it's going to cause

22  this chain of events that will end up having an effect on them.

23      The Plaintiffs aren't seeking, for example, a court

24  order to compel the Department of Education to pay out money

25  under the FSA.  They're instead trying to reverse personnel

1  decisions that the Department of Education has made.

2        I will start with the injury in fact element.

3  Standing injury elements, of course, requires an actual injury

4  or an imminent injury.  There is no actual injury by any of the

5  Plaintiffs.  The State Plaintiffs certainly can't show an

6  actual injury.  Standing is measured at the time a complaint is

7  filed and the state sued on March 13.  The press release that

8  Plaintiffs hold out as a Mass Termination order announces that

9  employees would go on administrative leave starting on March 21

10  after Plaintiffs even filed their complaint.

11        They must instead rely on an imminent injury, but

12  before turning to that, I should address the Somerville

13  Plaintiffs which filed their lawsuit so close in time to that

14  March 21 date that they couldn't possibly allege any actual

15  injury from it, but again, none of the Plaintiffs establish an

16  imminent injury to their -- to themselves.  Under the *Clapper*

17  case, an injury has to be certainly impending.

18        Our brief at Page 10 highlights the language that

19  Plaintiffs use to try to establish an injury in fact and they

20  don't allege any certain impending injury.  Instead they say

21  things like cuts could or may or will likely cause delays.

22  That does not meet the requirements for standing.

23        At bottom, your Honor, the types of lawsuits that

24  Plaintiffs have brought in this lawsuit are very strange and

25  not the way that plaintiffs litigate disputes in federal

1  courts.  They're relying on this downstream injury chain of

2  causation and, again, not alleging specific violations of

3  statutes.  If the Plaintiffs are concerned about funding delays

4  or if they think that data scientists in the Department of

5  Education are not giving them data that they are owed, someone

6  who has standing needs to bring a lawsuit seeking a court order

7  requiring the Department of Education to produce data or pay

8  out money, but that isn't what Plaintiffs are doing here.

9  They're instead seeking a court order, putting themselves as

10  Chief Human Resources Officer for the Department of Education,

11  and trying to restore 1,900 employees into the Department of

12  Education.

13       THE COURT:  I am not sure that that is accurate.  I am

14  just going to push back on that a little bit.  Do you drink

15  coffee?

16       MR. HAMILTON:  I do.

17       THE COURT:  I drink coffee every morning.  I go to

18  Dunkin' Donuts, and when I walk in, there is a person behind

19  the counter.  There is a person making a fresh pot of coffee.

20  If I want a sandwich, there's a person at the sandwich station.

21  I don't think the Plaintiffs are saying that these employees --

22  let's say one morning there is no one there.  I don't think the

23  Plaintiffs are saying that Dunkin' Donuts should hire these

24  three employees back.  I think what they're saying is they want

25  their cup of coffee.

 1          MR. HAMILTON:  I suppose I understood them to say, and

 2     I believe your Honor asked a question to Plaintiffs about this,

 3     and I understood their answer to be that accepting their

 4     arguments would require the Federal Government to reinstate

 5     employees who have been placed on administrative --

 6          THE COURT:  Well, I think that's the effect that for

 7     them to get their cup of coffee, Dunkin' Donuts will need to

 8     hire those employees or some other employees, but the relief

 9     that they're seeking is not that employees be hired but that

10     they want their cup of coffee.  There is a distinction.

11          MR. HAMILTON:  I agree there is a distinction and it's

12     our position that the way they have structured their complaint,

13     the proposed order is not give us a cup of coffee, it is

14     re-hire the barista, and that sort of framing of their lawsuit

15     we don't think is something that they have standing to

16     litigate.  If someone who has actually been denied funding that

17     they are owed, the plaintiff who can make that showing should

18     bring a lawsuit seeking funding, not the re-hiring of an

19     employee who may or may not have worked on that, and that is a

20     separate standing problem.  That's a traceability and

21     addressability problem because the Plaintiffs can't show that

22     the termination of any employee, the placement of someone on

23     administrative leave, would actually change what they are

24     speculating could happen into the future.

25               I will talk about the Evergreen declaration that my

```
 1    friend on the other side noted because I think it illustrates
 2    this.  That declaration talks about how the Department of
 3    Education received an application for recertification from
 4    Evergreen in August of 2024, months before the Department of
 5    Education posted the March 2025 press release, and the
 6    declaration says that in January of 2025 the Department of
 7    Education told Evergreen that its application was under review,
 8    and the Evergreen declaration further says that the Department
 9    of Education continues to provide access to federal financial
10    aid to students.  So we understand the Plaintiffs' complaint to
11    rest on the speculation that into the future something is going
12    to change for Evergreen, not that something has already
13    happened for Evergreen and the other entities involved in
14    Plaintiffs' lawsuit.
15            I also wanted to touch on jurisdiction.  We have
16    argued that Federal District Courts lack jurisdiction over
17    these types of claims because they are precluded by the Civil
18    Service Reform Act.  The only entity by Congress' design that
19    can make that remedy of reinstating an employee, taking an
20    employee off administrative leave, would be the Merit Service
21    Protection Board or the Federal Labor Relations Authority.
22    That's Congress' choice.  They have made it so that those sorts
23    of claims are not justiciable in Federal District Courts and
24    this is something that courts have recognized in recent months
25    as Plaintiffs have brought cases challenging the work that
```

1   officials in the Trump Administration have done to streamline
2   operations in the federal bureaucracy.
3          For example, the recent *Maryland v. USDA* decision of
4   the Fourth Circuit, that case was a challenge to the
5   termination of a number of probationary employees.  The Fourth
6   Circuit there stayed a preliminary injunction entered by the
7   District of Maryland noting the jurisdiction problems with the
8   plaintiff's claim.
9          Here, in the District of Massachusetts, the *AFL-CIO v.*
10  *Ezell* case was a challenge to the fork-in-the-road Deferred
11  Resignation Program.  There the District Court held that the
12  Civil Service Reform Act precluded the sort of relief that the
13  Plaintiffs were seeking.
14         And I will also highlight the *NTEU v. Trump* case from
15  D.D.C.  That also involved an allegation or rather a challenge
16  to the termination of probationary employees in a reduction in
17  force and the District Court held that those sorts of claims
18  were channelled to the -- it was channelled under the Civil
19  Service Reform Act.  Jurisdiction would not be appropriate in a
20  Federal District Court.
21         I also want to touch on the Administrative Procedure
22  Act because there are multiple defects with the Administrative
23  Procedure Act claims that the Plaintiffs have brought.  To
24  start, Plaintiffs haven't challenged any final agency actions.
25  That's a requirement for every claim under the Administrative

1　Procedure Act.  They claim to be challenging a Mass Termination

2　order, but, again, that Mass Termination order is just a press

3　release.  It is not addressed to anyone, signed by anyone.  It

4　doesn't order anything.

5　　　　　THE COURT:  So this is the second time you have said

6　that about press releases.  So how should I take those public

7　statements?  As nothing?

8　　　　　MR. HAMILTON:  No.  I think they can be accepted for

9　what they are which is statements about the work that the

10　Department of Education is doing.  I think the problem that the

11　Plaintiffs are having is that a decision to put out a press

12　release isn't the same as agency action subject to review under

13　the APA.  The problem is also one of discreteness because

14　agency action has to be discrete, and what that press release

15　is doing is it is describing multiple decisions and actions and

16　determinations that have been made within the Department of

17　Education since the Trump Administration transitioned.

18　　　　　For example, there is a discussion of the offer of

19　Deferred Resignation Program participation.  The press release

20　notes that some employees chose to accept early retirement

21　offers.  It talks about the elimination of roles.  The

22　reassignment of tasks would be necessarily involved in that, as

23　would be the redirection of priorities and exercises of

24　enforcement discretion.  Now, to be clear, not all of that is

25　discussed in the press release, but that sort of multiplicity

1   of agency decision-making is implicit in what that press

2   release was announcing which is progress in the Trump

3   Administration's promise to the American people to make the

4   Department of Education as efficient and streamlined as it can

5   possibly be consistent with the statutory obligations that

6   Congress has placed on the Department of Education.

7           I want to highlight a case cited in our brief, the

8   *Lujan v. Natural Wildlife* case, which says that an ongoing

9   program or policy is not in itself a final agency action.

10  That's exactly the sort of impermissible APA challenge that the

11  Plaintiffs are seeking to bring here.

12          THE COURT:  Before you turn to something else, I just

13  want to explore this a little bit.  Usually when somebody says

14  they're going to do something and then they start taking

15  actions to accomplish what they said they were going to do, I

16  can take meaning from that to say they're going to do exactly

17  what they said they're going to do, right, normally?

18          So there has been public statements, multiple public

19  statements from President Trump, for example, that he is going

20  to close the Department.  He told the Secretary that she should

21  I think his words were something like "put herself out of a

22  job" and then she herself has said that her final mission is to

23  close the Department, and I believe there is more than press

24  releases here.  I think there was an actual Department memo

25  directing the reduction in force.

1      So why shouldn't I take from all of that that there

2  was final agency action, the memo, and now this is simply an

3  implementation of that final decision?

4      MR. HAMILTON:  Well, a few points, your Honor.  The

5  references to closing the Department of Education are

6  references to working with Congress to enact the laws that

7  would be needed to do that and our brief says that, and I'd

8  also highlight the March 20th executive order.  It's an

9  executive order that postdated the March 11th press release

10  that Plaintiffs are calling a Mass Termination order, but that

11  March 20th executive order talks about closing the Department

12  of Education, but in talking about returning authority to the

13  states, it tells the Department of Education's Secretary,

14  Secretary McMahon, to only do so to the maximum extent

15  appropriate and permitted by law and to "ensure the effective

16  and uninterrupted delivery of services."

17      So the Department is committed to carrying out its

18  statutory obligations until there is an act of Congress that

19  changes the Department's statutory obligations.

20      THE COURT:  So if I understood the Plaintiffs

21  correctly, they would respond in two ways to that:  One, which

22  is that the Department says that it is fully committed to

23  ensuring that the Department carries out its function but in

24  reality they're incapable of doing that; and the second thing

25  is it's kind of like when my kids were teenagers and they would

1  throw a party at the house and say, to the extent that my

2  parents give me permission to, I am throwing this party.  It

3  doesn't excuse having thrown the party.  They never got

4  permission, but by including that verbiage, it's almost like to

5  the extent that Congress has authorized, but there is nothing

6  in the record that shows that Congress has authorized the

7  closure of the Department.  There is nothing in the record to

8  show that the administration is working with Congress to close

9  down the Department, right?

10        MR. HAMILTON:  I mean, I don't think that the

11  legislative work that, you know, the Trump Administration -- I

12  don't think its legislative priorities really fit into

13  Plaintiffs' claims.  Our brief comes out and acknowledges that

14  the Department of Education is not closed and it is not closing

15  absent an act of Congress.  So I don't think that we could be

16  clearer on our position on that.  Instead, what is happening in

17  the Department of Education is that, like other agencies in the

18  Federal Government, the agency is streamlining itself and

19  making it the most efficient version of itself it can be until

20  Congress acts and decides what to do on President Trump's

21  legislative priorities with respect to the Department of

22  Education.

23        I will touch on the other elements under the *Winter*

24  test and I will start with irreparable harm which is also not

25  satisfied by the Plaintiffs for all of the reasons that they

1    also lack standing.  The balance of the equities and public

2    interest elements also disfavor a preliminary injunction.  On

3    the one hand the Plaintiffs have brought this, again,

4    enormously unusual lawsuit based on speculative downstream

5    harms that they claim may befall them, but on the other hand is

6    the enormous expense to the Federal Government of having to

7    reinstate 1,900 employees at the Plaintiffs' urging.

8           In addition, it would be enormously disruptive to the

9    Executive Branch's management of the federal workforce for

10   Plaintiffs' claims to succeed and for Plaintiffs to place the

11   District Court in the role of superintending the Department of

12   Education's decision-making with respect to human resources,

13   and it would also be enormously disruptive in particular to the

14   572 employees described in the March press release as having

15   made a decision to accept an early retirement offer or to have

16   chosen to participate in the voluntary resignation program.

17          Finally, your Honor, I would just note that if the

18   Court does enter preliminary injunctive relief, we have argued

19   that a bond should be required of the Plaintiffs, and under

20   Rule 65 that bond must reflect the enormous expense that

21   injunctive relief would place on the Federal Government, and in

22   addition, we request a stay pending any appeal authorized by

23   the Solicitor General.

24          If the Court has no further questions, we'd ask that

25   the Court would deny the Plaintiffs' motions for a preliminary

 1  injunction.

 2          THE COURT:  Thank you.

 3          MR. HAMILTON:  Thank you, your Honor.

 4          MS. MUQADDAM:  I'd just like to touch on five points,

 5  but briefly first, I think our brief is quite clear that we are

 6  not seeking relief as to those who took the voluntary buyouts,

 7  only those who were terminated through the RIF or effectuated

 8  through that termination, so not the people who took the

 9  fork-in-the-road offer, for example, only those that were

10  RIF'ed, and that their terminations were effectuated through

11  that particular action on March 11.

12          So to the first point, I would bring the Court back to

13  the record.  Defendants have described the situation as very

14  strange, unusual, and that is exactly right.  It has never

15  happened before this year that the Federal Government has

16  attempted to fire so many people out of an executive agency

17  that it can no longer function.  The dismantling of the

18  Department of Education is unfortunately not the only instance

19  we have seen of that thus far in this administration, but

20  Plaintiffs are unaware of another example in the past when

21  something like this has actually occurred.  In fact, Presidents

22  in previous administrations have taken action to try and

23  persuade Congress to eliminate the Department of Education and

24  they have failed.  So this is strange, and the record is in

25  fact extremely unusual, but that record is a voluminous

1  testament to how the Department can no longer do what it does.

2  It does not have the resources to maintain compliance with

3  Title II or Title IV.  It cannot operate sufficient procedures

4  to protect student borrowers.  It cannot get the data it needs

5  to award Formula Title I and IDEA funding.

6  And so Defendants have said, and the President and

7  Secretary McMahon have articulated, that they would like to

8  close the Department, and the reality is that's exactly what

9  happened, and those declarations have not been rebutted.  If

10  Defendants had evidence that the Department was able to meet

11  the mandates that Plaintiffs have explained cannot be met, they

12  have not done so.

13  So I'd like to touch on the cases that Defendants

14  pointed to as supposedly analogous to the situation.  Defendant

15  cited a case about *OPM* probationary employees, the *USDA* case in

16  Maryland, and the *AFL-CIO* case.  So all of those are quite

17  different from the situation here.  For one, the courts

18  determined that there was not the same kind of direct harm that

19  we have here and also they are cases about the procedures that

20  were used to terminate employees.  So those cases involved

21  arguments about whether, for example, the RIF had been

22  procedurally correct.  A RIF requires a number of things

23  including notice to states about procedures about protective

24  areas.  So those cases touched on those questions.

25  Here, Plaintiffs are not bringing a challenge to how

1  the Department engaged in the RIF.  The arguments here are that

2  the particular actions, the terminations effectuated through

3  the March 11 RIF, not the acceptance of voluntary buyouts that

4  are also described in the memo and the March 21 directive to

5  transfer functions, those things have caused the Department to

6  be unable to provide direct services to the states, and so

7  there is no attenuation, and the harm is already occurring and

8  it will continue to get worse, especially once the RIF is fully

9  complete, but most of the harms have already manifested and

10  that's because the employees have been on administrative leave

11  since March 21.          And just to use the Evergreen example

12  that Defendants touched on.  That school needs its

13  certification to operate.  The people who could provide that

14  certification no longer exist in the Department.  So that is a

15  current harm that is also an irreparable harm and one that is

16  not going to get better.

17          So I wanted to touch on the scope of the relief here.

18  There were a few questions about reinstatement, and again,

19  Plaintiffs are not seeking to prevent the Department from

20  engaging in a RIF.  The Department can engage in a reasoned

21  decision-making process that results in the termination of

22  employees consistent with law.  Here, the restatement of the

23  RIF employees is necessary for the Department to continue to

24  function, and I think, as some of your questions got at, your

25  Honor, those employees as yet have not been finally terminated.

1  They are not fully terminated until the expiration of the RIF

2  period.

3          So what we're asking for is really just a return to

4  the status quo.  So reinstate these employees.  We are not

5  saying that the Department needs to keep particular employees.

6  The Department can engage in lawful efforts to terminate

7  employees.  It could hire new employees.  It can do all of

8  those things, but in order to return to the status quo here,

9  which we think is justified by the irreparable harm, both

10  actual and imminent, is necessary to do that.

11          So third, I'd like to touch on final agency action.

12  So I think it's worth thinking about how different *Lujan* is to

13  the situation.  In *Lujan*, Plaintiffs brought basically what was

14  described as a programatic challenge but the challenge was to

15  the way in which the Bureau of Land Management operated an

16  entire program.  So there were arguments that they were acting

17  unlawfully in a lot of different ways.  Perhaps they were

18  approving permits that might have been unlawful.  They were

19  maintaining the land in a way that Plaintiffs objected to.

20  Here, it's not that we're challenging a whole slew of different

21  actions that are all subject to discretion.  We're challenging

22  two particular administrative actions that have had concrete

23  and immediate effects.  So the RIF is one action that

24  immediately terminated over 1,000 employees, that is one

25  action, and then the implementation of the March 21 directive

1  is also a singular action.

2      And I just want to touch on that March 21 directive as

3  well because I think that's been less developed certainly in

4  Defendants' brief.  So that directive, which Secretary McMahon

5  has indicated she plans to implement, would remove FSA entirely

6  to the SBA which on the same day that this directive was

7  announced experienced a 40 percent RIF.  The SBA was also a

8  relatively small organization.  SBA has no experience or

9  qualification to administer this incredibly complex and

10  incredibly essential program, and so what declarants have said

11  in the record is that if that happens, it's already

12  catastrophic enough that FSA is not functioning, and if that

13  happens, FSA would basically fall apart entirely.

14      And then secondly, the directive to move what the

15  President described as special needs out of the Department and

16  into HHS, also completely unexplained, and HHS is similarly

17  unqualified and has no relative experience in administering

18  those incredibly essential programs.

19      And I think just to touch on the savings clause point,

20  I think for one, Plaintiffs are not seeking to preliminarily

21  enjoin implementation of the EO.  So any savings clause

22  language in that order is irrelevant, but I think your Honor

23  pointed to something which is that an action cannot be held to

24  destroy itself through a savings clause, and the court and many

25  circuit courts have explained this.  So it may say something

1  like what the directive in these instances says is we are going

2  to eliminate the staff necessary to comply with our statutory

3  mandate.  If they include something at the end that says

4  consists with applicable law, that actually cannot rescue this

5  from the reality of this situation.

6          And on the topic of the bond, I think imposing a bond

7  would be extremely unusual.  For one, this is a case relating

8  to an important matter of public concern so that's unusual to

9  begin with, and also Defendants are asserting that they will

10  have to expend money to comply with the relief that we have

11  asked for, but to be clear, Congress has appropriated funds for

12  the government to administer to meet its statutory mandates.

13  So there is no injury to the state from being pressed to merely

14  expend the money including our salaries and other things to

15  comply with that statutory mandate.  So we would ask that bond

16  is not imposed.

17          THE COURT:  All right, thank you.  I just have one

18  question for Mr. Hyman.  I'm sorry, not Mr. Hyman.  Mr. Homer.

19  My apologies.

20          MS. HOMER:  I'm Ms. Homer, your Honor.

21          THE COURT:  I've got it all wrong.  I'm sorry, you

22  were again?

23          MR. HAMILTON:  My name is Eric Hamilton.

24          THE COURT:  Hamilton, Mr. Hamilton.  I guess as I was

25  listening to both of you, it wasn't clear in my mind as to

1  whether or not the Defendants are claiming that the President

2  was acting under some statutory authority or are you claiming

3  that the President is acting in some inherent powers under

4  Article II?

5      MR. HAMILTON:  It would be inherent authority under

6  Article II supervising the Secretary of Education.  That would

7  be the authority for the executive order that he issued, but

8  again, that executive order postdated the press release that

9  Plaintiffs are saying is a Mass Termination order that is

10 subject to the Court's review.

11     THE COURT:  Sure, but that leads me to a second

12 question because I think you alluded to this earlier about the

13 time of the complaint.  You're not suggesting that whatever

14 concrete harm comes, let's say even after today, that I cannot

15 consider that?

16     MR. HAMILTON:  Well, I think the Plaintiffs would have

17 to amend their complaint if they want to challenge some other

18 administrative action, and actually, the States Plaintiffs'

19 challenge to what they're calling this transfer of function

20 order fits that description.  They're saying that a statement

21 that the President made to the press on March 21 is some sort

22 of a transfer order and that also postdates the filing of their

23 complaint.  They haven't amended their complaint.  There is no

24 mention of that obviously in the complaint since it didn't

25 exist and so the Court -- we don't think it's part of the case

1  or something that the Court can review barring an amendment to

2  the complaint, and as Plaintiffs appear to acknowledge, my

3  friend on the other side was speaking in terms of the future,

4  the transfer of any -- you know, the functions that the

5  Plaintiffs are talking about being transferred to the Small

6  Business Association and the Department of Health and Human

7  Services has not happened.

8       THE COURT:  All right.  Thank you very much.  I will

9  take this under advisement -- I'm sorry, do you want to speak?

10      MS. HOMER:  If your Honor doesn't mind, I just have a

11  few very quick points.

12      THE COURT:  Sure.

13      MS. HOMER:  First, I would like to just clarify that

14  the only relief we are seeking is about the Mass Termination

15  order on March 11.  It does not include the employees who were

16  voluntary separated, that 579.

17      Second, opposing counsel appears to be arguing that

18  this Court is not empowered to consider under the APA, the

19  claim that the Mass Termination order is arbitrary and

20  capricious or violates the APA in a variety of other ways that

21  we have articulated, and we would just like to point your Honor

22  to two cases that might be helpful on this.  The first is the

23  *Widakuswara* case that was submitted through a 28(j) letter two

24  days ago.  The second is the *NTEU v. Trump* case that we cite,

25  not the *NTEU v. Trump* case that they cite, both of which have a

1   helpful explanation about how gutting an agency whether through

2   firing all employees or taking some other actions that that

3   itself can be a violation of the APA and is not merely a matter

4   of RIFs or some other narrower consideration.  Thank you, your

5   Honor.

6          THE COURT:  Thank you, and sorry about the name mixup.

7   We will stand in recess.

8          MS. MUQADDAM:  Your Honor, could I respond to one

9   thing?

10         THE COURT:  Do want to file something?

11         MS. MUQADDAM:  We could.  It's just a very short

12  thing.

13         THE COURT:  All right, sure.

14         MS. MUQADDAM:  I just wanted to respond to the point

15  about amending the complaint.  So our complaint does extend to

16  Presidential direction to dismantle the Department, and we

17  think that the scope of the complaint well includes both the

18  RIF and implementation of the directive.

19         THE COURT:  Yes, I will go back to the complaint, but

20  I think to Mr. Hamilton's point, you know, I can only provide

21  relief that's sought in the complaint.

22         MS. MUQADDAM:  We think it covers that.

23         THE COURT:  All right, great.  All right, thank you

24  very much.

25                    **(A-D-J-O-U-R-N-E-D)**

1

2                      - - - - - - - - - - -

3                            CERTIFICATION

4          I certify that the foregoing is a correct transcript

5    of the record of proceedings in the above-entitled matter to

6    the best of my skill and ability.

7

8

9

10   /s/Jamie K. Halpin_____        April 27, 2025_____
     Jamie K. Halpin, CRR, RMR, RPR          Date
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25